1   DANIEL M. PETROCELLI (S.B. #97802)
    dpetrocelli@omm.com
2   O'MELVENY & MYERS LLP
    1999 Avenue of the Stars, Suite 800
3   Los Angeles, California 90067-6035
    Telephone:    +1 310 553 6700
4   Facsimile:    +1 310 246 6779

5
    JEFFREY L. FISHER (S.B. #256040)
6   jfisher@omm.com
    O'MELVENY & MYERS LLP
7   2765 Sand Hill Road
    Menlo Park, CA 94025
8   Telephone:    +1 650 473 2600
    Facsimile:    +1 650 473 2601
9
10  JONATHAN D. HACKER (*pro hac vice forthcoming*)
    jhacker@omm.com
11  O'MELVENY & MYERS LLP
    1625 Eye Street, N.W.
12  Washington, DC 20006
    Telephone:    +1 202 383 5300
13  Facsimile:    +1 202 383 5414

14  *Attorneys for Plaintiff TikTok Inc.*

15

16                  **UNITED STATES DISTRICT COURT**

17               **NORTHERN DISTRICT OF CALIFORNIA**

18
    TIKTOK INC.,                          Case No. _____
19
                           Plaintiff,     **COMPLAINT FOR DECLARATORY**
20                                         **AND INJUNCTIVE RELIEF**
                  v.
21
    ROB BONTA, in his official capacity as
22  Attorney General of California,

23                         Defendant.

24

25

26

27

28

**INTRODUCTION**

1.      The TikTok platform is where people discover things they love, build communities, and express themselves.[1]  What those things are and what those communities may be varies by individual, but at its core, the platform's mission is always "to inspire creativity and bring joy."[2]  Like many providers of online platforms, Plaintiff TikTok Inc. ("TikTok") provides a platform where people can share content with each other on topics "as diverse as human thought."  *Reno v. ACLU*, 521 U.S. 844, 870 (1997).  Unlike many platforms, which focus on individuals' interactions with friends and family, the TikTok platform is focused on curating and promoting content made by creators with whom a person may have no pre-existing relationship. In keeping with its mission, the TikTok platform allows people to engage with ideas, pursue their passions, and find their digital communities.

2.      Critical to the TikTok experience is TikTok's ability to curate the third-party content it shows people on the platform in a way that reflects both TikTok's editorial judgments and individuals' content preferences.  The TikTok platform is one of the most widely used online entertainment platforms in the United States, with more than 170 million monthly users in the United States and 1 billion users worldwide.  With millions of people on the platform come massive volumes of content.  In 2025 alone, people on the TikTok platform in the United States uploaded more than 7 billion videos, which were viewed more than 17 trillion times in the United States and abroad.  No single person could possibly sift through all of that content, much less identify content that they would enjoy.

3.      So TikTok curates that content for them.  When a person opens the TikTok app, they are shown the For You feed, a collection of videos assembled by the platform and specifically chosen for each individual person.  Videos recommended in the For You feed are the result of countless expressive choices made by TikTok, all centered on publishing interesting, informative, enjoyable, and relevant content.  That compilation is more than the sum of its individual parts.  As the Supreme Court recently recognized, "[d]eciding on the third-party speech

---

[1] "The TikTok platform" refers to the TikTok platform in the United States.

[2] TikTok, *About*, https://www.tiktok.com/about?lang=en (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own.  And that activity results in a distinctive expressive product" that is protected by the First Amendment.  *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024).  The State can no more dictate how platforms make such editorial decisions than it can tell a newspaper which articles to present or how to present them.

4.    California's Protecting Our Kids from Social Media Addiction Act does exactly that.  Purportedly addressing concerns about how much time minors spend on social media platforms, the Act assumes that all personalized feeds—that is, feeds keyed to a person's previously expressed preferences—are "addictive."  *See* Cal. Health & Safety Code § 27000.5(a).  Based on that assumption, the Act's "personalized-feed provisions" forbid social media platforms—but not other digital or other media, such as Netflix or the New York Times—from allowing minors to access personalized feeds absent verifiable parental consent.  *See id.* §§ 27001(a), 27002(b)(2), 27002(b)(4).  And although the Act recognizes that "[s]ocial media provides an important tool for communication and information sharing," this prohibition applies to all users who register as under the age of 18 and all content, regardless of its educational, political, or entertainment value.  That, as free speech groups noted in opposing the law, cannot be squared with the Constitution.

5.    While the particular provisions of the Act may be new, the impetus behind it—and the need for courts to reaffirm constitutional limits—are not.  Beginning with "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music lyrics," or "video games," states have tried time and time again to regulate new forms of expression based on concerns about harm to minors, and courts have time and time again struck those regulations down when, as they often do, they conflict with the First Amendment.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011).  In so doing, courts have recognized both that minors "are entitled to a significant measure of First Amendment protection" and that states lack "a free-floating power to restrict the ideas to which children may be exposed."  *Id.* at 794 (cleaned up).  Those protections apply with particular force when laws impeding minors' access to speech may also affect adults' access to

COMPLAINT
Case No. _____

speech. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004).

6.     Applying those constitutional rules of the road, courts throughout the country have enjoined similar laws restricting minors' access to online speech in the name of minor safety. *See, e.g.*, *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025) (permanently enjoining parental-consent law), *appeal docketed*, No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) (permanently enjoining age-verification and parental-consent law); *NetChoice, LLC v. Fitch*, 787 F. Supp. 3d 262 (S.D. Miss. 2025) (preliminarily enjoining age-verification and parental-consent law), *appeal docketed*, No. 25-60348 (5th Cir. June 26, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (enjoining age-assurance, parental-consent, and notifications-limiting law), *appeal docketed sub nom. NetChoice v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

7.     In previous rulings, the Ninth Circuit and this Court have already properly enjoined other portions of the Act because they likely violate the First Amendment.  *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1025 (9th Cir. 2025) ("*NetChoice II*") (enjoining like-count default setting); *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1232 (N.D. Cal. 2024) ("*NetChoice I*") (enjoining notification and disclosure requirements), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025).  While this Court and the Ninth Circuit declined to uphold facial and as-applied challenges at the preliminary-injunction stage based on the limited factual record before them about how personalized feeds function company by company, no court has yet determined whether the Act's personalized-feed provisions are unconstitutional as applied to any particular online platform.

8.     This Court should do so now because the personalized-feed provisions are plainly unconstitutional as applied to TikTok.  By conditioning teens' ability to access any personalized feeds on verifiable parental consent, and by prohibiting TikTok, absent such consent, from considering teens' expressed preferences or other information provided by them or associated with their devices when curating content, the personalized-feed provisions regulate the content of free expression, discriminate among similarly situated speakers, and impose unconstitutional

burdens on First Amendment-protected activity by TikTok and the people on its platform.  *Cf. Warth v. Seldin*, 422 U.S. 490, 501 (1975) (plaintiff with standing to assert own constitutional rights can seek relief on basis of legal rights and interests of others); *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, No. 4:24-CV-438, --- F.Supp.3d ---, 2025 WL 1570007, at *9 (N.D. Fla. June 3, 2025) (citing *Warth* for similar proposition).

9.     Specifically, the Act burdens TikTok's and individuals' expressive interests by fundamentally altering how TikTok interacts with people on the platform and vice versa.  If forced to exclude teens' own interests and information, TikTok would be limited to showing content that, while popular, may be of no interest to the individual person.  That privileges popular views over unpopular ones, and lets minority viewpoints be potentially drowned out.  It also fundamentally alters the TikTok experience.  Part of what makes TikTok TikTok is that it introduces people to content that it believes will interest them by creators to whom the person may have no pre-existing social connection.  A seventeen-year-old who goes to TikTok to learn new things, encounter new communities, and find new voices will be deprived of the primary way TikTok facilitates that discovery, unless and until he or she gets parental consent to do so.  That, simply put, is unconstitutional.

10.    Strict scrutiny applies to the Act's content- and speaker-based restrictions on speech, but the personalized-feed provisions cannot survive any level of First Amendment scrutiny.  TikTok recognizes and shares the State's interest in protecting minors, but that general interest does not support the particular prohibitions here.  Indeed, even if it did, there are less restrictive (and more direct) means of achieving that goal, including existing features on the TikTok platform.  Features like Family Pairing already allow parents to supervise teens' use of the platform, including how much time they spend on it, what they can see, how they can engage with it, and who they interact with on it.

11.    The personalized-feed provisions also fail because they are simultaneously overinclusive (they restrict access to all personalized-feed content, not only potentially harmful content, and apply the same standards to thirteen-year-olds and seventeen-year-olds) and

COMPLAINT
Case No. _____

1  underinclusive (they allow access to personalized feeds on other media, like Netflix and the news,

2  and on social media itself so long as one parent approves).

