DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, California 90067-6035
Telephone:     +1 310 553 6700
Facsimile:     +1 310 246 6779

JEFFREY L. FISHER (S.B. #256040)
jfisher@omm.com
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Telephone:     +1 650 473 2600
Facsimile:     +1 650 473 2601

JONATHAN D. HACKER (*pro hac vice*)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone:     +1 202 383 5300
Facsimile:     +1 202 383 5414

*Attorneys for Plaintiff TikTok Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| TIKTOK INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROB BONTA, in his official capacity as Attorney General of California,<br><br>                    Defendant. | Case No. 5:25-cv-9789-EJD<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:  February 5, 2026<br>Time: 9:00 a.m.<br>Place:  San Jose Courthouse,<br>          Courtroom 4 – 5th Floor<br>          280 South 1st Street<br>          San Jose, CA 95113 |

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION ......................... 1

STATEMENT OF THE ISSUE .................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 2

    I.     INTRODUCTION ................................................................................. 2

    II.    BACKGROUND ................................................................................ 4

        A.    The TikTok Experience................................................................... 4

            1.    *TikTok Screens, Curates and Disseminates First Amendment Protected Speech* ........................................... 4

            2.    *TikTok Provides a Variety of Means for Parents to Supervise Their Teen's Use of TikTok* ............................. 7

        B.    California Now Prohibits TikTok From Providing Any Personalized Feed to Any Minor Absent Verifiable Parental Consent.................................................................................. 8

        C.    Prior Challenges to the Act ...................................................... 10

    III.   LEGAL STANDARD......................................................................... 11

    IV.   ARGUMENT ...................................................................................... 11

        A.    TikTok is Likely to Succeed on the Merits of its First Amendment Claim .............................................................................. 12

            1.    *The Personalized-Feed Provisions Directly Restrict Protected Expression* ..................................................... 13

            2.    *The Personalized-Feed Provisions Trigger Strict Scrutiny* .......... 18

            3.    *The Personalized-Feed Provisions Fail Any Level of First Amendment Scrutiny*.................................................. 21

        B.    TikTok Faces Imminent and Irreparable Harm Absent Injunctive Relief.............................................................................. 24

        C.    The Balance of Equities and Public Interest Weigh in TikTok's Favor .................................................................................. 24

    V.    CONCLUSION.................................................................................. 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) .................................................................................................... 21

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) ................................................................................................ 3, 13

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) .............................................................................................. 11, 18

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..................................................................................... 24

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .............................................................................................. passim

*Chamber of Com. v. Bonta*,
62 F.4th 473 (9th Cir. 2023) .................................................................................. 11, 12

*Citizens United v. FEC*,
558 U.S. 310 (2010) .................................................................................................... 19

*Cmty. House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007) ..................................................................................... 24

*Elrod v. Burns*,
427 U.S. 347 (1976) .................................................................................................... 24

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) .................................................................................................... 18

*Free Speech Coal., Inc. v. Paxton*,
606 U.S. 461 (2025) .................................................................................................... 19

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ....................................................................................... 24

*Hous. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .................................................................................................... 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) .............................................................................................. 13, 21

*Interactive Digit. Software Ass'n v. St. Louis Cnty.*,
329 F.3d 954 (8th Cir. 2003) ....................................................................................... 13

*Klein v. City of San Clemente*,
584 F.3d 1196 (9th Cir. 2009) ..................................................................................... 24

*Lamont v. Postmaster Gen.*,
381 U.S. 301 (1965) .................................................................................................... 17

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*McCullen v. Coakley*,
    573 U.S. 464 (2014).................................................................................................. 21

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024).................................................................................. 12

*Miami Herald Publ'g Co. v. Tornillo*,
    418 U.S. 241 (1974)...................................................................................... 3, 13, 17

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024)........................................................................................ passim

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018).............................................................................................. 19

*NetChoice v. Bonta*,
    761 F. Supp. 3d 1202 (N.D. Cal. 2024) ..................................................... 10, 14, 24

*NetChoice v. Bonta*,
    761 F. Supp. 3d 1232 (N.D. Cal. 2025) .............................................................. 10

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024)............................................................................. 22

*NetChoice, LLC v. Bonta*,
    152 F.4th 1002 (9th Cir. 2025)...................................................................... passim

*NetChoice, LLC v. Reyes*,
    748 F. Supp. 3d 1105 (D. Utah 2024), *appeal docketed sub nom. NetChoice v.
    Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024) ....................................................... 12

*Nken v. Holder*,
    556 U.S. 418 (2009).............................................................................................. 24

*Packingham v. North Carolina*,
    582 U.S. 98 (2017)............................................................................................ 2, 17

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015)......................................................................................... 19, 21

*Reno v. ACLU*,
    521 U.S. 844 (1997)........................................................................................... 2, 18

*Riley's Am. Heritage Farms v. Elsasser*,
    32 F.4th 707 (9th Cir. 2022)................................................................................ 24

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011)........................................................................................ passim

*Stanley v. Georgia*,
    394 U.S. 557 (1969)........................................................................................ 3, 17

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994).............................................................................................. 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ................................................................................ 18, 22

*United States v. Stevens*,
    559 U.S. 460 (2010) ...................................................................................... 20

*Vidal v. Elster*,
    602 U.S. 286 (2024) ...................................................................................... 20

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................................... 17

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ....................................................................... 18

**Statutes**

Cal. Health & Safety Code § 27000.5(a) ................................................. 9, 10, 17, 27

Cal. Health & Safety Code § 27000.5(a)(1)-(7) ................................................... 9

Cal. Health & Safety Code § 27000.5(b) ..................................................... 10, 27

Cal. Health & Safety Code § 27000.5(b)(1) ....................................................... 22

Cal. Health & Safety Code § 27000.5(b)(2) ............................................. 10, 11, 27

Cal. Health & Safety Code § 27000.5(b)(2)(A) ................................................. 22

Cal. Health & Safety Code § 27000.5(d) ............................................................. 9

Cal. Health & Safety Code § 27000.5(e) ............................................................. 9

Cal. Health & Safety Code § 27000.5(f) .............................................................. 9

Cal. Health & Safety Code § 27001(a) ......................................................... passim

Cal. Health & Safety Code § 27001(a)(1) ...................................................... 9, 10

Cal. Health & Safety Code § 27002(a) ........................................................... 1, 11

Cal. Health & Safety Code § 27002(b)(1) ....................................................... 1, 11

Cal. Health & Safety Code § 27002(b)(2) ........................................... 1, 10, 17, 21

Cal. Health & Safety Code § 27002(b)(3) ....................................................... 1, 12