3  12.    The Act flatly bans TikTok from disseminating certain editorial content—

4  personalized feeds—to teens absent consent.  That content-based prohibition nevertheless does

5  not rest on a claim that any particular content in a personalized feed is, standing alone, obscene or

6  otherwise harmful to minors.  Instead, the law, by default, bars TikTok from communicating the

7  specific message it wants to communicate (a personalized feed) to its intended audience (the

8  person for which the feed was specifically curated and created).  And the fact that a parent can

9  consent to personalized feeds does not cure the constitutional problem.  Although the government

10  may, of course, protect parental rights, "it does not follow that the state has the power to prevent

11  children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S.

12  at 795 n.3 (emphasis omitted).

13  13.    For these reasons and more, this Court should declare Sections 27001(a),

14  27002(b)(2), and 27002(b)(4) of the Act unconstitutional as applied to TikTok and enjoin the

15  Attorney General of California from enforcing the challenged provisions against TikTok.  And

16  although other provisions of the Act were already enjoined from enforcement in *NetChoice v.*

17  *Bonta*, to ensure clarity, the Court should also confirm that those provisions violate the First

18  Amendment as applied to TikTok and thus cannot be enforced against it.  *NetChoice I*, 761 F.

19  Supp. 3d at 1232 (enjoining enforcement of Cal. Health & Safety Code §§ 27002(a), 27002(b)(1),

20  and 27005 [restrictions on sending minors notifications and requirement that companies annually

21  disclose number of minors that user service]); *NetChoice II*, 152 F.4th at 1025 (enjoining

22  enforcement of Cal. Health & Safety Code § 27002(b)(3) [like-count default setting]).

23  **PARTIES**

24  14.    Plaintiff TikTok Inc. is a California corporation with its principal place of business

25  in Culver City, California.  TikTok Inc. provides the TikTok platform in the United States.

26  15.    Defendant Rob Bonta is the Attorney General of the State of California and is

27  named in his official capacity.   The Act grants the California Attorney General exclusive

28

5

1    authority to enforce its provisions.  § 27006(a).

2                        **JURISDICTION AND VENUE**

3        16.    This Court has personal jurisdiction over Defendant acting in his official capacity

4    because it has personal jurisdiction over the State, and Defendant performs his duties as

5    California Attorney General in this State.

6        17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

7    1343(a).  This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983,

8    injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

9        18.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1).  Defendant has

10   offices in and performs his duties as California Attorney General in this District, and thus resides

11   there.

12                         **FACTUAL BACKGROUND**

13       19.    The TikTok platform enables people to discover, create, share, and view content.

14   People on the TikTok platform can experience content on topics ranging from philosophy to

15   fashion, talk about that content with other people on the platform, and find others who share their

16   interests.  TikTok seeks to brings its mission to "inspire creativity and bring joy" to life through

17   the services it provides, the content it cultivates and recommends, the communities it creates, and

18   the Community Guidelines it uses to keep the TikTok platform a safe and positive experience.

19       20.    People on the TikTok platform primarily engage with it by creating and sharing

20   videos, as well as watching and interacting with videos recommended to them by the platform.

21   Although other platforms also allow people to post and share videos, the TikTok platform differs

22   in an important respect:  The TikTok experience is centered on discovering new content.  The

23   TikTok platform is designed to curate and promote content made by creators that a person has no

24   pre-existing relationship with, based on individuals' personal preferences and TikTok**'s** editorial

25   choices about the content it thinks people might enjoy.

26       21.    The TikTok platform thus places an enormous array of content at people's

27   fingertips.  To take just a few examples, the platform might recommend videos to a person that

28

COMPLAINT
Case No. _____

feature celebrities like the Rock, provide reviews of the latest music release from pop stars like Sabrina Carpenter, or allow the individual to keep up with some of the world's most popular sports teams like FC Barcelona. The platform also recommends videos that allow people to see the latest updates on current events from major news organizations like CNN, or learn new things from educational accounts like the Carnegie Mellon Museum of Natural History. Not all of these options will be of equal (or indeed any) interest to everyone.

22.    TikTok's ability to personalize experiences on the platform is what makes such a wide range of content accessible, enjoyable, and appropriate. Through the various systems and processes TikTok has to review and recommend content, TikTok accounts for indicators that a person might find a particular video informative or interesting and can find content that a particular individual wants to watch and that it wants to show to that person, even among the billions of videos that get posted to the platform every year.

23.    That process allows people to both watch content that they might have sought out on their own and discover content they would otherwise never find. For example, if a person tends to watch chemistry-related videos posted by Encyclopedia Britannica, their For You feed might recommend a video by Chem Teacher Phil, a creator previously unknown to the person. This feedback loop between an individual's express and implied preferences and available content results in a feed that incorporates expressive choices by both the platform and the individual. In turn, this inspires and fosters creativity from creators, who may be discovered even if they are not already popular.

24.    **TikTok engages in protected speech through creating personalized feeds.** Identifying videos that a particular person might be interested in is done primarily through the platform's For You feed, which presents a collection of videos curated by TikTok. The For You feed is central to the TikTok experience and one of the defining features of the platform that makes it successful. The majority of video views on the TikTok platform are through the For You feed, but other personalized feeds—including the STEM feed, Explore feed, and the Friends feed—offer additional ways for people to discover new content. The content recommended in an

individual's For You feed is based on, among other factors, TikTok's assessment of what content

aligns with its own Community Guidelines and editorial priorities, that individual's interests, and

how the individual interacts with the content TikTok presents to them.  While individual

preferences are considered, they are not the sole factor that determines the composition of any

individual's For You feed.

25.    In this way, TikTok "engages in expression" by providing "feeds" that are

"personalized" to each individual.  *Moody*, 603 U.S. at 716, 734.  "Of the billions of posts or

videos (plus advertisements) that could wind up in a user's customized feed or recommendation

list," TikTok ensures that "only the tiniest fraction do."  *Id.* at 734.  TikTok curates and

personalizes people's video feeds in three key ways: (1) content moderation, (2) a proprietary

recommendation system, and (3) video promotion and filtering.  All three mechanisms involve

human decisions about what content to publish, recommend, and promote, although they use

technology to varying degrees as a tool to implement those decisions at scale.  But the use of

technology to effectively implement editorial judgments no more strips those judgments of their

constitutional protections than would the use of a printing press instead of a pen.

26.    *Content Moderation*.  The first process TikTok uses to curate personalized feeds is

content moderation based on a set of Community Guidelines, a publicly available collection of

rules and standards that apply to all TikTok users and content.[3]  The Guidelines are designed to

help TikTok achieve its goal of creating a platform "where people discover things they love, build

communities, and express themselves."[4]  TikTok creates and refines the Community Guidelines

in consultation with third-party experts, including the U.S. Content Advisory Council and the

industry's first Youth Council.[5]  The Content Advisory Council brings together groups of experts

who help TikTok develop forward-looking policies and processes to help create a safe and

enjoyable platform for all involved.

---

[3] TikTok, *Community Guidelines*, https://www.tiktok.com/community-guidelines/en  (effective
Sept. 13, 2025) ("Community Guidelines") (under "Overview").
[4] *Id.*
[5] TikTok, *Engaging our Advisory Councils* (last visited Nov. 10, 2025),
https://www.tiktok.com/transparency/en-us/advisory-councils/ (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

27.     The Community Guidelines address what is permitted on the TikTok platform, as well as what content is eligible for recommendation in the For You feed.  They are guided by eight principles, including preventing harm, encouraging kindness and respect, respecting local cultures, and supporting expression.[6]  In keeping with those principles, the Community Guidelines prohibit, among other things, nudity; promotion of or incitement of violence; promotion of criminal activities; hate speech, hateful ideology, and hateful behaviors; animal abuse; and harassment and bullying.[7]  The Community Guidelines also outline policies against misinformation.[8]

28.     TikTok uses both human and technology-based content moderation to implement those Guidelines.  All user-generated content uploaded to the TikTok platform first goes through an automated moderation system—one developed, monitored, and refined by employees—before it appears on the platform.  While undergoing this review, the content is visible only to the uploader.  If the automated moderation technology identifies content that is a potential violation of the Community Guidelines, it will either take action against the content or flag it for review by human moderation teams.  When it identifies a clear-cut content violation—for example, content that depicts graphic violence—the automated moderation technology removes it from the platform without the need for human review.  If it is ambiguous whether content violates the Community Guidelines, it is escalated to human moderators.

29.     If a moderator determines that content violates the Community Guidelines, appropriate enforcement action is taken.  Content that a moderator determines is outright prohibited by the Guidelines will be entirely removed from the platform.  Content that a moderator determines is not prohibited, but may be unsuitable for a broader audience, will be deemed ineligible for recommendation in the For You feed and/or downranked in the platform's search function so it is difficult to find.  Content might also be tagged as potentially not appropriate for people who register as under 18, in which case the content would not be viewable

---

[6] Community Guidelines (under "Community Principles").
[7] *Id.* (under "Safety and Civility" and "Sensitive and Mature Themes" headings).
[8] *Id.* (under "Integrity and Authenticity").

COMPLAINT
Case No. _____

to any person who registers as under the age of 18 on the platform.