Cal. Health & Safety Code § 27002(b)(4) ........................................... 1, 10, 17, 21

Cal. Health & Safety Code § 27005 .............................................................. 1, 11

S.B. 976, 2024 Legis., Reg. Sess. § 1(a) (Cal. 2024), 2024 Cal. Stats. ch. 321
    (West). ............................................................................................................ 2

S.B. 976, 2024 Legis., Reg. Sess. § 1(b) (Cal. 2024), 2024 Cal. Stats. ch. 321
    (West). .......................................................................................................... 24

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on February 5, 2026, at 9:00 a.m. before the Honorable Edward J. Davila, San Jose Courthouse, 280 South 1st Street, San Jose, California, Courtroom 4, 5th Floor, Plaintiff TikTok Inc. will and hereby does move under Federal Rule of Civil Procedure 65(a) for an order granting a preliminary injunction against Defendant Rob Bonta, in his official capacity as the Attorney General of California.  The motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the evidence submitted herewith, the pleadings and papers on file in this action, including Plaintiff's Complaint, the arguments of counsel, and any other matter the Court may properly consider.

Plaintiff respectfully requests that the Court enter a preliminary injunction against Defendant's enforcement of Cal. Health & Safety Code §§ 27001(a), 27002(b)(2), and 27002(b)(4) against Plaintiff, and confirm that the provisions of the Act already enjoined by this Court and the Ninth Circuit, *see* Cal. Health & Safety Code §§ 27002(a), 27002(b)(1), 27002(b)(3), and 27005 may not be enforced against Plaintiff.

**STATEMENT OF THE ISSUE**

1.  Whether this Court should preliminarily enjoin enforcement of SB 976's provisions prohibiting TikTok from allowing minors any access to a personalized feed absent verifiable parental consent because those provisions violate the First Amendment rights of TikTok and people on its platform and the other factors for such relief are satisfied.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiff TikTok Inc. ("TikTok") is a publisher whose goal is "to inspire creativity and bring joy." In keeping with that mission, TikTok allows people to engage through videos with ideas, pursue their passions, and find their digital communities.

At the same time, TikTok recognizes that what that looks like for each person will vary and that what interests one person may not interest another. Indeed, millions of people use the platform, and they post billions of pieces of content annually—infinitely more than any single person could ever view. And that content covers topics "as diverse as human thought." *Reno v. ACLU*, 521 U.S. 844, 870 (1997). Accordingly, TikTok curates that content in personalized feeds that reflect its editorial choices, including considering individuals' preferences. Indeed, this personalization is vital because TikTok focuses on curating and promoting content made by creators with whom an individual has no pre-existing relationship. And TikTok, like many other companies offering online platforms, uses algorithms and other forms of technology to implement its editorial choices at scale. Those tools allow TikTok to execute its expressive decisions about what content it wants to recommend—decisions that are based on its Community Guidelines, other editorial preferences, and its goals for its digital community and the content it wants to see promoted. It also uses those tools to reflect what that community wants to see—not just as determined by the majority, but by each individual.

California recognizes that "social media provides an important tool for communication and information sharing." California's Protecting Our Kids from Social Media Addiction Act ("SB 976" or the "Act"), 2024 Cal. Stats. ch. 321, SB 976, 2023-24 Reg. Sess. (Cal. 2024) (codified at Cal. Health & Safety Code §§ 27000-07), § 1(a). In fact, platforms like TikTok are "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017). Yet the State's new law makes it illegal for TikTok to provide any personalized feeds to any minors absent express parental consent.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

The statute's assumption is that personalized speech—that is, speech that reflects at least in part what an individual wants to see—is uniquely and unduly dangerous (or, in the State's terminology, "addictive").

Because the Act's personalized-feed provisions trample both TikTok's and teens' First Amendment rights, this Court should issue a preliminary injunction prohibiting the State from enforcing them. The First Amendment protects a publisher's "exercise of editorial control and judgment." *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974). In other words, "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own" that "results in a distinctive expressive product." *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024); *accord Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). That is true whether the resulting speech is on paper or online. *Moody*, 603 U.S. at 731. Furthermore, people have a First Amendment right to receive information and entertainment. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

The State appears to think that using technology to carry out editorial decisions at scale or the resulting personalization of a feed—which creates many individualized expressive products, rather than a single generalized one—erodes these constitutional rights to speak and listen. The State is incorrect. The use of technological tools to carry out TikTok's human editorial choices no more dilutes First Amendment protections than does the use of a printing press rather than a quill pen. And creating an expressive product that takes into account individual preference is nothing new either. As the Supreme Court has explained, speech "can be more effective when [the speaker] know[s] the background and . . . preferences" of their audience, which will influence "how best to present a particular . . . message." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011). Accordingly, magazines, newspapers, and television channels have traditionally arranged content in part to account for reader interest. As they have increasingly shifted to the Internet, such publishers have continued to use the same approach to giving people content that they want to show and that their users want to see. Nearly all online publishers and streaming platforms—from the

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

New York Times to Netflix—now consider individualized preferences in determining what content to publish and how to present it to their users. TikTok, like other companies offering online platforms, does the same. For teens, that lets them learn about the things that interest them, makes their experience safer and more positive, and allows them to find connections in a digital community.

TikTok recognizes (and shares) the State's interest in protecting children from harm. But a laudable end does not justify unconstitutional means. And that basic principle dooms SB 976's personalized-feed provisions. The provisions severely burden the expressive interests of both TikTok and the teens who use it. In addition, TikTok already provides ample tools for parents to monitor and even restrict their teens' use of the platform. That being so, the Act's parental consent requirement is both unnecessary and places an impermissible governmental thumb on the scale of suppressing protected speech.

Because TikTok is likely to prevail on the merits of its argument and all the other requirements for interim relief are readily satisfied here, this Court should preliminarily enjoin the enforcement of SB 976's personalized-feed provisions against TikTok.