30.     Over 189 million videos were removed from the platform for violating the Community Guidelines between April and June 2025.[9]  Over that same time frame, more than 99% of the content TikTok removed for violating the Community Guidelines was taken down before someone reported it, and 90% of all videos removed for violating the Community Guidelines were never viewed by a single user.[10]  Statistics regarding enforcement of the Community Guidelines are published quarterly on the TikTok platform's website.[11]

31.     TikTok also takes steps to limit access to content that does not strictly violate Community Guidelines, but that TikTok otherwise decides may not be appropriate for a broad audience.  For example, content depicting adults smoking cigarettes may not violate the Community Guidelines, but is not eligible for recommendation on the For You feed.  Likewise, videos that some people might find distressing but involve a matter of public interest are covered by "opt-in viewing screens" that warn the viewer that the video may contain sensitive material. Those videos are also ineligible for recommendation in the For You feed.

32.     *Recommendation System.*  The second process TikTok uses to personalize video feeds is content recommendation.  Content is recommended to people through TikTok's proprietary recommendation system, a sorting and ranking mechanism designed, and constantly updated, by employees created to select and recommend videos for an individual's For You feed. In the United States, the recommendation system is deployed by TikTok U.S. Data Security Inc. ("USDS"), a special purpose subsidiary of TikTok that controls access to protected U.S. user data and monitors the security of the U.S. platform.

33.     To determine what content the TikTok platform presents to a particular person, the recommendation system analyzes various signals from the individual and others, such as their likes, comments, and what they watch, then matches those signals to the content the TikTok

---

[9] TikTok, *Community Guidelines Enforcement Report* (Apr.-June 2025), https://www.tiktok.com/transparency/en-us/community-guidelines-enforcement-2025-2 (last visited Nov. 13, 2025) (under "Total removals and restorations, by content type" heading).
[10] *Id.* (under "Safety" heading).
[11] *See generally, e.g.*, *id.*

COMPLAINT
Case No. _____

platform has determined is eligible for recommendation in the For You feed.  At a high level, a pool of candidate videos is identified for a person, then the recommendation system scores and ranks those videos to determine which particular video would be most interesting and informative to that individual.  Content that violates the Community Guidelines or is otherwise ineligible for recommendation in the For You feed is excluded from the candidate pool.

34.     Employees designed the models to consider a variety of factors when attempting to identify videos for an individual's For You feed, including engagement or activity information (like video playtime, likes, shares accounts followed, comments, and content created), account and device information (such as language preference and country setting), and video information (such as captions, sounds, and hashtags), that determine how videos are ranked.  The factors considered each reflect TikTok's editorial judgments about what third-party content should appear in people's feeds.  And TikTok may adjust how the system considers different factors depending on, among other things, how a factor will further TikTok's mission and business goals.

35.     The development of the recommendation system is an ongoing process, evolving as employees refine models; reassess influential factors based on people's feedback, research, and data analysis; and optimize the system to better reflect TikTok's expressive choices.  For example, employees may refine the model so the platform's feeds attract a broad array of individuals and to serve those already on the platform more informative and useful content, in addition to content that is enjoyable and entertaining.  The overarching goal of the model's refinement remains the same: to optimize the TikTok platform to inspire creativity and joy among those on the platform.

36.     The recommendation system is critical to the TikTok platform and reflects TikTok's unique expressive choices about what content to present and how to present it.  Without this personalization, people would likely see content that they are not interested in or that is not appropriately tailored to them.  For example, if TikTok's decisions about what content to recommend to a particular person could be driven only by what is popular, a person's feed might show only content reflecting majority views and disfavor or silence minority perspectives.  In that

COMPLAINT
Case No. _____

scenario, a platform designed to help people find their community could no longer serve its expressive purpose.  That these feeds also reflect particular platforms' expressive choices and editorial judgments is obvious from the fact that the same person will see different personalized feeds on TikTok, Instagram, and Bluesky.  Each platform's feeds reflect its own editorial judgments about how to compile third-party content for each person.  For example, TikTok personalizes content to inspire creativity and bring joy.[12]  Other platforms personalize content to foster "open and decentralized public conversation" or to enable people to "connect with friends and family."[13]

37.    In an effort to help people understand why content might be recommended in their personalized feed, the TikTok platform gives people context for those decisions.[14]  Sample reasons include: "You commented on, liked, shared, or watched similar posts"; "This post is popular in your country"; "This post was created recently"; "This video is longer, and you seem to like longer videos"; and "You're following the creator."



---

[12] *See* Community Guidelines (under "Overview").

[13] *See About Bluesky*, Bluesky (last visited Nov. 13, 2025), https://bsky.social/about/faq (under "What is the relationship between Bluesky and Twitter?"); Meta, *Community Standards* (last visited Nov. 13, 2025), https://transparency.meta.com/policies/community-standards/.

[14] TikTok Newsroom, *Learn why a video is recommended For You* (Dec. 20, 2022), https://newsroom.tiktok.com/en-us/learn-why-a-video-is-recommended-for-you.

COMPLAINT
Case No. _____

38.     The TikTok platform also allows people to provide feedback that shapes the content that they see.  For example, a person can tap a button on a video that says "Not interested" or refresh their For You feed.  An individual can also provide filter words to reduce or help eliminate certain kinds of content, and adjust preference for subject matter categories as well.  And the platform advises people that they can help avoid certain categories of content by not interacting with it—for instance, by scrolling past it quickly.[15]



39.     *Video Promotion and Filtering*.  Video promotion and filtering is the third process for determining which content is shown to people on the TikTok platform.  As part of that process, TikTok may promote specific content—for example, highlights from the Super Bowl or videos from a Taylor Swift concert.  Employees hand-select individual video categories that they want to promote and submit a request to do so.  Each request to promote a video in the United States is manually reviewed by a U.S.-based reviewer.

40.     TikTok abides by several guiding principles as the foundation for all of its editorial practices on the platform, including video promotion.  These principles include emphasizing quality and safeguarding an authentic experience.  To uphold these principles, the TikTok

---

[15] TikTok Support, *How TikTok recommends content*, https://www.tiktok.com/support/faq_detail?id=7543897458892577336&category=web_using_tiktok (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

platform tries to elevate content that is original, educational, trustworthy and reliable, current and trending, positive and engaging, and high quality.

41.    The TikTok platform also applies rules to filter out and disperse certain content— *i.e.*, to prevent the For You feed from showing one video after another about the same subject and to make the platform more enjoyable and safer, while supporting commercial goals.  For example, TikTok created rules that prioritize content from the same country a person is in, avoid duplication, and ensure appropriate video length.  Rules like these are intended to filter out content that is low quality (like extremely short videos) and disperse content (like videos about the same subject) to create a more enjoyable experience.

42.    The TikTok platform seeks to include a mix of content in a person's feeds to avoid or interrupt repetitive patterns.  This is intended to prevent people from seeing videos only about a particular topic, rather than discovering new interests like TikTok intends.  As part of this practice, the TikTok platform tries to identify and disperse content that, when viewed sparingly is not harmful, but may not be healthy to review excessively.  Examples are extreme exercise and mental health videos.

43.    *Other feeds.*  Although people interact with the TikTok platform primarily through the For You feed, other feeds also allow them to explore content in a personalized way.  For example, a person can view a feed based on creators they like, such as the "Following" feed, which shows content exclusively from creators that person chooses to follow.  Or they can view content in the "Friends" feed, which shows videos from creators that the person follows and the creator has followed back.  In addition, people can view feeds based on their searches or comments.  For instance, if a person searches for "painting," they can receive a feed of videos about painting sorted based on a combination of factors, including relevance to the person's search query and other peoples' level of engagement with the video.  People can also view feeds based on a particular topic, like the "STEM" feed, which displays content related to science, technology, engineering, and mathematics.  These feeds operate in fundamentally the same way as the For You feed, with different rules, signals, and filters governing which videos are

COMPLAINT
Case No. _____

recommended.

44. **TikTok facilitates the protected speech of others through personalized feeds.** In addition to engaging in protected speech itself, the TikTok platform's personalized feeds allow people "to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham v. North Carolina*, 582 U.S. 98, 105, 107 (2017); *Reno*, 521 U.S. at 870.

45. Teens and adults alike use the TikTok platform to engage in speech that is entitled to First Amendment protection. In creating videos and responding to content posted by others, people can take positions and engage with others on political, social, economic, educational, religious, and cultural topics, all of which are protected by the First Amendment. *See Packingham*, 582 U.S. at 105, 107; *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 557 (S.D. Ohio 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, *5-6 (W.D. Ark. Aug. 31, 2023).

46. The TikTok platform's personalized feeds also facilitate protected First Amendment activity by expanding the audience creators can reach and the creators from whom people on the platform can hear. The First Amendment protects not only the right to speak and associate, but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." (quotation marks omitted)). Receiving information and ideas is "fundamental to our free society," regardless of the "social worth" of the content at issue. *Stanley*, 394 U.S. at 564 (collecting cases); *see also Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (First Amendment "necessarily protects the right to receive" information).