## II.    BACKGROUND

### A.    The TikTok Experience

1.    *TikTok Screens, Curates and Disseminates First Amendment Protected Speech*

TikTok enables people to create, share, and view videos—as well as post and comment on others' videos. With a mission "to inspire creativity and bring joy," Declaration of Daniel M. Petrocelli ("Petrocelli Decl."), Ex. A, TikTok has become one of the world's most widely used online media platforms, with more than 170 million monthly users in the United States. Declaration of Joey Zhou ("Zhou Decl.") ¶ 4. In a single year in the United States alone, TikTok creators uploaded more than 7 billion videos that were viewed more than 17 trillion times in the United States and abroad. *Id.* ¶ 5. TikTok's personalized feeds allow TikTok to sift through that mountain of content and recommend videos that reflect both what TikTok and a particular person consider valuable and interesting.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

The content available on TikTok covers all manner of topics. For example, people can watch videos posted by celebrities, keep up with their favorite sports teams, or engage with new music releases from pop stars. They can get news on TikTok, learn from educational channels, listen to politicians who post regularly on TikTok, and get help on everyday school topics from education-focused creators like Chem Teacher Phil, whose videos teach viewers about basic chemistry concepts and who has millions of followers. *See* Petrocelli Decl., Exs. B-H; *see also id.*, Ex. I (3.8 million followers). Through these exchanges, individuals of all ages can learn, connect, and find communities. That may be with other people faced with a family member with cancer or a grandparent with dementia, *see* Petrocelli Decl., Ex. J, other teens trying to be recruited for college sports or to pursue a particular profession, or other LGBTQ+ teens.

Unlike some other companies that offer online platforms, TikTok focuses on curating and promoting content made by creators with whom an individual might have no existing relationship. Zhou Decl. ¶ 6. To help discover new content and new creators, TikTok uses content moderation, personalized recommendation systems, and video promotion and filtering processes to identify and prioritize content TikTok thinks an individual is likely to find interesting and that reflects TikTok's own content preferences as well. Because a creator need not be famous or have an existing fanbase for their videos to reach a wide audience, that incentivizes regular creators to generate new and creative content and allows a broad user base to discover and engage with new and interesting ideas.

TikTok's For You feed is the primary personalized feed TikTok offers. Zhou Decl. ¶¶ 6, 8. Three overall processes drive it. First, TikTok applies its Community Guidelines, a set of principles addressing what content is permitted on TikTok and of that content, what subset is eligible for recommendation in the For You feed. Declaration of Mikaela Schiller ("Schiller Decl.") ¶¶ 3-8. Those principles include preventing harm, encouraging kindness and respect, respecting local cultures, and supporting free expression. *Id.* ¶ 5. Consistent with these principles, the Guidelines prohibit, among other things, (i) threats, glorifying violence, or promoting criminal behavior; (ii) hate speech, hateful behavior, or promotion of hateful ideologies; (iii) certain types of body exposure and sexualized behavior, like nudity; and (iv) trading, marketing, or providing access to regulated, prohibited, or high-risk goods and services, like firearms and regulated substances. *Id.*

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

They also outline policies against misinformation. *Id.* By enforcing the Guidelines through both technology-based and human content moderation, TikTok tries to cultivate a platform where people can safely "discover things they love, build communities, and express themselves." Petrocelli Decl., Ex. K.

Second, TikTok sorts, ranks, and filters content that TikTok thinks is sufficiently high quality and that it expects an individual will find interesting. Zhou Decl. ¶ 11. It does so based on a variety of factors, including but not limited to a person's previous interactions with content on the platform. *Id.* Those factors include whether an individual likes, comments, or searches for content, scrolls past content, or chooses to follow new creators. *Id.* ¶ 12. They also include characteristics of the videos themselves like the quality of the video, the video creator, and the video's content. *Id.* The recommendation system also incorporates rules based on individual characteristics separate from a person's interactions to make their experience a more positive one. For example, TikTok excludes certain content that does not violate the Community Guidelines but is potentially inappropriate for those under 18 from the pool of videos that may be recommended to any individual teen. *Id.* ¶ 18. People also have the ability to shape the content they see in their personalized feed by, for example, tapping "Not interested" on a video shown to them or adjusting their preferences for subject matter categories. *Id.* ¶ 20. Importantly, while TikTok's recommendation system uses models to carry out this process, those models—like the other models used in identifying content and compiling it for particular people—are simply a tool to implement TikTok's editorial decisions at scale.

Third, TikTok promotes certain content through its video promotion and filtering process both to reflect its editorial preferences (e.g., supporting the inclusion of varied and high-quality content on the platform) and to filter out and disperse certain content. Those decisions also take into account individual preferences. For example, TikTok employees might decide to promote videos about the FIFA World Cup, but those videos would primarily be promoted to individuals who are actually interested in soccer. Schiller Decl. ¶ 12.

As a result, the For You feed is different for each individual. That facilitates people's discovery of new content and engagement with that content and other individuals, and, particularly

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

for teens, can make for a safer, more positive online experience.  Zhou Decl. ¶ 18.

Several other TikTok feeds similarly account for user-expressed interests, including the Following feed, Friends feed, Stories Skylight, LIVE feed, Search feed, STEM feed, Explore feed, and Comment feed.  Zhou Decl. ¶ 8.  For instance, if an individual asks the Search feed for "Christmas" videos, that could mean clips from television specials, religious figures explicating the historical and spiritual significance of the holiday, or scenes of ordinary families opening presents under their trees.  In deciding what would be responsive, TikTok considers, among other things, whether the individual has previously expressed greater interest in one of those things compared to the others.  Similarly, the STEM feed, which displays content related to science, technology, engineering, and math, might present videos about physics or home science experiments—as opposed to computer engineering or algebra—based on the preferences an individual has expressed through their past interactions.

        2.       *TikTok Provides a Variety of Means for Parents to Supervise Their Teen's Use of TikTok*

TikTok has created a suite of features to enable teens to control and their parents to supervise their experience on TikTok.  Declaration of Khoi Nguyen ("Nguyen Decl.") ¶ 3.  For example, parents can limit daily screen time on the platform; see summaries of their teen's screen time; decide who can see or comment on their teen's videos; and determine whether their teen's account can be recommended to others.  *Id.* ¶ 4.  Individuals can also make their accounts private (a mandatory setting for those who register as under the age of 16), limit their daily screen time (a default setting for those who register as under 18), schedule reminders to take a break from the platform, and mute notifications, among other things.  *Id.* ¶¶ 5-8, 12.  TikTok also provides a Well-Being Guide that encourages people to assess how their digital habits impact their physical and mental health, and includes resources and prompts to help them do so, as well as Safety Centers that include information on topics like tragic event support and countering hate speech and behavior.  *Id.* ¶¶ 14-15.

Parents can also use any of the many other parental control tools offered by cellular and broadband providers, internet browsers, third-party software developers, and others that enable

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

parents to ensure their teens use social media or other platforms safely and consistent with each individual family's preferences. *See* Petrocelli Decl., Exs. L-P. For example, Samsung phones and tablets allow parents to set limits on app usage, restrict access to certain content, and lock their child's device during certain hours. *Id.*, Ex. Q. And third-party software programs like Aura allow parents to set screen time limits, schedule downtime, block certain apps, and receive reports on their teens' social behavior patterns online (e.g., their "engagement style" and the "volume and tone" of online interactions). *Id.*, Ex. R.