47. The TikTok platform's personalized feeds make all of this constitutionally protected activity possible. Indeed, creators join the TikTok platform because of its personalized content. The TikTok platform's ability to facilitate content discovery through organic reach allows creators access to a large number of people—beyond their current universe of followers—

COMPLAINT
Case No. _____

without any paid promotion.  It also allows people on the platform access to content created by a wide range of individuals, meaning that it is not unusual for videos created by everyday people to receive thousands, or even millions, of views.  And people on the platform and creators both value their ability to speak to and learn from an international audience.  Barring TikTok from offering personalized feeds to whole groups of people absent parental consent would interfere with the ability to form and foster these communities.

48.      Personalization is critical to all of these aspects of the TikTok experience.  Take two alternatives to personalization:  If a platform shows people content based on, for example, overall popularity, that would favor creators who hold the majority view, potentially drowning out creators with minority views and limiting variety of thought.  If it shows people content in a chronological feed, people will experience posts and content from accounts that post the most, not necessarily accounts they want to see the most.  Individual creators' posts and content will be drowned out by brands and influencers employing teams of people to post throughout the day.  And posters can game a chronological feed to spread more low-quality content.

49.      Indeed, when given a choice, people on the platform almost unanimously choose personalized feeds.  In Europe, where a non-personalized feed option is available, only a tiny fraction of people have actually selected it—a testament to the importance of personalization in creating the TikTok platform's vibrant community.  That people prefer the content they see to be relevant to them is not intrinsically bad, despite the Act's assumption that all feeds that account for peoples' preferences are "addictive."  *See* § 27000.5(a).  To the contrary, there are good reasons for that preference—and for allowing platforms like TikTok to convey content the way people want.

50.      **Existing options for parental consent and oversight.**  Parents, guardians, and other caregivers have many existing options to manage their teen's online experiences on the TikTok platform.  *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Griffin*, 2023 WL 5660155, at *6-8.

51.      As an initial matter, parents can decide when and whether to let their teens use the

COMPLAINT
Case No. _____

1    TikTok platform.

2          52.      The TikTok platform also offers tools and information to enable parents and

3    guardians to supervise their teens' online experience.  In particular, the TikTok platform provides

4    a suite of features that allows teens and their parents to manage the time that they spend on the

5    platform, as well as what they see, and how and with whom they interact.  Those features and

6    information enable parents and teens to craft (and adapt over time) what works for their family,

7    rather than imposing a categorical rule.

8          a.      **Family Pairing:** Family Pairing allows parents and guardians to customize their

9    teens' safety settings based on what they deem appropriate for their family by linking their

10   account to their teen's account.  Through Family Pairing, parents can set daily screen time limits

11   or schedule breaks, see summaries of their teen's time spent on the TikTok platform via a screen

12   time dashboard, mute push notifications, filter keywords, enable Restricted Mode (discussed

13   below), get notifications about their teen's account activity, customize search capabilities, decide

14   whether their teen's account will be public or private, determine whether their teen's account can

15   be recommended to others, restrict who can send direct messages to their teen or turn off direct

16   messaging entirely, decide who can view their teen's liked videos, and decide who can comment

17   on their teen's videos.

18

19

20

21

22                                    

23

24

25

26

27

28

COMPLAINT
Case No. _____

b.     **Daily Screen Time:**  Daily Screen Time[16] is a screen time management setting that allows all individuals to manage how much time they spend on the TikTok platform by setting a daily screen time limit.  People are notified when they reach that limit on the TikTok platform.  People may view their screen time summary in their activity center.  Parents can also control their teens' daily screen time settings through Family Pairing.



c.     **Screen Time Default Limits for Minors:** For individuals who register as over 18, Daily Screen Time default limits are available as an opt-in feature.  By contrast, for people who register as under 18, Daily Screen Time is automatically enabled by default and set to 60 minutes. Once the 60-minute limit has been reached, teens must enter a passcode to continue spending more time on the platform. Parents can also control their teens' screen time breaks through the Time Away feature in Family Pairing.

//

//

//

//

---

[16] Daily Screen Time has also been known as Daily Screen Time Limits, Screen Time Limits, and Screen Time Management.

COMPLAINT
Case No. _____



     d.     **Screen Time Breaks:**  When enabled, Screen Time Breaks allow people to schedule reminders to take a break from using the TikTok platform after a period of screen time. Once a person reaches a predetermined amount of screen time, the person is notified with a popup to consider taking a break.  The notification prompts the individual to either: (1) tap OK to dismiss the notification; (2) tap Snooze to restart the timer and remind you again within a set period of time; or (3) tap Edit Reminders to change the screen time break schedule.



e.      **Digital Well-Being Information:**  For people who register as under 18, the TikTok platform displays digital well-being information throughout the user experience, which encourages people to learn about TikTok's well-being tools.

f.      **Mute Push Notifications:**  The TikTok platform introduced mute windows[17] for teens.  Typically, push notifications are sent to a person's device when they are not using the TikTok app, and can include notifications of likes, comments, video suggestions, and more. People can set a schedule to mute push notifications on their device for a specific amount of time. For people who register as ages 13 to 15, the platform sets a mandatory mute period for push notifications from 9 p.m. to 8 a.m., and this setting cannot be changed.  For people who register as ages 16 to 17, this period is from 10 p.m. to 8 a.m. by default, and this setting also cannot be changed.  Parents and guardians can also schedule additional time to mute their teen's push notifications in Family Pairing.  The default scheduled time overrides any custom time that is less restrictive.  For example, if a parent sets their thirteen-year-old's scheduled time from 11 p.m. to 7 a.m., the default time from 9 p.m. to 8 a.m. will override the parent's setting.  People over the age of 18 may opt-in to muted push notifications.



---

[17] This feature has also been known as Quiet Mode.

COMPLAINT
Case No. _____

g.      **Sleep Hours:**  Sleep Reminders help people wind down and prepare for bedtime. Sleep Hours encourages young people to switch off at night.  If a teen who registers as under 16 is on the TikTok platform after 10 p.m., their For You feed will be interrupted with the Sleep Hours feature.  Sleep Hours will launch a full-screen takeover with calming music to help teens relax and be mindful of the time.  If a teen decides to spend additional time on the TikTok platform after the first reminder, the platform show a second, harder to dismiss, full-screen prompt.



h.      **Creator Care Mode:**  Creator Care Mode or Comment Care Mode provides people with more control over their TikTok experience by applying additional filters to the comments posted on the individual's content.  When turned on, it filters out comments that may not be appropriate, are offensive, contain profanity, have been flagged or reported by the individual or others, or are similar to comments that the individual or others have previously reported, deleted, or disliked.  Creator Care Mode is available in the United States as an opt-in feature.

//

//

COMPLAINT
Case No. _____



i.      **Restricted Mode.**  Restricted Mode, which is available to all people, and which parents and guardians can manage for their teens through Family Pairing, limits a person's exposure to content that may not be comfortable for everyone, such as content that contains mature or complex themes.  Some features are unavailable when a person enables Restricted Mode, including access to the "following feed."  Restricted Mode is available to people as an opt-in feature.



COMPLAINT
Case No. _____

1         j.        **Private Account.**  Private Account allows an individual to approve or deny

2  follower requests and choose people that are allowed to (1) follow them (2) watch their videos,

3  and (3) see their bios, likes, and followers and following list.  When Private Account is activated,

4  others cannot Duet, Stitch, or download the individual's videos.  Private Account is automatically

5  enabled by default for all people who register as under the age of 18.  For people who register as

6  under the age of 16, this setting cannot be changed.  People who register as between ages 13-17

7  are notified of this feature upon creating their accounts. Parents can control their teens' private

8  account settings through Family Pairing.



20         k.        **Search Interventions.**  When a person searches for certain words or phrases, such

21  as "suicide," the TikTok platform will direct them to local support resources such as the Crisis

22  Text helpline, where they can find support and information for treatment options.

23  //

24  //

25  //

26  //

27  //

28

COMPLAINT
Case No. _____



l.      **Safety Centers.**  TikTok provides access to a Safety Center that offers a number of tools and controls to help manage peoples' experience,[18] as well as a Teen Safety Center specifically designed to help younger people understand different features and safety tools available on TikTok.[19]  The Safety Center provides pages on safety topics, such as tragic event support and countering hate speech and behavior, as well as guides with safety tips and guidelines for using TikTok.  The Teen Safety Center provides guidance on the safety features and settings teens can use to keep their accounts protected, as well as ways to control who they interact with on TikTok.

m.      **Well-Being Guide.**  TikTok also provides a toolkit to help people feel in control of their platform experience and interact with technology in a way that feels right for them.  The guide encourages people to assess how their digital habits impact their physical and mental health by, among other things, reflecting on screen time, assessing their emotional state after screen time, evaluating their online privacy and security practices, and considering the content they

---

[18] TikTok, *Safety Center*, https://www.tiktok.com/safety/en/ (last visited Nov. 13, 2025).
[19] TikTok, *Teen Safety Center*, https://www.tiktok.com/safety/en/youth-portal (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

consume online.  TikTok provides prompts to help individuals reflect, points people to the tools available to manage their platform time, and offers tips and resources for those struggling with mental health.[20]

53.    Cellular and broadband internet providers offer families tools to block certain online services from certain devices.[21]  As do internet browsers.[22]  For example, some browsers offer a "kids mode" that allows parents to see what their teens are accessing the most.[23]

54.    Parents can use third-party software and browser extensions to reinforce any existing parental controls.[24]  Third-party applications also allow parents to oversee their teen's online activities.[25]

55.    Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and oversee time spent on the internet.[26]  And device manufacturers allow parents to limit the time their teens may spend on the device, constrain the applications that can be used, filter the content that they see, and control their privacy settings.[27]

**PROTECTING OUR KIDS FROM SOCIAL MEDIA ADDICTION ACT**

56.    Last year, California passed the Protecting Our Kids from Social Media Addiction Act (the "Act").  2024 Cal. Stats. Ch. 321, SB 976, 2023-24 Reg. Sess. (Cal. 2024) (codified at Cal. Health & Safety Code §§ 27000-07).  The Act acknowledges that "[s]ocial media provides

---

[20] TikTok, *Well-being guide*, https://www.tiktok.com/safety/en/well-being-guide e (last updated July 24, 2025).