### B.    California Now Prohibits TikTok From Providing Any Personalized Feed to Any Minor Absent Verifiable Parental Consent

California's Protecting Our Kids from Social Media Addiction Act recognizes that "[s]ocial media provides an important tool for communication and information sharing." § 1(a). The Act nonetheless deems *any* digital feed that takes into account information provided by an individual— including information about their content preferences and certain information about their devices— automatically "addictive," regardless of actual usage.[1] Based on that assumption, the Act restricts online services' ability to provide personalized feeds to minors in three ways.

First, the Act categorically forbids covered internet-based services or applications from "provid[ing]" a personalized feed to any minor "unless … [t]he operator has obtained verifiable

---

[1] Specifically, the Act defines an "addictive feed" as "online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device" § 27000.5(a). Feeds are exempt from that definition when at least one of seven conditions is met, including that information is not persistently associated with a user or their device and does not concern the user's previous interactions with media; the user expressly and unambiguously requested the specific media; or the recommended media is exclusively the next in a preexisting sequence and not automatically played. *Id.* § 27000.5(a)(1)-(7).

parental consent." § 27001(a).[2]  Second, it requires covered online services to limit minors' access to personalized feeds to "one hour per day unless modified by a parent." § 27002(b)(2).  Third, the Act requires that a covered online service provide a mechanism for a parent to set the "default feed" shown to a minor to "one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor." § 27002(b)(4).  Together, these "personalized-feed provisions" prohibit TikTok from displaying any personalized feeds to any teens absent parental consent.  And even when parents do consent, the provisions limit the time each day a teen may access personalized feeds, unless that, too, is modified by a parent.

Notwithstanding the State's professed concerns about the risks of personalization, the Act does not apply to all entities that offer a personalized feed—not by a long shot.  The Act does not apply to any "online service, online application, or mobile application, including, but not limited to, a 'social media platform'" that does not offer a personalized feed "as a significant part of the service provided by that internet website." § 27000.5(b).  It does not apply to personalized feeds that do not involve user-generated content.  §27000.5(a).  And it does not apply to websites or applications on which "interactions between users are limited to commercial transactions or to consumer reviews." § 27000.5(b)(2).  Websites and applications that "operate[] a feed for the primary purpose of cloud storage" are also exempt.  *Id.*

---

[2] The Act defines an "Operator" as "a person who operates or provides an internet website, an online service, an online application, or a mobile application," § 27000.5(e); a "Minor" as "an individual under 18 years of age who is located in the State of California," § 27000.5(d); and "Parent" as a "parent or guardian," § 27000.5(f).  Until January 1, 2027, this requirement applies only to users the operator knows are minors.  *See* § 27001(a)(1).  But after that date, the Act requires Operators to "reasonably determine[]" that a user is not a minor.  *Id.*  Doing so will require verifying users' age, which will affect all users, not just minors.  *See NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1018-19 (9th Cir. 2025) (age verification challenges not yet ripe).

### C.    Prior Challenges to the Act

Shortly after the Act's enactment, NetChoice (of which TikTok is not currently a member) sued in this Court to enjoin the Act's enforcement.  *See* Compl., *NetChoice v. Bonta*, No. 5:24-cv-7885 (N.D. Cal. Nov. 12, 2024), ECF No. 1.  NetChoice raised facial and as-applied First Amendment challenges to the personalized-feed provisions, the Act's central coverage definition, and several other provisions.  NetChoice also challenged the central coverage definition as void for vagueness.  *Id.* ¶¶ 75-141.  NetChoice moved for a preliminary injunction, and this Court granted it in part and denied it in part, enjoining provisions limiting the timing of notifications and compelling disclosure of statistics related to minors' social media use, §§ 27002(a), 27002(b)(1), 27005).  *See NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1232 (N.D. Cal. 2024).

As to the personalized-feed provisions, the Court recognized that (1) under *Moody*, the curation of information in personalized feeds is unquestionably protected speech activity insofar as it reflects the platform's own expressive choices; (2) editorial "content moderation" is such a choice; and (3) "[i]f a human designs an algorithm for the purpose of recommending interesting posts on a personalized feed, the feed probably" constitutes such expression as well.  *NetChoice*, 761 F. Supp. 3d at 1219-23.  But the Court held that NetChoice was not likely to succeed on its *facial* First Amendment challenge because it had not proven that *all* of the platforms covered by SB 976 "uniformly" have this goal, as opposed to "recommend[ing] posts based solely on prior user activity."  *Id.* at 1221.  Similarly, the Court deemed the record insufficient to assess individual members' feeds, so it concluded NetChoice lacked associational standing to bring its as-applied challenge.  *Id.* at 1230-31.

NetChoice appealed, and both this Court and the Ninth Circuit barred enforcement of the Act pending appeal given the "weighty issues" at play.  *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1236 (N.D. Cal. 2025); Order, *NetChoice, LLC v. Bonta*, No. 25-146 (9th Cir. Jan. 28, 2025), Dkt. No. 11.  Like this Court, the Ninth Circuit acknowledged that personalized feeds can be expressive and thus protected by the First Amendment.  *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014 (9th Cir. 2025).  But, also like this Court, the Ninth Circuit concluded that the record was insufficient to establish that all of NetChoice's members' feeds were expressive, that NetChoice's challenge

required the participation of individual members, and thus that NetChoice's as-applied and facial challenges failed. *Id.* at 1014, 1022. In so doing, the Ninth Circuit did not decide whether or when personalized feeds are protected by the First Amendment. Instead, it simply recognized that "some personalized recommendation algorithms may be expressive, while others are not, and that inquiry is fact intensive." *Id.* at 1021.[3]

NetChoice's petition for rehearing and rehearing en banc was denied. *See* Order, *NetChoice v. Bonta*, No. 25-146 (9th Cir. Nov. 6, 2025), Dkt. No. 75.

## III.    LEGAL STANDARD

A preliminary injunction is appropriate where a party establishes "(1) a likelihood of success on the merits, (2) a likelihood of irreparable harm, (3) that the balance of harm tips in [their] favor, and (4) that the injunction is in the public interest." *Chamber of Com. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023).