[21] *See, e.g.*, Verizon, *Verizon Family*, https://www.verizon.com/solutions-and-services/add-ons/safety/verizon-family-parental-control-monitoring-app (last visited Nov. 13, 2025); Xfinity, *Set up parental controls for the internet*, https://www.xfinity.com/support/articles/set-up-parental-controls-with-comcast-networking (last visited Nov. 13, 2025).

[22] *See, e.g.*, Microsoft, *How to set parental controls to keep your loved ones safe online*, https://www.microsoft.com/en-us/edge/learning-center/how-to-set-up-parental-controls?form=MA13I2 (last visited Nov. 13, 2025).

[23] *See, e.g.*, Google, *Kids Space*, https://families.google.com/kidsspace (last visited Nov. 13, 2025).

[24] *See, e.g.*, Aura, *Parental Controls*, https://www.aura.com/parental-controls (last visited Nov. 13, 2025).

[25] *See, e.g.*, Bark, *Bark App*, https://www.bark.us/bark-app (last visited Nov. 13, 2025).

[26] *See, e.g.*, Gryphon, *Parental Controls*, https://gryphonconnect.com/pages/parental-control.

[27] *See, e.g.*, Apple, *Families*, https://www.apple.com/families/; Google, *Family Link*, https://safety.google/families/parental-supervision/ (last visited Nov. 13, 2025); Microsoft, *Family Safety*, https://www.microsoft.com/en-us/microsoft-365/family-safety (last visited Nov. 13, 2025); Samsung, *Parental controls available on your Galaxy phone or tablet*, https://www.samsung.com/us/support/answer/ANS10003399/ (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

an important tool for communication and information sharing." *Id.* § 1(a).  Yet it nonetheless imposes sweeping restrictions on minors' access to social media in California, purportedly to reduce the "risk of harm to the mental health and well-being of children and adolescents" it believes that "[h]eavier usage of social media" poses. *Id.* § 1(b),(d).  It blames how much time minors spend with speech on social media on how that speech is presented—specifically, "the algorithmic delivery" of personalized content on and by online platforms. *Id.* § 1(b).

57.    From its introduction, SB 976 faced opposition from a variety of groups concerned with its restrictions on speech.  For example, an opposition coalition expressed concern that the Act's restriction on personalized feeds in favor of chronological feeds was "based on the faulty assumption" that chronological feeds are better.[28]  Chronological feeds, the opposition argued, might result in the drowning out of friends' posts by those of brands and influencers, or could be "gamed by bad actors to spread more low quality or harmful content."[29]

58.    As ACLU California Action explained, "[a]s written, [the Act] is not an effective method to protect children online.  It will instead undermine publishers' ability to organize their content and people's ability to access the content they need.  It will also diminish online privacy by incentivizing companies to collect more private information."[30]  The Chamber of Progress, LGBT Tech, the Trevor Project, and the Woodhull Freedom Foundation also expressed concerns that the Act's parental-consent provisions could have a disparate impact on marginalized youth.[31]  Conditioning LGBTQ+ youth's ability to access social media content on parental approval could "cut [them] off from affirming online communities and resources."[32]

59.    **The Act's Coverage and Definitions Are Content- and Speaker-Based (§ 27000.5).**  The Act's coverage depends on a content-based and speaker-based set of definitions and exclusions.  The Act applies to only a subset of online services: so-called "[a]ddictive

---

[28] Senate Bill Policy Analysis at 9 (June 30, 2024), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB976#.
[29] *Id.*
[30] *Id.* at 17.
[31] *Id.* at 11.
[32] *Id.*

COMPLAINT
Case No. _____

internet-based service[s] or application[s]."  § 27000.5(b)(1).[33]  An "[a]ddictive internet-based service or application" is defined as an "online service, online application, or mobile application, including, but not limited to, a 'social media platform' as defined in Section 22675 of the [California] Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website."  *Id.*

60.    The California Business and Professions Code defines "social media platform" as "a public or semipublic internet-based service or application that has users in California" and meets two criteria: (1) a "substantial function" of the service is to connect users socially beyond email or direct messaging, and (2) the platform allows users to create a profile and share content with other users.  Cal. Bus. & Prof. Code § 22675(f).

61.    Despite the Act's provocative labeling, the definition of "[a]ddictive feed" does not depend in any way on *addiction*.  The sole defining feature is *personalization* of the speech compilation:  An "[a]ddictive feed" is simply any "online service, online application, or mobile application, or portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information by the user, or otherwise associated with the user or the user's device."  Feeds are exempted from the definition when at least one of seven conditions are met, including that the information used is not persistently associated with the user or their device and does not relate to their prior interactions on the platform; the user "expressly and unambiguously requested" the media and the content is not recommended based on information associated with the user; or the content is direct, private communications between users. § 27000.5(a)(1)-(7).

62.    Legislative history confirms that the Act regulates speech based on its content.  It clarifies that the Act's focus on addictive feeds is intended to "prohibit[] social media platforms from serving content to children through a manipulative, addictive algorithmic feed," and it "would require that social media platforms—by default—serve children content through a

---

[33] There is no consensus among academics or professionals on what constitutes "addiction" in the social media context, and the Act does not provide any definition for, or explanation of, what might constitute "addiction" or "addictive" behavior.

COMPLAINT
Case No. _____

chronological feed from people they've already followed and information that they've searched for."[34]  The Act's goal is to limit not only platforms' ability to provide personalized feeds, but also minors' access to new content and new speakers.  Indeed, Defendant stated that the Act was necessary because "the default … algorithmic feed" offered to social media users "too often sends them down rabbit holes of harmful content."[35]

63.    The Act thus applies to an online service like the TikTok platform based on the speaker and its content:  Online services are targeted based on the constitutionally protected "feeds" the online services "personalize[]."  *Moody*, 603 U.S. at 734.  This is exactly the kind of conduct that the Supreme Court recognized is entitled to First Amendment protection—creating "curated compliation[s]" of content that combine "multifarious voices" into a "distinctive expressive offering" that users can "react to," "comment on," or "share … themselves."  *Id.* at 719, 728, 738.

64.    In addition to the limitations of the pre-existing definition of social media platform, the Act also creates exceptions from its coverage based on speaker and content.  The Act provides that the term "'[a]ddictive internet-based service or application' does not apply to either of the following":

(A) An … online service, online application, or mobile application for which interactions between users are limited to commercial transactions or to consumer reviews of products, sellers, services, events, or places, or any combination thereof.

(B) An … online service, online application, or mobile application that operates a feed for the primary purpose of cloud storage.

§ 27000.5(b)(2).

65.    **The Act Prohibits Personalized Feeds for Minors Absent Verifiable Parental Consent (§§ 27001(a), 27002(b)(2), 27002(b)(4)).**  The Act imposes three requirements on covered online services that restrict minors' ability to access personalized feeds absent "verifiable

---

[34] Senate Judiciary Analysis at 13(Apr. 19, 2024),
https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB976#.
[35] *Id.*

COMPLAINT
Case No. _____

1    parental consent." §§ 27001(a), 27002(b)(2), 27002(b)(4).[36]

2          66.    *Parental consent to view personalized feeds (§ 270001(a)).*  The Act provides that

3    "[i]t shall be unlawful for the operator of" a covered online service "to provide an addictive

4    feed"—*i.e.*, a personalized feed—to a minor "user unless … [t]he operator has obtained verifiable

5    parental consent." § 27001(a).[37]  Under this provision, TikTok cannot provide "minors"—

6    defined as individuals under 18—with any personalized feed without first securing verifiable

7    parental consent.  This provision burdens TikTok's protected speech by prohibiting it from

8    curating the content it provides to teens in the way it would prefer, and it burdens teens' access to

9    protected speech by conditioning that access on parental consent.