## IV.    ARGUMENT

While the particular provisions of the Act may be new, the impetus behind it—and the need for courts to reaffirm constitutional limits—are not. Beginning with "dime novels," "[r]adio dramas," "movies," "comic books," "television," "music lyrics," and "video games," states have tried time and time again to regulate new forms of expression based on concerns about harm to minors. Time and time again, courts have held that such regulations conflict with the First Amendment. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 797-98 (2011). In particular, courts have recognized both that minors "are entitled to a significant measure of First Amendment protection" and that states lack "a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794 (cleaned up). Those protections apply with particular force when, as here, laws impeding minors' access to speech may also affect adults' access to speech. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004). Applying those constitutional rules of the road, courts throughout the country

---

[3] While the Ninth Circuit largely upheld this Court's ruling, it extended the injunction to the default setting limiting minors' ability to view the number of likes or other feedback to pieces of media within a personalized feed, § 27002(b)(3). *NetChoice*, 152 F.4th at 1025.

have enjoined similar laws restricting minors' access to online speech. *See, e.g.*, *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1118 n.77, 1134 (D. Utah 2024) (preliminarily enjoining law requiring parental consent and collecting other cases enjoining similar laws), *appeal docketed sub nom. NetChoice v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024).

The Act's personalized-feed provisions should meet the same fate. This Court and the Ninth Circuit declined to issue a preliminary injunction in the *NetChoice* litigation against SB 976's personalized-feed provisions because the record in that case lacked sufficient facts to determine whether all of the personalized feeds there warranted First Amendment protection. This litigation supplies those facts as to TikTok. And those facts establish that TikTok's personalized feeds are not solely driven by individual preference, but instead incorporate a host of TikTok's content-based choices resulting in a distinct, constitutionally protected expressive product. Neither the fact that that product differs for each individual nor the fact that TikTok uses tools to carry out those expressive choices changes the constitutional calculus. TikTok is entitled to a preliminary injunction because (1) it is likely to succeed on the merits of its as-applied challenge to the personalized-feed provisions, (2) it is likely to suffer irreparable harm absent preliminary relief, (3) the balance of equities weighs in its favor, and (4) the State has no valid interest in enforcing an unconstitutional statute. *See Chamber of Com.*, 62 F.4th at 481.

### A.    TikTok is Likely to Succeed on the Merits of its First Amendment Claim

A party seeking preliminary injunctive relief on a First Amendment claim need only carry the "initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).

TikTok easily establishes a colorable claim that the Act's personalized-feed provisions together and separately violate the First Amendment. The provisions directly restrict both TikTok's protected speech and the protected speech of people on its platform by regulating TikTok's editorial decisions about what content to display to teens and how. The State cannot articulate a compelling interest that the provisions actually serve or that justify the sweeping restrictions on speech that they impose. TikTok therefore satisfies its burden on this "most important factor." *Id.*

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

1.      *The Personalized-Feed Provisions Directly Restrict Protected Expression*

a. The personalized-feed provisions regulate protected speech as applied to TikTok's For You feed and other personalized feeds.  The First Amendment protects against interference with the "exercise of editorial control and judgment," even when the content comes from third parties. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).  Indeed, "[d]eciding on the third-party speech that will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own" that "results in a distinctive expressive product." *Moody*, 603 U.S. at 731; *accord Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).  Nor is a "particularized message" required for those compilations to be constitutionally protected.  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569 (1995); *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 957 (8th Cir. 2003).  What matters is the exercise of editorial discretion in deciding how to compile the speech.  *Tornillo*, 418 U.S. at 258.

All of these principles apply to *personalized* feeds as well.  As the Supreme Court has explained, speech "can be more effective when [the speaker] know[s] the background and … preferences" of their audience, which will influence "how best to present a particular … message." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558 (2011).  In *Brown*, therefore, the Court rejected out of hand the idea that video games were not constitutionally protected because they were interactive and took into account user input, noting that "young readers of choose-your-own-adventure stories have been able to make decisions that determine the plot by following instructions about which page to turn to." 564 U.S. at 798.  In *Moody*, the Supreme Court confirmed that personalized social media feeds such as YouTube and Facebook are "expressive activity" protected by the First Amendment as well.  603 U.S. at 733-40; *see also NetChoice*, 152 F.4th at 1021 (recognizing that *Moody* established that "some personalized recommendation algorithms may be expressive").

To be sure, *Moody* left open the question whether an online feed that reflected *only* individual preferences could constitute expressive activity. *Id.* at 736 n.5.[4]  First principles indicate

---

[4] Similarly, this Court has posited that if a personalized feed were to "recommend posts based *solely*

it clearly would.  But the facts of this case don't require this Court to address that question.  TikTok's personalized feeds depend on a whole host of editorial choices besides individual preference that TikTok makes about the kind of content it wants to present and the kind of digital communities it wants to foster.  Among other things, TikTok's content moderation process implements its Community Guidelines' editorial judgments about what content should be on TikTok and which should be considered eligible for a personalized feed.  These Guidelines reflect judgments about appropriateness of content for certain audiences, popularity among others, local customs, and TikTok's own editorial priorities.  Schiller Decl. ¶¶ 3-8; Zhou Decl. ¶¶ 9-23.  TikTok also makes individual-agnostic judgments as to what constitutes high- or low-quality content.  Zhou Decl. ¶¶ 11-19.  Finally, For You feeds may also include certain content that TikTok independently—i.e., unrelated to any individual—wants to promote.  Schiller Decl. ¶¶ 9-12.  That process *in toto*—that is, the combination of all of those content moderation rules with considerations of individualized preference—"is expressive activity of its own" and "results in a distinctive expressive product."  *Moody*, 603 U.S. at 731.

All of this remains true when those choices are carried out through an algorithm.  When humans program algorithms to carry out their "editorial judgment" about which posts "to prioritize [or] remove," the First Amendment protects that "judgment."  *Moody*, 603 U.S. at 745-46 (Barrett, J., concurring); *see also NetChoice*, 152 F.4th at 1014 ("[T]he more an algorithm implements human editorial directions, the more likely it is to be expressive under the First Amendment.").  Such is the case here.  TikTok's feeds use a combination of human editorial judgments and human-designed algorithms to decide what third-party speech "will be included in or excluded" from a person's feed and to "organiz[e] and present[] the included items."  *Moody*, 603 U.S. at 731; *see also NetChoice*, 152 F.4th at 1014.  Those algorithms implement TikTok's Community Guidelines' editorial judgments; analyze eligible videos using, among other things, a variety of factors chosen

on prior user activity" for the exclusive purpose of "maximiz[ing] engagement," it "would be hard" to say that the feed is expressive.  *NetChoice*, 761 F. Supp. 3d at 1221-22.  That is not what TikTok does.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

by TikTok that relate to what a person has previously engaged with (or avoided), as well as TikTok's judgments regarding the quality of content; and effectuate TikTok's promotional decisions.  Each of these factors and their application reflect human editorial judgments. *See, e.g.*, Zhou Decl. ¶¶ 7, 9; Schiller Decl. ¶¶ 10-11.  The use of tools to execute those judgments at scale does not change the fundamentally expressive nature of TikTok's feeds.

b. Contrary to the State's suggestion in *NetChoice*, the Act's personalized-feed provisions do not impose merely an "incidental burden" on expressive activity.  Those provisions are "directed at"—and directly burden—TikTok's protected speech. *Sorrell*, 564 U.S. at 567.