10          67.    *Parental consent to view personalized feeds for more than one hour per day*

11    *(§ 270002(b)(2)).*  The Act requires covered online services to implement a "default" setting

12    limiting minors' access to personalized feeds to "one hour per day unless modified by the verified

13    parent." § 27002(b)(2).  Specifically, "[t]he operator of" a covered online service "shall provide a

14    mechanism through which the verified parent of a user who is a minor may … [l]imit their child's

15    access to any addictive feed from the addictive internet-based service or application to a length of

16    time per day specified by the verified parent."  *Id.*  The "setting shall be set by the operator as on

17    by default, in a manner in which the child's access is limited to one hour per day unless modified

18    by the verified parent."  *Id.*  This provision thus requires an additional layer of parental consent

19    before teens can access the TikTok platform's personalized feeds for more than one hour per day.

20    It therefore burdens TikTok's protected speech and minors' access to protected speech in much

21    the same way as § 27001(a) .

22          68.    *Parental tools to require default feed on entry to be non-personalized*

23

24    [36] Until January 1, 2027, this requirement applies only to users the platform knows are minors.
      *See* § 27001(a)(1).  But after that date, the Act requires Operators to "reasonably determine[]"
25    that a user is not a minor.  *Id.*  Doing so will require verifying users' age, which will affect all
      users, not just minors.  In prior challenges to the Act, courts have held that challenges to this age-
26    verification provision are not yet ripe.  *See NetChoice II*, 152 F.4th at 1018-19.

      [37] Under the Act, an "Operator" is "a person who operates or provides an internet website, an
27    online service, an online application, or a mobile application." § 27000.5(e).  The Act defines a
      Minor" as "an individual under 18 years of age who is located in the State of California."
28    § 27000.5(d).  And the Act defines "Parent" as a "parent or guardian." § 27000.5(f).

COMPLAINT
Case No. _____

1    *(§ 27002(b)(4)).*  The Act provides that "[t]he operator of an addictive internet-based service or

2    application shall provide a mechanism through which the verified parent of a user who is a minor

3    may":

4         (4) Require that the default feed provided to the child when entering the internet-based

5         service or application be one in which pieces of media are not recommended, selected, or

6         prioritized for display based on information provided by the user, or otherwise associated

7         with the user or the user's device, other than the user's age or status as a minor.

8    § 27002(b)(4).   This provision burdens TikTok's protected speech and minors' access to that

9    protected speech by imposing "default" limits on the speech available to minors and giving

10   control over those limits to parents.[38]

11                                **CLAIMS FOR RELIEF**

12                                     **COUNT I**
     **VIOLATION OF THE FIRST AMENDMENT AS INCORPORATED BY THE**
13                      **FOURTEENTH AMENDMENT, 42 U.S.C. § 1983**
     **(PERSONALIZED-FEED PROVISIONS, §§ 27001(A), 27002(B)(2), 27002(B)(4))**
14

15       69.    TikTok incorporates all prior paragraphs as though fully set forth herein.

16       70.    The Act's personalized-feed provisions, §§ 27001(a), 27002(b)(2), 27002(b)(4), as

17   applied to TikTok, burden protected speech and cannot satisfy strict scrutiny or any form of First

18   Amendment scrutiny.

19       71.    **General principles.**  The First Amendment, as incorporated against the States by

20   the Fourteenth Amendment, provides that governments "shall make no law … abridging the

21   freedom of speech, or of the press."  U.S. Const. amend. I.

22       72.    The "most basic" principle of the First Amendment is that "government has no

23   power to restrict expression because of its message, its idea, its subject matter, or its content."

24   *Brown*, 564 U.S. at 790-91 (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).  Nor can the

25   _____

26   [38] As previously noted, other provisions of the Act have been enjoined, including
     Section 27002(a) (prohibiting the sending of notifications to minors during certain hours);
27   Section 27002(b)(1) (requiring provision of tool to prevent access to notifications during certain
     hours and turning tool on as default); Section 27002(b)(3) (requiring provision of tool to limit
28   minors' ability to view number of likes and turning on as default); and Section 27005 (requiring
     operators to publicly disclose number of minor users of its service).

                                                    COMPLAINT
                                                    Case No. _____

government interfere with "the exercise of editorial content and judgment" that publishers employ to determine what content to present to the public.  *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also Moody*, 603 U.S. at 728-33 (collecting cases).  The First Amendment's protections extend not only to the right to speak, but also to "the right to distribute, the right to receive, the right to read and freedom of inquiry."  *Griswold v. Connecticut*, 381 U.S. 479, 482 (1965); *see also Sorrell*, 564 U.S. at 570 ("An individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used or disseminated." (quotation marks omitted)).  And "[a]ll manner of speech—from 'pictures, films, paintings, drawing, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections; no less can hold true when it comes to speech … conveyed over the Internet."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citing cases).  Nor does the fact that something is interactive dilute, let alone delete, those protections.  *Brown*, 564 U.S. at 798.

73.     Laws that target speech based on its content "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"—in other words, that they satisfy strict scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

74.     The law is also "deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but not others.'"  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).  Such distinctions "run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'"  *Id.* at 778 (quoting *Sorrell*, 564 U.S. at 580).  Thus, when the "speaker preference reflects a content preference," speaker-based laws demand strict scrutiny.  *Reed*, 576 U.S. at 170 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)).

75.     Even content- and speaker-neutral laws that burden speech demand heightened scrutiny.  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  Such laws are subject to intermediate

COMPLAINT
Case No. _____

1    scrutiny and must be "narrowly tailored to serve a significant government interest" in order to

2    prevent governments from "too readily sacrific[ing] speech for efficiency." *Id.* (quoting *Ward v.*

3    *Rock Against Racism*, 491 U.S. 781, 796 (1989), and *Riley v. Nat'l Fed. of Blind of N.C., Inc.*,

4    487 U.S. 781, 795 (1988)).

5         76.    All of these principles apply to minors, too.  While governments possess

6    "legitimate power to protect children from harm," their authority "does not include a free-floating

7    power to restrict the ideas to which children may be exposed"—either by prohibiting minors from

8    accessing expressive material altogether or from doing so without parental consent.  *Brown*, 564

9    U.S. at 794 (invalidating law prohibiting distribution of violent video games to minors without

10   parental consent).  Accordingly, except in "narrow and well-defined circumstances," governments

11   may not bar dissemination of protected content to minors or otherwise infringe on the "significant

12   measure of First Amendment protection" to which minors are entitled.  *Erznoznik v. City of*

13   *Jacksonville*, 422 U.S. 205, 213 (1975) (invalidating ordinance prohibiting display of movies

14   containing nudity at drive-in theaters); *see also Ashcroft*, 542 U.S. 656 (enjoining law

15   criminalizing Internet speech that is "harmful to minors"); *Reno*, 521 U.S. 844 (invalidating law

16   protecting minors from "indecent" and "patently offensive" Internet communications); *United*

17   *States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual

18   programming on television).

19        77.    These principles apply with equal force online.  The "'basic principles of freedom

20   of speech and the press … do not vary' when a new and different medium for communication

21   appears."  *Brown*, 564 U.S. at 790 (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503

22   (1952)).  Thus, the Supreme Court's longstanding recognition that the First Amendment protects

23   a publisher's presentation of a "curated compilation of speech originally created by others"

24   applies equally to an online platform's "choices about what third-party speech to display and how

25   to display it."  *Moody*, 603 U.S. at 716, 728.

26        78.    When it restricts speech, "the Government bears the burden of proving the

27   constitutionality of its actions."  *Playboy Ent. Grp.*, 529 U.S. at 816-17.

28

COMPLAINT
Case No. _____

79.    **Applying these principles to this controversy**.  The State cannot demonstrate that the Act's personalized-feed restrictions, as applied to TikTok, are consistent with the First Amendment's protections.  While TikTok shares the State's interest in protecting minors, the State cannot here articulate a sufficiently compelling governmental interest that the Act actually supports, and the Act is not properly tailored under any form of First Amendment scrutiny.

80.    **The Act's personalized-feed provisions directly regulate TikTok's protected expression as well as that of the people on the platform.**  The personalized-feed provisions, §§ 27001(a), 27002(b)(2), 27002(b)(4), restrict teens' access to TikTok's protected expression in the form of personalized feeds and limit the editorial choices TikTok may make in compiling its feeds.[39]

81.    The Supreme Court has held that "feeds" that are "personalized" are protected by the First Amendment.  *See Moody*, 603 U.S. at 716-17, 734-35; *see also NetChoice II*, 152 F.4th at 1021 (recognizing, in discussing this Act, that *Moody* established that "some personalized recommendation algorithms may be expressive").[40]  "Deciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own" and "results in a distinctive expressive product." *Moody*, 603 U.S. at 731.

82.    The TikTok platform's personalized feeds are precisely this sort of expressive activity—they provide "curated compilation[s]" of user-created speech, allowing "users to upload content…to share with others," to "view[] the content" and "react to it, comment on it, or share it themselves." *Id.* at 719.  They are created through a series of "choices about what third-party speech to display and how to display it," including how to "organize and prioritize" speech, what content reflects TikTok's editorial policies, and what content TikTok wishes to promote based on its own interests (as opposed to a particular individual's)—thus producing TikTok's own

---

[39] As noted above, when the age-verification requirement comes into effect, the personalized-feed provisions will also burden the First Amendment rights of adult users who will have to submit to the age-verification process in order to access personalized feeds.