The provisions declare it "unlawful," absent parental consent, to provide teens access to protected speech that is curated even "in part" based on user-expressed preferences or an array of other information provided by or associated with a person.  §§ 27000.5(a), 27001(a), 27002(b)(2), 27002(b)(4).  TikTok's For You feed and others mentioned above prioritize content for viewing based in part on such preferences and information.  The Act's personalized-feed provisions, therefore, directly restrict TikTok's ability to speak to teens in the manner it wishes.

This restriction plays out on two independent levels.  First, TikTok's decision about *whether* to consider user-expressed preferences as one factor in curating content is itself an expressive, editorial choice about what content to show to people and in what order.  This choice is no different than the New York Times choosing to put a story above the fold in part because of reader interest— an everyday choice that is unquestionably constitutionally protected. *Moody*, 603 U.S. at 738.  Considering user-expressed preferences as one factor among others is likewise central to TikTok's mission—to inspire creativity and bring joy—and the message its For You feeds transmit: that TikTok thinks the displayed content will be interesting, informative, or entertaining to the individual.

All of which is to say that forbidding the consideration of user-expressed preferences would fundamentally alter how TikTok speaks to teens—and how teens experience the platform—by replacing TikTok's preferred form of expression with a State-dictated alternative.  Without the ability to consider user-expressed preferences, TikTok would have to base its content presentation solely on other factors, such as when videos are posted or what is generally popular.  Either change

would come with real disadvantages.  Presenting posts chronologically would leave feeds completely scattered with no curation at all, bury the content people want to see in the mass of what they don't, and allow entities who can marshal armies to post around the clock to drown out individuals who cannot.  Privileging popular videos over unpopular ones would drown out minority viewpoints and interfere with the variety of views on TikTok.  Indeed, central to what makes TikTok TikTok is that it introduces people to content that it believes will interest them from creators that are not widely popular already.  Requiring people to try to find such content manually (among literally billions of postings) is at war with TikTok's very mission and message.  It also ignores the fact that searches themselves are subject to the Act's strictures insofar as they organize the results they present in part according to user-expressed preferences.  *See* Zhou Decl. ¶ 8.

Second, TikTok's decisions about *how* to assess and understand individual preferences reflect an additional layer of human editorial judgments about how to carry out TikTok's mission and convey TikTok's message:  Should the curation of a feed focus on only the subject matter of posts a person has previously engaged with?  Do the identities of the creators of previously viewed posts matter?  How about the length of videos the individual has previously liked?  Each of these choices—and innumerable others—is an expressive decision about how to "compil[e] and curat[e] others' speech," *Moody*, 603 U.S. at 731.

Take, for example, someone who likes basketball videos.  Millions of basketball videos are uploaded to TikTok each week—everything from game highlights, to kids shooting free throws in their driveways, to famous coaches and players talking about why they love the game.  TikTok focuses more than other platforms on curating and promoting content made by creators that are not already famous, or with whom a person has no pre-existing relationship.  And TikTok focuses not just on whether the person viewing the feed likes basketball, but also on which *kinds* of such videos are likely to interest them.  And TikTok's emphasis on the subject matter of videos is just the beginning:  The videos the person sees turn on many personalized factors beyond an interest in basketball.  TikTok also considers, among other things, picture quality, video length, and age of video subjects.  The decisions to consider these various factors in assessing individuals' preference lead a basketball enthusiast's feed to look different on TikTok than it would on, say, Instagram or

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

X.

Yet the Act's personalized-feed provisions directly regulate—indeed, outright restrict—TikTok's distinctive approach to considering individuals' preferences. The provisions thus aim to transform TikTok's expressive activity by requiring it to present collective content "it would not otherwise" convey. *Tornillo*, 418 U.S. at 256, 258; *see also Hurley*, 515 U.S. at 572-74 (First Amendment barred compelling parade organizers to include certain groups and thus "alter the expressive content of the[] parade").

c. The Act imposes a direct restriction not just upon TikTok itself, but also upon people who use it. The First Amendment protects not just the right to speak but also "the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The latter right applies even where the speech at issue is not itself entitled to First Amendment protection. *See Lamont v. Postmaster Gen.*, 381 U.S. 301 (1965). And this "fundamental principle" applies with full force to "social media" and other online platforms, which for many are "the principal sources for knowing current events, checking ads for employment, speaking and listening in the modern public square, and otherwise exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 104, 107 (2017).

TikTok has standing to raise the rights of those who use it, *see Warth v. Seldin*, 422 U.S. 490, 501 (1975), and teens—like all others—have a keen interest in getting the content in which they are actually interested. That is how people learn, dig into new interests, cultivate new artistic tastes, and find digital communities. But the billions of videos online make all of this practically impossible without some meaningful way of finding the content they want. Indeed, the Act's personalized-feed provisions restrict TikTok from considering what it thinks individual teens might like in even the slightest way, for even the slightest amount of time, and, as a result, they preclude teens from getting that content in the form most relevant to them. That restriction severely burdens teens' First Amendment right to listen.

d. Finally, the Act's restrictions on protected speech are not lessened in any constitutional sense because parents can consent to their teens receiving personalized feeds. Governments lack any "free-floating power to restrict the ideas to which children may be exposed," *Brown*, 564 U.S.

at 794, and protected speech (i.e., all speech except for certain narrow, historically recognized categories) "cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them," *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (1975) (invalidating ordinance prohibiting display of movies with nudity at drive-in theaters, including as to minors); *see also ACLU*, 542 U.S. 656 (enjoining law criminalizing Internet speech that is "harmful to minors"); *Reno v. ACLU*, 521 U.S. 844 (1997) (invalidating law protecting minors from "indecent" and "patently offensive" Internet communications); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (invalidating law restricting sexual programming on television). These principles apply equally to laws that "prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3; *see also Sorrell*, 564 U.S. at 566 ("Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring it[].")  Consequently, laws that "impose *governmental* authority, subject only to a parental veto" are subject to the same First Amendment scrutiny as laws that outright prohibit minors' access to speech. *Brown*, 564 U.S. at 795 n.3, 799.