[40] The Court did not decide whether personalized feeds are sufficiently expressive that restricting access to them would restrict access to the platforms' speech because it concluded that NetChoice had not met its evidentiary burden. *NetChoice II*, 152 F.4th at 1021.

COMPLAINT
Case No. _____

1    "distinctive compilations of expression." *Id.* at 716.

2         83.    For example, to determine what content is presented and how it should be arranged

3    in a person's For You feed, the TikTok platform analyzes and removes any uploaded content that

4    does not comply with the TikTok platform's content eligibility standards; sorts and rearranges

5    content using a recommendation system programmed to predict what a person will find relevant,

6    informative, and interesting; and promotes videos that reflect the TikTok platform's independent

7    editorial priorities.  The TikTok platform's choices about what to include in an individual's

8    personalized feed thus consider not only user-expressed preferences, but also the TikTok

9    platform's content-moderation policies, editorial policies, decisions to promote particular pieces

10   of content for reasons that are not tied to and do not reflect user preference, and other factors.

11        84.    These curation decisions and the personalized feeds they produce promote

12   TikTok's own messages, including its view that presented content is content TikTok thinks a

13   person will enjoy viewing or from which a person could learn.  Those compilations are more than

14   the sum of their parts:  A video feed comprising some, but not all, of TikTok's curation decisions

15   is no substitute for the cohesive whole of the For You feed.

16        85.    The same principles apply to the other personalized feeds offered on the TikTok

17   platform, including:

18            a.  The Following feed, which presents content from accounts a person follows based

19                on their information and interactions with the platform and TikTok's editorial

20                decisions;

21            b.  The Friends feed, which presents content from accounts a person follows and who

22                follows them back based on their information and interactions with the platform

23                and TikTok's editorial decisions;

24            c.  Stories Skylight, which a person can access from the Following and Friends feed,

25                and mirrors their recommendation methods and TikTok's editorial decisions;

26            d.  The LIVE feed, which presents content from TikTok LIVE streams based on

27                users' information and interactions with the platform and TikTok's editorial

28

34

COMPLAINT
Case No. _____

1      decisions;

2          e.   The Search feed and Search recommendations within comments, which present

3               content to a person based on information about the search terms they have entered

4               and their interactions with the platform and TikTok's editorial decisions;

5          f.   The STEM feed, which is an educational feed that presents content related to

6               science, math, tech, and engineering based on a person's information and

7               interactions with the platform and TikTok's editorial decisions;

8          g.   The Explore feed, which presents content to an individual on their Explore page

9               based on that person's information and interactions with the platform and

10              TikTok's editorial decisions; and

11         h.   The Comment feed, which prioritizes comments on a particular video based on a

12              person's information and interactions with the platform and TikTok's editorial

13              decisions.

14     86.    The TikTok platform's personalized feeds are therefore constitutionally protected

15 expression.  *See Moody*, 603 U.S. at 731; *NetChoice II*, 152 F.4th at 1014 (citing *TikTok Inc. v.*

16 *Garland*, 604 U.S. 56 (2025)); *see also 303 Creative v. Elenis*, 600 U.S. 570, 589 (2023) ("All

17 manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance

18 and the printed word—qualify for the First Amendment's protections; no less can hold true when

19 it comes to speech … conveyed over the Internet." (quotations omitted)).

20     87.    The Act's personalized-feed provisions restrict that protected expression by

21 prohibiting TikTok from considering the user-expressed preferences of teens unless it obtains

22 parental consent, thereby "interfer[ing] with … editorial choices" and "confront[ing] the First

23 Amendment."  *Moody*, 603 U.S. at 731-32.  The personalized-feed provisions thus restrict

24 TikTok's ability to speak to teens through its curated feeds in the manner it wishes.

25     88.    The fact that parents can grant consent and alter mandated defaults for feed

26 settings does not alter the fact that the Act impermissibly restricts speech.  *See Brown*, 564 U.S. at

27 795 n.3 (laws preventing children from "hearing or saying anything without their parents' prior

28

COMPLAINT
Case No. _____

consent" are no different from the standpoint of the First Amendment than outright bans). By setting a default, the State imposes a one-size-fits-all mandate that strips parents and teens of the autonomy to make deeply personal decisions about minors' access to speech.

89. The personalized-feed provisions also restrict the First Amendment rights of teens. *Cf. Warth*, 422 U.S. at 501 (plaintiff with standing to assert own constitutional rights can seek relief on basis of legal rights and interests of others); *Uthmeier*, 2025 WL 1570007, at *9 (citing *Warth* for similar proposition). By conditioning teens' access to protected speech on parental consent, the provisions interfere with teens' "right to receive information and ideas." *Stanley*, 394 U.S. at 564. That right is protected with full force on "social media" platforms, which for many are "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the case realms of human thought and knowledge." *Packingham*, 582 U.S. at 107; *see also Citizens United*, 558 U.S. at 339 ("The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a preconditioned to enlightened self-government and a necessary means to protect it."). And the right to listen applies even where the speech at issue is not itself entitled to First Amendment protection—for instance, because the speaker is a foreigner speaking from abroad. *See Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965).

90. **The personalized-feed provisions trigger strict scrutiny.** The personalized-feed provisions implicate strict scrutiny because they regulate the content TikTok publishes to people on its platform, restrict access only to speech by certain speakers, depend on the Act's content- and speaker-based coverage definition, and are a sharp break from history and tradition.

91. The Act's personalized-feed provisions trigger strict scrutiny because they prohibit TikTok from publishing certain content absent parental consent—namely, personalized feeds that reflect the preferences of people on its platform. §§ 27001(a), 27002(b)(2), 27002(b)(4).

92. The Act's personalized-feed provisions also trigger strict scrutiny because they "distinguish among different speakers." *Citizens United*, 558 U.S. at 340. While speaker preferences are problematic only when they "reflect[] a content preference," *Reed*, 576 U.S. at

COMPLAINT
Case No. _____

170, these provisions do.  The personalized-feed provisions restrict teens' access to compilations of third-party content created by websites that use personalized feeds, but allow unfettered access to compilations of content by other websites.  §§ 27001(a), 27002(b)(2), 27002(b)(4).  That is a restriction not only on speech by certain speakers, but on a particular type of speech: feeds of third-party content curated to reflect, among other things, user-expressed preferences.

93.     Additionally, the personalized-feed provisions are subject to strict scrutiny because they rely on the Act's central-coverage definition, which is content- and speaker-based.  That definition restricts access to websites that display personalized feeds of media "generated or shared *by users*," § 27000.5(a) (emphasis added), but not to websites that display personalized feeds of their own content.

94.     The personalized-feed provisions are also subject to strict scrutiny because they are a sharp break from history and tradition.  "[L]ong settled and established practice is a consideration of great weight" when applying the First Amendment.  *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022) (citation omitted).  The Supreme Court, therefore, recently made clear that when a state law fits within a "widespread" "tradition[]" of regulation, it should not be subjected to strict scrutiny.  *Free Speech Coal. v. Paxton*, 606 U.S. 461, 485 (2025).  The converse is also true.  Without "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription," the government "may not revise the 'judgment of the American people,' embodied in the First Amendment, 'that the benefits of its restrictions on the Government outweigh the costs.'"  *Brown*, 564 U.S. at 792 (quoting United States v. Stevens, 559 U.S. 460, 470 (2010) (alteration adopted)); *see also Vidal v. Elster*, 602 U.S. 286, 301 (2024).

95.     **The personalized-feed provisions fail any level of First Amendment scrutiny.** The Act's personalized-feed provisions, §§ 27001(a), 27002(b)(2), 27002(b)(4), cannot survive any level of heightened scrutiny.

96.     Strict scrutiny requires a law to be narrowly tailored to a "compelling" government interest.  *Reed*, 576 U.S. at 171.  By contrast, intermediate scrutiny requires a law to be narrowly

1    tailored to a "significant" government interest.  *Packingham*, 582 U.S. at 105-06.

2         97.    The State cannot demonstrate that the Act's personalized-feed provisions are

3    narrowly tailored to serve either a compelling or significant government interest.  While the State

4    has an interest in protecting minors—one which TikTok shares—here, the State has not

5    "specifically identif[ied] an 'actual problem' in need of solving" to which these provisions

6    effectively respond.  *Brown*, 564 U.S. at 799 (quoting *Playboy Ent. Grp.*, 529 U.S. at 822-23).

7    Despite the State's concern with so-called "addictive" feeds, these provisions do not focus on any

8    *addiction*, but rather any personalized feed available on the platform, assuming personalization

9    amounts to addiction without basis.  The Act's labeling is merely a sleight-of-hand that exposes

10   that its means are not narrowly tailored to its ends.