### 2. *The Personalized-Feed Provisions Trigger Strict Scrutiny*

a. The Act's personalized-feed provisions are subject to strict scrutiny for three independent reasons: they are content-based, distinguish among similarly situated speakers, and dramatically depart from history and tradition.

First, laws that "suppress, disadvantage, or impose differential burdens upon speech because of its content" are subject to "the most exacting scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994); *see also X Corp. v. Bonta*, 116 F.4th 888, 899-900 (9th Cir. 2024). The Act's personalized-feed provisions meet this test. On their face, they restrict TikTok from publishing certain types of content—namely, personalized feeds that reflect in part the expressed preferences of teens. §§ 27001(a), 27002(b)(2), 27002(b)(4). And the provisions are explicitly intended to alter the content TikTok presents in a person's feed: As bill co-sponsor and Defendant Bonta explained, the personalized-feed provisions were enacted in part because he thought algorithmic feeds based on individual's preferences "too often send[ children] down rabbit holes of harmful content." Petrocelli Decl., Ex. S at 13.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

Second, the First Amendment is "deeply skeptical of laws that 'distinguish[] among different speakers, allowing speech by some but not others.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (quoting *Citizens United v. FEC*, 558 U.S. 310, 340 (2010)). Strict scrutiny thus applies where a law discriminates among similarly situated speakers. *Reed v. Town of Gilbert*, 576 U.S. 155, 170 (2015); *Citizens United*, 558 U.S. at 340. Such is the case here. The Act's provisions apply only to personalized feeds involving user-generated material and, even where user-generated material is involved—and only to companies whose personalized feeds comprise a significant part of their service. Consequently, the Act does not cover websites such as Apple News, streamers like Netflix and Hulu, or music platforms like Spotify, all of which provide curated digital content based on a person's past interactions, often by means of continuous feeds. The Act also regulates companies that provide personalized feeds "as a significant part of the[ir] service," but not those that provide the same types of compilations as a secondary offering. §§ 27000.5(b)(1), 27001(a). That means teens have unfettered access to websites like CNN, even though readers create user profiles, can engage with others via comment threads, and receive personalized feeds. Finally, because the Act exempts sites on which users interact only through commercial transactions or product reviews, § 27000.5(b)(2)(A), it imposes no restrictions on teens' extended scrolling through Etsy or Amazon's personalized product recommendations. This exemption also triggers strict scrutiny. *See Sorrell*, 564 U.S. at 564-65 (applying strict scrutiny because statute differentiated marketing from other similarly situated speech).

Third, the personalized-feed provisions' sharp break from our history and tradition requires the application of strict scrutiny. "[L]ong settled and established practice is a consideration of great weight" when applying the First Amendment. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022) (citation omitted). The Supreme Court thus recently affirmed that when a state law fits within a "widespread" "tradition[]" of regulation, it should not be subjected to strict scrutiny. *Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 485 (2025) (considering materials obscene as to minors). The converse is also true. Without "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription," the government "may not revise the 'judgment of the American people,' embodied in the First Amendment, 'that the benefits

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

of its restrictions on the Government outweigh the costs.'" *Brown*, 564 U.S. at 792 (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010) (alteration adopted)); *see also Vidal v. Elster*, 602 U.S. 286, 301 (2024).

Such is the case here. Ever since people began speaking to others and vying for their attention or patronage, speakers have considered audience interest. And for as long as the notion of catering to individuals' interest has existed, it has been also been criticized—including where it has been seen as a dominant factor in publication or dissemination decisions. In 100 AD, Roman poet Juvenal expressed alarm that the ruling class was "consistently distracting the citizens of Rome with frivolous entertainment, misinformation and a steady program of frivolity to make sure they remained ignorant masses." Petrocelli Decl., Ex. T. For decades, local newsrooms have been criticized for prioritizing attention-grabbing crime stories over potentially less-engaging topics like local politics or public safety policies. *Id.*, Ex. U (describing attempts to change this trend). And Hollywood's consistent production of sequels, typically based on prior audience engagement, is criticized as hampering the industry's ability to foster and reward novelty and creativity. *See, e.g., id.*, Ex. V.

Yet no previous American statute of which we are aware has ever restricted a media outlet's ability to consider user-expressed preference in making editorial and publication decisions. Certainly no court has ever upheld such a restriction. The closest attempted regulation in this respect is probably California's violent-video-games statute, which the State defended in *Brown* partly on the ground that allowing teens to "choose their own adventure" was especially harmful—an argument the Court swiftly rejected. *See supra* at 13. This absence of legislative or judicial precedent for restricting speech that considers reader or viewer preferences shows how alien such regulation is to the First Amendment. And when it comes to teens, that reality is just as stark. Parents, as private actors, may limit their teens' media content or usage. But there is no history or tradition of the government restricting publishers' ability to recommend expressive material to teens based on their previous expressions of interest. *Brown*, 564 U.S. at 795 & n.3.

b. Even if the personalized-feed provisions did not trigger strict scrutiny on their face, they would still be subject to exacting scrutiny because, in "practical operation," they require TikTok

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

fundamentally to alter its message. *Sorrell*, 564 U.S. at 567. "[T]he major social-media platforms are in the business, when curating their feeds, of combining 'multifarious voices' to create a distinctive expressive offering." *Moody*, 603 U.S. at 738 (quoting *Hurley*, 515 U.S. at 569). Yet the effect of the personalized-feed provisions is to prevent TikTok from curating feeds as it wishes and signaling to individuals that it thinks—based in part on their past engagement with the platform—that they will find recommended videos interesting, informative, and entertaining. That effect is at war with the First Amendment.