11        98.    Moreover, the Act does not outright forbid TikTok from providing personalized

12   feeds to teens.  Instead, it requires parental consent before doing so.  "That is not how one

13   addresses a serious social problem."  *Id.* at 802.  Teens cannot, for example, buy alcohol with

14   parental consent.  In any event, the platform (not to mention the internet in general) already has

15   numerous tools that enable parents to exercise exactly the oversight the State envisions, if they so

16   desire.  "Filling [any] remaining modest gap in concerned parents' control can hardly be a

17   compelling state interest."  *Id.* at 803.

18        99.    Nor can the State demonstrate that the Act's personalized-feed provisions are "the

19   least restrictive means" of achieving its interest, *Ams. for Prosperity Found. v. Bonta*, 594 U.S.

20   595, 607 (2021) (quotation marks omitted), or that they do not "burden substantially more speech

21   than is necessary to further" a significant interest, *Packingham*, 582 U.S. at 105-06 (quotation

22   marks omitted).

23        100.   Parents have many means of supervising their teens' access to social media,

24   including the tools the TikTok platform already provides.  *Cf. Brown*, 564 U.S. at 803 (assessing

25   existing means of achieving State's goal in assessing whether law narrowly tailored).  If the State

26   believed parents were doing an insufficient job of managing their teens' social media use, it could

27   have "educat[ed] children and parents" on the alleged dangers of social media use, or even

28

COMPLAINT
Case No. _____

"incentiviz[ed] companies to offer voluntary" tools to assist parents.[41] *NetChoice, LLC*, 113 F.4th at 1121.  The State's decision instead to "impose *governmental* authority, subject only to a parental veto," *Brown*, 564 U.S. at 795 n.3, ignored those alternatives and was therefore not the least restrictive means of accomplishing its goal.  *See Playboy Ent. Grp.*, 529 U.S. at 826 (finding speech regulation not least restrictive means where option of added communication and support to assist parental monitoring existed).

101.    The personalized-feed provisions are fatally overinclusive because, for example, they restrict access to vast amounts of information in personalized feeds—including compilations of political, educational, and news videos—that are not only not harmful to teens, but that lie at the core of First Amendment protections.

102.    The personalized-feed provisions are also fatally underinclusive.  For one thing, they prohibit the provision of recommended content on some platforms but not the very same content on others.  For example, an e-commerce website could serve teens an unlimited feed of products likely to catch their eye, but TikTok's provision of the same feed (absent parental consent) would violate the Act.  Such underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker." *Brown*, 564 U.S. at 802.  In addition, the provisions allow other platforms—such as Netflix and the New York Times—to recommend videos and other content to people based on what their prior use of the platform has revealed about their interests and preferences.

103.    Finally, the Act's parental-consent provisions impose an invalid prior restraint, "the most serious and the least tolerable infringement on First Amendment rights," *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Long condemned as "presumptively unconstitutional," prior restraints require the government to "carr[y] a heavy burden of showing justification." *Id.* at 558.  The Act flatly bans TikTok from disseminating certain editorial content—personalized feeds—to teens, which is a classic prior restraint.  That the Act does permit such dissemination with parental consent does not solve the First Amendment problem because, by requiring the

---

[41] The State has taken this approach in other contexts.  *See, e.g.*, Cal. Dept. of Education, *Media Literacy Resources*, https://www.cde.ca.gov/ci/cr/ml/index.asp (last visited Nov. 13, 2025).

COMPLAINT
Case No. _____

consent of parents for access to personalized feeds, the Act deputizes parents, guardians, and other caregivers to act as agents of the government applying whatever standards the parents decide to apply.  The Act thus creates a framework that closely resembles "a licensing statute placing unbridled discretion in the hands of a government official," which "constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).  "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech, it may not *condition* that speech on obtaining a license or permit from a government official in that official's boundless discretion."  *Id*. at 764.  That is because "a law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship" and that "danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official."  *Id*. at 763.

104.    Although the government may, of course, protect parental rights, "it does not follow that the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*."  *Brown*, 564 U.S. at 795 n.3.  The Act deputizes private individuals—parents—to act as viewpoint-based licensors on behalf of the government, exercising their standardless "unbridled discretion," *Lakewood*, 486 U.S. at 757.  This contravenes the Supreme Court's recent unanimous holding in *Nat'l Rifle Ass'n of Am. v. Vullo*:  "[A] government official cannot do indirectly what she is barred from doing directly."  602 U.S. 175, 190 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-69 (1963)).

105.    Unless declared invalid and enjoined, the Act's personalized-feed provisions, §§ 27001(a), 27002(b)(2), 27002(b)(4), will unlawfully deprive TikTok and the people on the platform of their fundamental First Amendment rights.

//

//

//

COMPLAINT
Case No. _____

**COUNT II**
**VIOLATION OF THE FIRST AMENDMENT AS INCORPORATED BY THE**
**FOURTEENTH AMENDMENT, 42 U.S.C. § 1983**
**(LIKE-COUNT, NOTIFICATION, AND DISCLOSURE PROVISIONS, §§ 27002(A),**
**27002(B)(1), 27002(B)(3), 27005)**

106.     TikTok incorporates all prior paragraphs as though fully set forth herein.

107.     The Ninth Circuit previously held that the Act's like-count provision,

§ 27002(b)(3), likely violates the First Amendment on its face and enjoined enforcement of that

provision. *NetChoice II*, 152 F.4th at 1022, 1025.

108.     This Court previously held that the Act's notification provisions, §§ 27002(a),

27002(b)(1), and disclosure provision, § 27005, likely violate the First Amendment on their face

and enjoined the enforcement of those provisions. *NetChoice I*, 761 F. Supp. 3d at 1224-28,

1229-30, 1232.

109.     Neither decision limited the injunctive relief to NetChoice and its members. *See*

*NetChoice II*, 152 F.4th at 1025; *NetChoice I*, 761 F. Supp. 3d at 1232.

110.     Those provisions violate the First Amendment as applied to TikTok for the same

reasons articulated in those earlier decisions.

111.     Accordingly, the Court should clarify that its preliminary injunction prohibits the

enforcement of those provisions against TikTok .

112.     Unless enjoined, the Act's like-count, notification, and disclosure provisions,

§§ 27002(a), 27002(b)(1), 27002(b)(3), 27005, will unlawfully deprive TikTok of its rights.

**COUNT III**
**DECLARATORY RELIEF, 42 U.S.C. § 1983, 28 U.S.C. § 2201**

113.     TikTok incorporates all prior paragraphs as though fully set forth herein.

114.     The Act's personalized-feed provisions, §§ 27001(a), 27002(b)(2), 27002(b)(4),

violate the First Amendment as incorporated by the Fourteenth Amendment.  They thereby

deprive TikTok of its enforceable rights.

115.     Federal courts have the power to "declare the rights and other legal relations of

any interested party seeking such declaration."  28 U.S.C. § 2201(a).

COMPLAINT
Case No. _____

116.    This Court can and should exercise its equitable power to enter a declaration that the Act's personalized-feed provisions are unconstitutional and otherwise unlawful.

**PRAYER FOR RELIEF**

TikTok respectfully requests the following relief from the Court:

1.    A declaration, pursuant to 28 U.S.C. § 2201, that the personalized-feed provisions of the Protecting Our Kids from Social Media Addiction Act, Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), 27002(b)(4), violate the First Amendment of the United States Constitution as applied to TikTok's feeds that could be deemed "addictive," including, but not limited to, those identified above.

2.    A preliminary injunction enjoining Defendant and his agents, employees, and all persons acting under their supervision, direction, or control from taking any action to enforce the challenged portions of the Act against TikTok;

3.    A permanent injunction enjoining Defendant and his agents, employees, and all persons acting under their supervision, direction, or control from taking any action to enforce the challenged portions of the Act against TikTok;

4.    An entry of judgment in favor of TikTok;

5.    Attorneys' fees and costs to which TikTok may be entitled by law, including under 42 U.S.C. § 1988; and

6.    Any further relief the Court deems just and proper.

COMPLAINT
Case No. _____

Dated: November 13, 2025                     Respectfully submitted,


                                             By:    /s/ Daniel M. Petrocelli
                                                    Daniel M. Petrocelli

                                             DANIEL M. PETROCELLI (S.B. #97802)
                                             dpetrocelli@omm.com
                                             O'MELVENY & MYERS LLP
                                             1999 Avenue of the Stars, Suite 800
                                             Los Angeles, California 90067-6035
                                             Telephone:    +1 310 553 6700
                                             Facsimile:    +1 310 246 6779

                                             JEFFREY L. FISHER (S.B. #256040)
                                             jfisher@omm.com
                                             O'MELVENY & MYERS LLP
                                             2765 Sand Hill Road
                                             Menlo Park, CA 94025
                                             Telephone:    +1 650 473 2600
                                             Facsimile:    +1 650 473 2601

                                             JONATHAN D. HACKER (*pro hac vice
                                             forthcoming*)
                                             jhacker@omm.com
                                             O'MELVENY & MYERS LLP
                                             1625 Eye Street, N.W.
                                             Washington, DC 20006
                                             Telephone:    +1 202 383 5300
                                             Facsimile:    +1 202 383 5414

                                             *Attorneys for Plaintiff TikTok Inc.*

COMPLAINT
Case No. _____