       3.     *The Personalized-Feed Provisions Fail Any Level of First Amendment Scrutiny*

To survive strict scrutiny, the State must establish that the personalized-feed provisions are "narrowly tailored" to further a "compelling" government interest. *See Reed*, 576 U.S. at 171. That standard requires a showing that the provisions are the "least restrictive means" of achieving the government's objective. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021). Even under intermediate scrutiny, the State must show that the provisions are "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). The State cannot meet either burden.

a. <u>State interest.</u> The Act's legislative findings express concern that social media may "pose a significant risk of harm to the mental health and well-being of children and adolescents" and equate personalized feeds with addictive ones. §1(b). Protecting the well-being of minors is no doubt, in the abstract, a compelling interest. But *Brown* requires this Court to home in on what exactly the State's restriction does and how it addresses the "child safety" problem it says it is trying to solve. If it does not meaningfully address that problem—or if the most the state law does is fill a "modest gap in concerned parents' control" over their teens' conduct—then the law's objective "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

Here, the Act fails that test. Even if the State could establish a causal connection between personalized feeds and harm to minors (we believe it cannot), the Act is really just a parental support law, not a child safety law. That is because TikTok already provides a suite of tools that allow parents to monitor and restrict their teen's use of TikTok. For example, using the platform's

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

existing Family Pairing feature, parents can customize their teen's safety setting to set daily screen time limits, mute push notifications, decide who can view their teen's content, and see summaries of their teen's time spent on TikTok. Nguyen Decl. ¶ 4. Teens and their parents can also enable notifications reminding the teen to take a screen-time break, set prompts to encourage them to log off TikTok and sleep, and limit the types of content a person can see through Restricted Mode. *Id.* ¶¶ 7, 9, 10. Furthermore, third parties like cellular and broadband providers allow parents to restrict access to certain websites or apps; internet routers provide means of setting time limits on the devices' ability to access the internet; and software programs enable parents to set time limits, restrict certain websites, and get reports about their teens' online activity.[5]

Perhaps the State thinks these tools leave a "modest gap in concerned parents' control," *Brown*, 564 U.S. at 803, over the content teens view on TikTok. But providing marginal support to parents in that regard does not constitute a compelling interest. *Id.*

b. Narrow tailoring. Nor are the personalized-feed provisions a sufficiently tailored means of accomplishing the State's purported goals. As just discussed, TikTok itself provides a variety of means for parents to control their teen's use of TikTok. So do third parties. *Supra* at 21-22. The First Amendment prefers such private options over governmental intrusion, *Playboy Ent. Grp.*, 529 U.S. at 826, and their existence is all the more reason to conclude that the regulation is not narrowly tailored. *Brown*, 564 U.S. at 803. If the State believes parents are doing an insufficient job of monitoring their teens' social media use, it could "educat[e] children and parents" about the purported dangers of unrestricted social media use and encourage parents to be more involved in their kids' digital engagement. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). Its choice instead to "impose *governmental* authority, subject only to a parental veto," *Brown*, 564 U.S. at 795 n.3, ignores those less restrictive alternatives.

The personalized-feed provisions also fail First Amendment scrutiny because they are both over- and underinclusive. They are overinclusive because they restrict access to TikTok's personalized feeds even when that content is educational, political, or on newsworthy topics of

---

[5] *See, e.g.*, Petrocelli Decl., Exs. L, R, W.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

national concern.  As applied to TikTok, for instance, the personalized-feeds provisions would restrict a teen from accessing their TikTok STEM feed, which displays personalized content related to science, technology, engineering, and mathematics.  Zhou Decl. ¶ 8.  The State can provide no basis for thinking that access to educational content in which a teen has indicated interest contributes to teens' negative mental health outcomes.

What's more, taking user-expressed preferences into account can help teens (and others) "*avoid* inappropriate [content] or content they do not want to see."  *See* Petrocelli Decl., Ex. X at 9 (opposition concerns) (emphasis added).  A person who recently lost a pet may not want to view dog videos.  Or a vegetarian may not want to see cooking videos involving meat.  But the Act bars TikTok from taking such individual preferences into account, despite the indisputable *benefits* personalization can provide to individuals.  That makes no sense.

The personalized-feed provisions are also underinclusive because they do nothing to prevent teens from watching endless numbers of videos on other platforms.  If the problem the State is trying to address is addiction to video content, it makes no sense to distinguish TikTok's feeds curated according to user-expressed preferences from those on platforms like Hulu and Netflix.  The fact that those platforms don't present user-generated content, *see* § 27000.5(a), does not seem to make any relevant difference.  Nor does the Act apply to platforms that do not offer personalized feeds "as a significant part of the service provided by that internet website."  § 27000.5(b).  Again, it is hard to understand how such feeds differ from TikTok's in any respect relevant to the Act; a personalized feed that is a "secondary offering" can be just as readily available online and can offer the same kind of content as TikTok.  Nor does the Act apply to websites or applications on which "interactions between users are limited to commercial transactions or to consumer reviews."  § 27000.5(b)(2).  Yet to borrow Defendant Bonta's phrase, people have been known to fall down "rabbit holes" on Etsy and the like.  *See* Petrocelli Decl., Ex. S at 13.  Such arbitrary underinclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring" particular speakers, *Brown*, 564 U.S. at 802—here, social media companies or companies that offer other online platforms.

NOTICE OF MOTION AND MOTION FOR
PRELIMINARY INJUNCTION
Case No. 5:25-CV-9789-EJD

**B.      TikTok Faces Imminent and Irreparable Harm Absent Injunctive Relief**

Because TikTok is likely to succeed on the merits of its First Amendment challenge, it "follows inexorably" that it has established irreparable harm. *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017); *see also Baird v. Bonta*, 81 F.4th 1036, 1044 (9th Cir. 2023) (A "plaintiff who can show that a statute likely violates the Constitution will also usually show that both the public interest and the balance of the equities favor a preliminary injunction." (cleaned up)).  "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  *Klein v. City of San Clemente*, 584 F.3d 1196, 1207-08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also NetChoice*, 761 F. Supp. 3d at 1212 (same).

**C.      The Balance of Equities and Public Interest Weigh in TikTok's Favor**

Similarly, because TikTok is likely to succeed on the merits of its First Amendment claim, the final two factors—the balance of equities and the public interest—which merge where the government is a party, also weigh in TikTok's favor.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). It "is always in the public interest to prevent the violation of a party's constitutional rights." *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022).  And the fact that TikTok has "raised 'serious First Amendment questions compels a finding that … the balance of hardships tips sharply in [Plaintiff's] favor.'"  *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007) (cleaned up).

**V.      CONCLUSION**

For the foregoing reasons, this Court should grant a preliminary injunction.

Dated: November 18, 2025

Respectfully submitted,

By:    /s/ *Daniel M. Petrocelli*
          Daniel M. Petrocelli

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, California 90067-6035
Telephone:    +1 310 553 6700
Facsimile:    +1 310 246 6779

JEFFREY L. FISHER (S.B. #256040)
jfisher@omm.com
O'MELVENY & MYERS LLP
2765 Sand Hill Road
Menlo Park, CA 94025
Telephone:    +1 650 473 2600
Facsimile:    +1 650 473 2601

JONATHAN D. HACKER (*pro hac vice*)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone:    +1 202 383 5300
Facsimile:    +1 202 383 5414

*Attorneys for Plaintiff TikTok Inc.*