DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

JONATHAN D. HACKER (*pro hac vice*)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorneys for Plaintiffs TikTok Inc. and TikTok USDS Joint Venture LLC*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

TIKTOK INC.; TIKTOK USDS JOINT VENTURE LLC,

Plaintiffs,

v.

ROB BONTA, in his official capacity as Attorney General of California,

Defendant.

Case No. 5:25-cv-9789-EJD

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Date: May 7, 2026
Time: 9:00 a.m.
Place: San Jose Courthouse,
Courtroom 4 – 5th Floor
280 South 1st Street
San Jose, CA 95113

## TABLE OF CONTENTS


Page

INTRODUCTION ........ 1

ARGUMENT ........ 2

A. The Personalized-Feed Provisions Directly Restrict Protected Expression ........ 3

1. The State's Argument That TikTok's Feeds Do Not Involve Human Decision-making Is Factually Mistaken And Legally Irrelevant ........ 4

2. TikTok's Consideration Of Individual Interests In Generating Its Speech Compilations Does Not Render Those Compilations Non-expressive ........ 9

B. SB 976's Personalized-Feed Provisions Trigger Strict Scrutiny ........ 13

C. The Personalized-Feed Provisions Fail Any Level Of Scrutiny ........ 16

1. The State Identifies No Compelling Or Significant Governmental Interest Actually Served By These Provisions ........ 16

2. The Personalized-Feed Provisions Are Not Narrowly Tailored ........ 18

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) .......... 14

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998) .......... 6

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) .......... 2

*Bay Area Peace Navy v. United States*,
914 F.2d 1224 (9th Cir. 1990) .......... 20

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) .......... passim

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2024) .......... 9

*Chiles v. Salazar*,
No. 24-539 (U.S. March 31, 2026) .......... 15

*Citizens United v. FEC*,
558 U.S. 310 (2010) .......... 9

*Doe (K.B.) v. Backpage.com, LLC*,
768 F. Supp. 3d 1057 (N.D. Cal. 2025) .......... 13

*Hou. Cmty. Coll. Sys. v. Wilson*,
595 U.S. 468 (2022) .......... 15

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*,
515 U.S. 557 (1995) .......... 6, 7, 9, 11

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) .......... 9

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025) .......... 5

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) .......... 19

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974) .......... 6, 11

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... passim

*Nat'l Ass'n of Wheat Growers v. Bonta*,
85 F.4th 1263 (9th Cir. 2023) .......... 17

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
585 U.S. 755 (2018) ........ 15

*NetChoice v. Bonta*,
761 F. Supp. 3d 1202 (N.D. Cal. 2024) ........ 7, 8

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) ........ 18

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ........ 14

*Patterson v. Meta Platforms, Inc.*,
244 A.D.3d 29 (N.Y. App. Div. 2025) ........ 3, 13

*Porter v. Martinez*,
68 F.4th 429 (9th Cir. 2023) ........ 17

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) ........ 15

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ........ 14

*Reuber v. Food Chem. News, Inc.*,
925 F.2d 703 (4th Cir. 1991) ........ 10

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,
547 U.S. 47 (2006) ........ 12, 13

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) ........ 10

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) ........ 13

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000) ........ 18

*Vidal v. Elster*,
602 U.S. 286 (2024) ........ 15

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ........ 20

*Wollschlaeger v. Governor, Fla.*,
848 F.3d 1293 (11th Cir. 2017) ........ 17

**Statutes**

Cal. Health & Safety Code § 27000.5(a) ........ 20

Cal. Health & Safety Code § 27000.5(b) ........ 20

Cal. Health & Safety Code § 27000.5(b)(1) ........ 14

## TABLE OF AUTHORITIES
## (continued)

**Page(s)**

S.B. 976, 2024 Legis., Reg. Sess. § 1 (Cal. 2024), 2024 Cal. Stats. ch. 321 (West) ..................... 16

## INTRODUCTION

Plaintiffs TikTok Inc. and TikTok USDS Joint Venture LLC (collectively, "TikTok") operate an online platform that compiles third-party speech into personalized feeds to entertain and inform viewers, consistent with its mission of inspiring creativity and bringing joy. The State contends that it can control how TikTok fulfills that objective by dictating how TikTok compiles its feeds. That contention rests on two extraordinary propositions.

*First*, the State argues that TikTok's speech compilations are not protected by the First Amendment because they are "generated by computerized algorithms, and not human beings." Opp. 27-28. That argument is factually and legally wrong. As a matter of fact, TikTok's recommendation system does not operate on its own, without human oversight, management, or control. To the contrary, human decision-making pervades every aspect of TikTok's system—humans designed the system and continually monitor and adjust it to ensure that TikTok's feeds are aligned with its values and interests. And as a matter of law, the foundational First Amendment rule of "speaker's autonomy" gives publishers the right to decide for themselves how best to compile and distribute third-party speech at scale.

*Second*, the State asserts that it can regulate even *human* decision-making about what speech to publish if the humans do not seek to "convey an expressive message of [their] own," but instead seek to "reflect users' interests back to them." *Id.* at 28. That argument, too, is factually and legally wrong. As a matter of law, the State's assumption that an articulable message is a condition of First Amendment protection has been repeatedly rejected by the Supreme Court. As a matter of fact, the State grossly misstates the record: TikTok's feeds indisputably do *not* simply reflect individuals' own interests back to them. The feeds are, rather, the product of multiple expressive judgments, starting with the kinds of speech that should be allowed on the platform at all, and continuing through various decisions about how to identify new content viewers would not otherwise seek out, whether to promote certain content, and whether to deprioritize certain content for certain viewers. These expressive judgments are precisely why every platform's feed differs from every other's. And such feeds do express a clear message: this content is consistent with our

values and we think you will find it informative and/or entertaining. It is the same message traditional distributors of third-party speech—including publishing houses, bookstores, and libraries—have always sought to convey in their compilations. The fact that online platforms can deliver more focused recommendations to more individuals does not make their recommendations non-expressive or unworthy of protection. Were it otherwise, the State could dictate how music apps compile recommended playlists or how news aggregators compile targeted news recommendations for subscribers. The First Amendment forbids that result. By forcing online platforms to make speech recommendations different from those they want to make, SB 976 violates the right of every speaker and publisher to decide for themselves what to say.

Once TikTok's human-controlled personalized feeds are correctly recognized as TikTok's own protected speech compilations, the remainder of the First Amendment analysis is straightforward. SB 976 triggers strict scrutiny because it only regulates feeds containing content personalized to the viewer, and the State admits that the law was enacted to address concerns about the "harmful content" that allegedly results from such personalization. While TikTok agrees that protecting teens is an important objective, the State's defense of SB 976 rests on highly-contested evidence generated after the fact, not the kind of contemporaneous legislative record required to justify speech restrictions. And the statute is not remotely tailored to the asserted harm—among other things, its broad strictures would deprive teens of functional access to the overwhelming array of protected speech that TikTok can identify for them.

The motion for a preliminary injunction should be granted.

## ARGUMENT

When a plaintiff seeks a preliminary injunction in a case involving an alleged constitutional violation, the plaintiff's showing of likely success on the merits "will almost always demonstrate that he is suffering irreparable harm" and also will "tip[] the merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). This reply accordingly focuses on TikTok's likelihood of success, which the State's brief amply confirms.

### A. The Personalized-Feed Provisions Directly Restrict Protected Expression

The State's efforts to defend SB 976 cannot escape its fundamental constitutional flaw: the statute "prevents a platform from compiling the third-party speech it wants in the way it wants"—here, by personalizing those compilations for the particular individual. *Moody v. NetChoice, LLC*, 603 U.S. 707, 731 (2024). Essentially by definition, any method a publisher uses to select, organize, and display third-party speech involves "editorial choices" about what to "include and exclude" and how to "organize and prioritize." *Id.* at 716-17. No matter how they are executed, making judgments about what content "will be included in or excluded from a compilation—and then organizing and presenting the included items—is expressive activity of its own." *Id.* at 731.

That principle fully applies to an online platform's feeds. Just like traditional purveyors of third-party speech, such as "editors, cable operators, and parade organizers," online platforms "are in the business, when curating their feeds, of combining multifarious voices to create a distinctive expressive offering." *Moody*, 603 U.S. at 738. The only difference is "the immense volume of content on the Internet," which makes it "virtually impossible to display content without ranking it in some fashion." *Patterson v. Meta Platforms, Inc.*, 244 A.D.3d 29, 38 (N.Y. App. Div. 2025). Any such ranking necessarily "represents an editorial judgment of which content a user may wish to see first." *Id.* Accordingly, when online platforms use such "tools" as "content-recommendation algorithms" to select and rank content for each viewer's feed, they are simply performing "a traditional publishing function" aided by tools "made necessary by the scale at which providers operate." *Id.* And just like a traditional speech compilation, an online platform's feed is a "product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content," and those choices "in the aggregate … give the feed a particular expressive quality." *Moody*, 603 U.S. at 738; *see* Declaration of Joey Zhou ("Zhou Decl.") ¶ 7 (summarizing specific choices TikTok makes to generate its feeds). Where, as here, the government seeks to alter "the mix of speech" (*Moody*, 603 U.S. at 740) or "the content of the compilation" (*id.* at 732) that a platform chooses to present, the government is inherently interfering with that platform's own expressive choices about what speech to recommend and how to display it.

The State argues in response that the First Amendment does not apply because (1) humans

do not generate TikTok's feeds and (2) the feeds do not express an articulable message. Both arguments are directly contrary to law and fact.

1. *<u>The State's Argument That TikTok's Feeds Do Not Involve Human Decision-making Is Factually Mistaken And Legally Irrelevant</u>*

The State's first argument is that TikTok's speech compilations "are not protected speech" because they are "generated by computerized algorithms, and not human beings." Opp. 27-28. That contention is wrong in two respects: (1) extensive human editorial judgments drive TikTok's feeds, and (2) in any event, the First Amendment encompasses content compiled by machines when humans control the decision whether to *publish* the compilation.

*a. Extensive Human Decision-making Drives TikTok's Feeds*

Contrary to the State's assertion, humans are involved at all stages of the curation process, including in the implementation of human editorial judgments through machine-learning based models. *See generally* Zhou Decl.; Supplemental Declaration of Joey Zhou ("Supp. Zhou Decl."); Declaration of Chris Mattmann ("Mattmann Decl.") ¶¶ 23-42. As the State acknowledges, humans author the content moderation guidelines and program the automated moderation technology that provides the initial filter selecting what third-party content appears in personalized feeds. Declaration of Mikaela Schiller ("Schiller Decl.") ¶¶ 4-7; Zhou Decl. ¶ 7. In 2025 alone, that process resulted in removal of more 780 million videos from the platform, Supplemental Declaration of Daniel M. Petrocelli ("Supp. Petrocelli Decl."), Ex. A, with enormous consequences for the content of each feed. Humans also control the recommendation system, which accounts for individuals' preferences (among other factors) in selecting, organizing, and presenting third-party content. *See* Zhou Decl. ¶¶ 16-17; Supp. Zhou Decl. ¶¶ 4-12. As to the recommendation system specifically, humans at TikTok program the models to assess factors those humans have determined to be predictors of the type of content individuals on the platform will enjoy. *See* Zhou Decl. ¶¶ 15-16; Supp. Zhou Decl. ¶¶ 7-8. Humans also program *how* the recommendation system considers those factors, i.e., which preferences are prioritized, and how individuals' preferences are prioritized relative to other considerations overall. Zhou Decl. ¶¶ 16-17; Supp. Zhou Decl. ¶ 8. For example, humans decide whether the models give greater consideration to the length of videos an

individual has previously liked versus the creator or subject matter of those videos. Zhou Decl. ¶¶ 16-17; Supp. Zhou Decl. ¶ 8. And as the recommendation system implements those human choices, humans constantly monitor the system and its outputs, making adjustments where the outputs do not align with the messages TikTok seeks to convey. Zhou Decl. ¶ 19; *see* Supp. Zhou Decl. ¶¶ 11, 13-15; Mattmann Decl. ¶¶ 33, 36, 38-39; Declaration of Neil A. Malhotra ("Malhotra Decl.") ¶¶ 76-77. As just one example, the recommendation system was updated *more than 900 times* in January 2026 *alone*. Supp. Zhou Decl. ¶ 11.

The State's own brief highlights another prominent example of the continuous human decision-making involved in managing the recommendation system. As the State observes (Opp. 3, 16-17), in 2021 TikTok began receiving feedback that its personalized feeds were sending some people down "rabbit holes," i.e., showing them repeated content on a single topic in which they had expressed interest. Supp. Zhou Decl. ¶ 14; Malhotra Decl. ¶ 76. Humans at TikTok determined that this dynamic did not reflect the kind of feeds TikTok wanted to publish, so engineers changed the recommendation system to ensure that videos on any one topic are "dispersed." Zhou Decl. ¶ 19; Supp. Zhou Decl. ¶ 10, 14. To this day, system engineers constantly monitor and update the recommendation system to ensure adequate dispersal within the feeds. Supp. Zhou Decl. ¶ 13. TikTok's dispersal rules thus implement the human judgment that dispersal promotes TikTok's values of protecting viewers and introducing them to new content on topics that might interest them. *See* Supp. Petrocelli Decl., Ex. B.

Finally, human involvement in the design and implementation of the recommendation system includes the threshold decision to consider individuals' preferences *at all* in selecting and prioritizing the third-party content TikTok publishes. That decision is an expressive editorial choice, akin to a newspaper editor's decision to account for likely reader preferences by publishing a story "above the fold." *See M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025). Humans also made the editorial decision to allow *other* humans—i.e., individuals on the platform—to influence the content of their own feeds. As designed by humans, the platform allows individuals to instruct the recommendation system by, for example, tapping the "Not interested" button to avoid certain types of content, the "Like" button to signal appreciation,

or the "Refresh your For You feed" feature to restart the entire feed when they are not satisfied with its output. Zhou Decl. ¶¶ 13-14, 20. Thus, human judgments are involved throughout the feed-curation process, including its "personalization." *Contra* Opp. 30.

The State nevertheless insists that even if human judgment pervades the design and implementation of the personalized feeds, they still are not expressive because no TikTok employee knows what *specific* third-party content will be displayed in a *specific* person's feed. Opp. 28-30, 32. The Supreme Court has already rejected that argument. As the Court observed in *Moody*, Facebook users shared more than *100 billion messages every day*, and YouTube users uploaded more than *500 hours of video every minute*. 603 U.S. at 719. Because no human could possibly evaluate every piece of content, the platforms used algorithms to conduct content moderation. Yet the Court found the resulting feeds to be expressive, even though no Facebook employee was aware of the specific content being uploaded and displayed to any specific individual. *Id.* at 734-40. And in *Brown v. Entertainment Merchants Association*, 564 U.S. 786 (2011), the Court held that the First Amendment protects interactive video games in which the player's own participation in the game "determines its outcome"—much like a "choose your own adventure" book—such that player himself, rather than the publisher, controls the ultimate expression. *Id.* at 798.

At bottom, the State's focus on whether humans had knowledge of specific recommendations to specific viewers misunderstands First Amendment protection for third-party speech compilations. The Supreme Court has long made clear that speech rights exist in a compilation *as a compilation*, which is its own "single speech product" that reflects the publisher's private decisions about how to select the speech, how to arrange it, and whether to publish the compilation. *Moody*, 603 U.S. at 731-32; *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998) ("Although programming decisions often involve the compilation of the speech of third parties, the decisions nonetheless constitute communicative acts." (citations omitted)); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557, 569-70 (1995) (a "private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive subject matter of the speech"); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974) ("The choice of material to go into a

newspaper, and the decisions made as to limitations on the size and content of the paper … constitute the exercise of editorial control and judgment."); *see also* Mattmann Decl. ¶ 46 (explaining that State's experts conflate output prediction with system control). The issue thus is not whether humans made specific choices about specific videos in each feed, but whether they controlled the overall compilation. They indisputably did.

The fact that a speech compilation is protected in itself belies the State's effort to disaggregate the supposedly unprotected "personalization" decisions involved in the compilation process from the concededly protected "content moderation" elements. Opp. 30, 33-34. Like compilations produced by other media, an online platform's feed is the overall product of an integrated collection of editorial judgments, including what speech to allow on the platform at all, what speech to promote generally, what speech to recommend specifically to each individual (the personalization factor), and how to arrange those recommendations. Zhou Decl. ¶ 7; Supp. Zhou Decl. ¶¶ 19-20 (content moderation and recommendation system intertwined); Mattmann Decl. ¶¶ 51-52 (explaining content moderation and recommendation system "interact dynamically and interdependently at every stage" of curation process). In other words, the record establishes that, as this Court previously hypothesized, each personalized feed *does* "recommend posts based on both content moderation policies *and* user activity," among still other factors (such as content promotion decisions). *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1223 (N.D. Cal. 2024). And the most effective content moderation is personalized precisely because some content may be appropriate for some individuals and not for others. But, even if the personalization element were (incorrectly) deemed non-expressive in itself, prohibiting it would *profoundly* alter feeds' overall content. Indeed, the point of SB 976 is to compel TikTok to publish *different* speech compilations that TikTok does *not* want to publish, directly contravening the "important" free speech principle "that one who chooses to speak may also decide what not to say." *Hurley*, 515 U.S. at 573 (quotation omitted). Forcing TikTok to publish different feeds thus would not just "incidentally burden" TikTok's speech rights, *NetChoice*, 761 F. Supp. 3d at 1223—it would effect a direct "intrusion" into "a private party's collection of third-party content into a single speech product," which "must be specially justified under the First Amendment." *Moody*, 603 U.S. at 729-30.

*b. The First Amendment Protects Algorithmically Compiled Speech When Humans Decide Whether To Publish That Speech*

Even if, contrary to fact, humans were *not* pervasively involved in designing and implementing the recommendation system, the First Amendment would still protect its output because humans indisputably control the decision whether to *publish* that output.

This Court has already rejected the State's basic premise that a speech compilation generated by an algorithm is categorically exempt from First Amendment protection: "Algorithms operate personalized feeds, and humans create algorithms to achieve certain purposes. To do so, humans build rules into those algorithms that they believe will best serve their purposes. In that sense, an algorithm simply acts as a tool to implement a conscious human choice." *NetChoice*, 761 F. Supp. 3d at 1222. As just shown, the record now confirms that TikTok's recommendation system operates as the Court hypothesized—it is built and managed to implement human choices about how best to make each person's feed entertaining and/or informative to that individual.

The State refutes its own argument by analogizing TikTok's recommendation system to "a wall-mounted security camera programmed to film when it detects movement." Opp. 29. According to the State, neither the security camera nor the recommendation system "create[s] expressive speech" because they are both "non-human mechanisms simply responding to stimuli whose output does not reflect an expressive choice by an actual human being." *Id.* But speech protection for a camera's output is not based on an expressive decision by the *camera itself*—it is based on an expressive decision by a human being to *publish* the camera's output. For example, there are very popular websites that publish the output of livestream cameras trained on a particular spot, such as an eagle nest, panda house, or even an office coffee pot. *See* Supp. Petrocelli Decl., Exs. C-E. Just like the security camera in the State's analogy, these cameras respond solely to non-expressive stimuli, but nobody would contend that states could ban the publication of their output. Such livestreams are protected because they reflect an expressive human judgment that the cameras' output is likely to be entertaining and/or informative, and hence worth publishing in real time. TikTok's human managers make exactly the same judgment: the recommendation system's output of third-party speech—which is vastly more varied and informative than a fixed livestream

webcam—is worth publishing in real time because it is likely to be entertaining and/or informative. The First Amendment protects that judgment from government interference.[1]

That protection applies fully to publication decisions made by businesses. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952) ("It is urged that motion pictures do not fall within the First Amendment's aegis because their production, distribution, and exhibition is a large-scale business conducted for private profit. We cannot agree. That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment."). The State's assertion that the First Amendment "extends only to human beings," Opp. 28, is flatly incorrect: "First Amendment protection extends to corporations," which, "like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster." *Citizens United v. FEC*, 558 U.S. 310, 342-43 (2010); *see Hurley*, 515 U.S. at 574 (First Amendment "principle of autonomy to control one's own speech" is "enjoyed by business corporations generally"). Protecting corporate speech protects the rights of the human "shareholders" and others who act collectively *through* the corporation, *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706 (2024), regardless whether or which specific employees drafted, authorized, or compiled the speech, and regardless of the reasons the corporation had for publishing the compilation.

2. *TikTok's Consideration Of Individual Interests In Generating Its Speech Compilations Does Not Render Those Compilations Non-expressive*

The State's second argument is that even if humans control the recommendation system's publishing decisions, those decisions are not protected by the First Amendment because they seek to compile speech that "reflect[s] users' interests back to them," rather than "convey[ing] an expressive message of Plaintiffs' own." Opp. 28. That argument is wrong in multiple respects.

---

[1] There is likewise no merit to the State's contention that TikTok's speech compilations are unprotected because algorithms do not "understand" the speech they compile. Opp. 12. Not only is the assertion factually false, Supp. Zhou Dec. ¶ 5, it is legally irrelevant: webcams and printing presses do not understand content either, but their output is protected when humans choose to publish it.

*First*, the factual record squarely establishes that TikTok's feeds do *not* solely respond to individuals' expressed interests. As shown above, TikTok's feeds are compiled through consideration of *many* factors, including content moderation guidelines, TikTok's own editorial preferences about promoting certain content, and editorial judgments about how to balance goals like safety and engagement. Zhou Decl. ¶ 7; Mattmann Decl. ¶¶ 54-79 (TikTok's feeds reflect goals other than maximizing engagement for profit maximization); Malhotra Decl. ¶¶ 35-56 (feed design reflects concern for certain groups, provides benefits, and is consistent with consumer and creator autonomy). The "dispersal" example described above illustrates the point: although a given person may express strong and immediate interest in specific content, TikTok consciously programs and adjusts its recommendation system to identify *other* content the individual may find engaging, precisely so the person does not become consumed by the specific content they immediately prefer. *See supra* at 5; Supp. Zhou Decl. ¶ 10; *see also* Mattmann Decl. ¶¶ 91-96 (explaining that dispersion requires consideration of information about an individual and "is itself a form of personalization").[2]

*Second*, consistent with TikTok's mission of inspiring creativity among creators and bringing joy to their audiences, TikTok's feeds plainly do convey a clear message: this speech is consistent with our values and likely to be entertaining and/or informative to you. *See Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 561 (2011) (use of information about recipient preferences helps speaker shape message); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc) (publishers commonly seek to publish material that will please their subscribers). It is the same message conveyed by any platform that distributes third-party speech tailored to consumers' expressed interests, i.e., the same message that Spotify sends when it recommends songs and that Apple News sends when it recommends news stories. Such tailoring is precisely what makes this publication method attractive both to speakers and viewers: speakers can expand their audiences, and viewers can expand their information and entertainment base. Under the State's theory,

[2] The State is accordingly wrong to assert that TikTok's feeds are "designed to be addictive." Opp. 6. As the record shows, they are in fact driven by various editorial choices and value judgments.

however, speech compilations tailored to individuals' interests would not be "protected speech" at all, and thus the State could freely prohibit online platforms from publishing any news, music, educational, or video compilations that account for individuals' interests. But choices about whether and how much to value individuals' interests in compiling speech belong to the publisher, not the government.

*Third*, the State cannot question or devalue the expression inherent in TikTok's compilations because "a narrow, succinctly articulable message is not a condition of constitutional protection" *at all*. *Hurley*, 515 U.S. at 569. There is no requirement that when a party speaks by "combining multifarious voices," it must "edit their themes to isolate an exact message as the exclusive subject matter of the speech." *Id.* at 569-70. The First Amendment instead embodies the broader principle of "speaker's autonomy," which secures for the publisher the right to be free from government control in deciding what speech to convey and how to convey it. *Id.* at 578-79. That principle applies whenever the State seeks to regulate a publisher's own "editorial control and judgments" about what speech to include in a compilation, no matter what specific "message," if any, the compilation expresses. *Tornillo*, 418 U.S. at 258; *see Moody*, 603 U.S. at 738. The State's premise that it can control speech compilations unless the publisher can identify the specific message it seeks to convey is anathema to the First Amendment rule of speaker's autonomy.

*Fourth*, the State ignores the fact that *how* a publisher chooses to account for individuals' preferences in compiling speech reflects editorial judgments about the best way to assemble the compilation. As shown above, for example, humans at TikTok decide how much the recommendation system must weigh certain interest signals—i.e., the time spent watching a video versus tapping the "Like" button. *See supra* at 4-5. The combination of such human-controlled editorial decisions determines the content of the "single speech product" produced by the recommendation system for each person on the platform. *Moody*, 603 U.S. at 729-30. Lest there be any doubt about the inherently expressive nature of such decisions, one need only compare the content expressed in feeds generated by different platforms: even though each platform considers user preferences, one person's TikTok feed will look very different from her Facebook feed, which will differ from her YouTube feed, and so on. Those differences conclusively establish that

editorial decisions about *how* to consider user preferences necessarily have expressive consequences for the overall compilations each platform publishes.

TikTok, for example, emphasizes discovery—i.e., introducing viewers to new content with which they have no prior connection—over existing social connections. Zhou Decl. ¶ 6. Its recommendation system design reflects this objective, and, as a result, TikTok's feeds may be more likely than others to recommend an unknown creator to an individual who has watched videos on a related topic. For example, the creator @etymologynerd was able to build a huge audience for his informative linguistics videos because TikTok's recommendation system connected his videos to viewers who expressed interest in videos on related subjects—viewers who would not otherwise have known about or discovered @etymologynerd. *See* Supp. Petrocelli Decl., Exs. F-G. Prohibiting TikTok from considering individuals' preferences in compiling their feeds would seriously undermine not only its own ability to distribute the speech of third-party creators to broad and varied new audiences, but also the ability of people (adults and teens) to find welcoming digital communities. Malhotra Decl. ¶ 53, Declaration of Dr. Adriana Galván ("Galván Decl.") ¶ 105.

*Fifth*, the State errs in insisting that a speech compilation is not "expressive" unless its publisher personally agrees with the individual message of every piece of content within the compilation. Opp. 37. Newspaper opinion pages invariably publish op-eds the publisher sharply disagrees with, but the pages certainly do not become non-expressive and unprotected as a result. What the First Amendment protects is the publisher's judgment that the opinions are *worth publishing*, because, for example, they may be informative or engaging to readers, or for whatever other reason the publisher deems sufficient. The decisions made by TikTok are no different: the third-party speech it compiles is worth publishing because the viewer is likely to find it entertaining and/or informative. The government has no more business regulating that judgment than it does regulating the same judgment made by an op-ed page publisher.

*Sixth*, the State likewise errs in invoking *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), to justify regulation of TikTok's speech compilations. Opp. 35-36. The law at issue there "required law schools to allow the military to participate in on-campus recruiting." *Moody*, 603 U.S. at 731. The law schools asserted First Amendment

objections to "hosting third-party speech" they did not agree with, but the Court rejected those objections because law school recruiting events "lack[ed] the expressive quality of a parade, a newsletter, or the editorial page of a newspaper." *Id.* (quoting *FAIR*, 547 U.S. at 64). That analysis has no application to a published compilation of actual speech in a video feed, which is much more like a parade or editorial page than a law-school recruiting event. If the State's analogy to *FAIR* were valid, the State could tell TikTok what speech it *must* include in its feeds, just as the government in *FAIR* could require law schools to host military recruiters. Presumably even the State would not endorse such a radical intrusion on liberty, but that conclusion follows directly from its argument that TikTok's feeds are analogous to law-school recruiting events.

*Finally*, the State creates a false dichotomy in asserting that if TikTok's feeds express its own message about likely viewer interest in the recommended speech, then TikTok "cannot avail" itself of the publisher's immunity established by § 230 of the Communications Decency Act. Opp. 36-37. Of course it can. Section 230 immunity and First Amendment protections "are not mutually exclusive," *Patterson*, 244 A.D.3d at 38, so the fact that publishing acts protected by § 230 "are *also* protected by the First Amendment does not strip them of their Section 230 immunity," and vice versa, *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063-64 (N.D. Cal. 2025). But this Court need not address the scope of § 230 immunity here. What matters is that the State seeks to exert control over how TikTok exercises its editorial discretion in compiling the "single speech product" that is each of its feeds. *Moody*, 603 U.S. at 731-32. That compilation is subject to the same First Amendment protection publishers have always enjoyed in seeking to compile and distribute third-party speech to audiences likely to enjoy it.

**B. SB 976's Personalized-Feed Provisions Trigger Strict Scrutiny**

1. Strict scrutiny applies to "regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641-42 (1994). That standard applies here: SB 976's personalized-feed provisions explicitly draw a content-based distinction between feeds whose content is compiled based on the expressed preferences of teens (prohibited), and other types of feeds, such as those whose content is compiled chronologically or based on general popularity (unregulated). The State's Opposition only

confirms the content-based nature of these provisions. Citing its accompanying expert declarations, the State repeatedly asserts that personalized feeds are likely to contain harmful *content*, which SB 976 in turn exists to address. *See* Opp. 16-18, 23-24 (citing Radesky, Christakis, Telzer, and Twenge Declarations). That content-based concern is consistent with the claim asserted by bill co-sponsor and Defendant Bonta that personalized feeds are unsafe for teens because of the "harmful content" such feeds contain. Declaration of Daniel M. Petrocelli ("Petrocelli Decl."), Ex. S, at 13. In short, SB 976 triggers strict scrutiny because it regulates speech according to its "particular subject matter" and "cannot be justified without reference to the content of the regulated speech," *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (quotation omitted): only feeds with subject matter that is personalized (rather than determined chronologically or otherwise) are deemed problematic, and only feeds with such personalized content are prohibited.[3]

The State openly confirms the point by asserting that "to determine whether Plaintiffs' feeds comply with or violate SB976, one need not examine the actual content of any feed; rather, one need only look to … Plaintiffs' algorithms" to determine *how* that content is selected. Opp. 39. By the State's own account, then, feeds containing one type of content (i.e., content selected based on individual preferences) are prohibited; feeds containing other types of content (i.e., content selected any other way) are not. The fact that the State can determine whether the law applies only by investigating a platform's internal process for assembling content does not salvage the law; to the contrary, it exacerbates the infringement on speech rights. *See Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (no distinction between speech and process of creating speech for First Amendment purposes).

2. The personalized-feed provisions also trigger strict scrutiny for the independent reason that they "distinguish[] among different speakers, allowing speech by some but not others." *Nat'l*

---

[3] The Ninth Circuit did not address this content-based distinction in *NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025). It held only that SB 976 did not draw a content-based distinction by targeting only *social media* platforms while excepting *commercial* websites. *Id.* at 1015-16. TikTok is not raising those distinctions here.

*Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) (quotation omitted). The provisions prohibit allegedly "addictive" feeds only by entities that publish third-party speech, not by entities that publish "addictive" feeds containing speech generated by themselves or their employees. They also apply only to publishers whose *primary* offering is tailored feeds of user-generated material, not publishers who provide the same compilations as a *secondary* offering. Cal. Health & Safety Code § 27000.5(b)(1).

The State's only answer is that "the First Amendment itself distinguishes between third-party and first-party speech." Opp. 41. No, it does not—a third-party speech compilation is a "single speech product" subject to the same protection as first-party speech itself. *See supra* at 3. The State's contrary argument rests entirely on the statement in *Project Veritas v. Schmidt*, 125 F.4th 929 (9th Cir. 2025), that the First Amendment "bears less heavily when speakers assert the right to make other people's speeches." *Id.* at 955 (quotation omitted). But that principle applies only when a person seeks to re-assert the speech of another *who does not want their speech asserted*, e.g., when the third-party speech was secretly recorded without consent, or is subject to copyright or trademark protection. *See id.* As already shown, the third-party speech rights and interests here are the opposite—creators *want* TikTok to compile and publish their speech, and they *want* TikTok to identify the viewers most likely to be interested in their speech.

3. Finally, the personalized-feed provisions are subject to strict scrutiny because they have no historical precedent or analog whatsoever. *See Vidal v. Elster*, 602 U.S. 286, 301 (2024); *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474-77 (2022). As the Supreme Court has emphasized, "new categories of unprotected speech" cannot be created "by a legislature that concludes certain speech is too harmful to be tolerated," absent "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription." *Brown*, 564 U.S. at 791-92. The Supreme Court just last week forcefully reaffirmed the need to identify a strong "historical pedigree" to justify a speech regulation. *See Chiles v. Salazar*, No. 24-539, slip op. at 9, 15 (U.S. March 31, 2026). Yet the State here cites no statute from any jurisdiction in any period in U.S. history restricting a publisher's ability to tailor its editorial and publication decisions to audience interests. The State's only response is that history does not matter—it is free to control

TikTok's publication decisions without special justification because the decisions are non-expressive and the law is content-neutral. Opp. 41. Those arguments are incorrect for the reasons already discussed, but they also miss the point. As TikTok's motion showed, for decades—even millennia—publishers have been criticized for promoting speech that catered to audience preferences rather than supposedly higher values. TikTok Mot. 20. And yet the State cannot cite one example of any legislature or court barring publishers from considering audience preferences in deciding whether and how to compile third-party speech. The stark absence of such regulation "shows how alien [it] is to the First Amendment." *Id.*

**C. The Personalized-Feed Provisions Fail Any Level Of Scrutiny**

1. *The State Identifies No Compelling Or Significant Governmental Interest Actually Served By These Provisions*

The State's own brief confirms that it cannot survive either strict or intermediate scrutiny. "Even where the protection of children is the object, the constitutional limits on governmental action apply." *Brown*, 564 U.S. at 804-05. And under any standard of scrutiny, the State must demonstrate more than a generalized interest in teen welfare—it must show a connection between the specific conduct regulated and the harm it seeks to prevent. *Id.* at 799-801. It has not done so.

The State invokes (Opp. 44-45) the Legislature's reference to a U.S. Surgeon General report, and its own numerous expert declarations, to identify the "actual problem" supposedly addressed by SB 976. *Brown*, 564 U.S. at 799-800. But the State's sources address only the connections between negative mental health outcomes and "social media usage" *generally*. *See* S.B. 976, 2024 Legis., Reg. Sess. § 1 (Cal. 2024), 2024 Cal. Stats. ch. 321 (West) (California Legislature description of Surgeon General report and related evidence); Christakis Decl. ¶ 15; Radesky Decl. ¶ 24; Telzer Decl. ¶ 44(b)[4]; Twenge Decl. ¶¶ 3-8. None of them even purports to establish a direct causal relationship between negative mental health outcomes and *personalized feeds* in particular, which is the single element of "social media" the challenged SB 976 provisions regulate. In fact, their "opinions that 'personalized feeds' negatively impact adolescents are not supported by existing scientific data," and no "studies exist that examine the impact that

[4] Telzer also relies on an article with questionable content and origins. Galván Decl. ¶ 54.

personalized feeds have on brain development in adolescents." Galván Decl. ¶¶ 3, 38-55; *see also* Declaration of Robert Gibbons ("Gibbons Decl.") ¶¶ 64-83 (available scientific literature does not establish a causal relationship [or even a valid association) between social media use, including features of apps, and negative mental health outcomes). The State's inability to separate personalized feeds from general social media usage as the cause of the problem it seeks to address mitigates, if not outright eliminates, any nexus between the speech prohibition and the asserted reasons for prohibiting speech. *See Brown*, 564 U.S. at 799.

According to the State, it has no burden to establish "a causal connection specifically between the personalized feeds regulated by SB976 and the harms to children the State seeks to remedy." Opp. 44. The State is incorrect: it cannot justify a law burdening speech rights on the basis of an objective unconnected to the law and its speech burdens. For that reason, as *Brown* explains, the State must demonstrate more than "at best some correlation" between the regulated activity and the asserted harm. 564 U.S. at 800. And when defending a statute subject to strict scrutiny, it cannot rely on rationales and evidence the legislature itself did not consider. *See Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1314 (11th Cir. 2017). As just shown, *both* the report cited by the Legislature *and* the new expert declarations address only "social media usage" generally—none of the evidence, new or old, establishes that *personalized feeds* are what causes the negative mental health effects associated with that social media usage.

What is more, the State's own authorities reaffirm the longstanding principle that a state *does* need to provide "a more extensive evidentiary documentation" justifying a law burdening speech when the movant makes a "showing of [its] own to cast doubt on the State's justifications." *Porter v. Martinez*, 68 F.4th 429, 446 (9th Cir. 2023) (quotation omitted). In other words, the State "may not regulate … speech on the back of controverted evidence." *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1282 (9th Cir. 2023). And TikTok's experts make clear that any link between personalized feeds—or even "social media usage" generally—and teens' mental health is far from uncontroverted. *See, e.g.*, Galván Decl. ¶¶ 2-3, 7, 27-55, 84-98 (discussing lack of research on connection between personalized feeds and mental health, and limitations of evidence on causal impact of social media use generally); *see also* Gibbons Decl. ¶¶ 156-273 (highlighting State

experts' reliance on self-reported symptom screening tools with low predictive power and discussing studies finding no find no causal association between social media use and established psychiatric conditions).[5]

2. *The Personalized-Feed Provisions Are Not Narrowly Tailored*

Even if the State could show that the personalized-feed prohibition is causally connected to, and significantly furthers, the State's interest in protecting teens, it has not demonstrated that the prohibition is a narrowly tailored means of accomplishing its goal.

As TikTok demonstrated, other mechanisms already exist to avoid or mitigate the harms alleged by the State, including tools provided by TikTok and third parties that enable parents to control teens' access to the platform. TikTok Mot. 22. The First Amendment prefers such private options over governmental mandates. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 825-26 (2000). And TikTok offers an extensive suite of tools to help parents navigate teens' access to its feeds. Mattmann Decl. ¶¶ 105-14. If the State believes parents are doing an insufficient job of monitoring their teens' social media use, it could "educat[e] children and parents" about the purported dangers of unrestricted social media use and encourage parents to be more involved in their kids' digital engagement. *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024). But rather than pursue such less restrictive alternatives, the State has impermissibly selected to "impose governmental authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3.

The State asserts that these alternatives actually are *not* less restrictive, because they enable parents "only to block access altogether" and thus "address only platform usage generally," not personalized feeds specifically. Opp. 47. But as shown above, the State's own asserted harm is only "social media usage" in general, so greater emphasis on the existing tools *would* address the asserted harm. Further, parental tools are not limited to outright blockage of access; among other things, they allow parents to control *time spent*, which is precisely what the State describes as the

---

[5] The State cites this Court's prior assessment of the State's justification for the private-mode-default provision of SB 976 (Opp. 45), but that has no bearing here, where different provisions are at issue and a different evidentiary record has been developed by both parties.

problem it wants to address. Opp. 25 (citing Twenge Decl. ¶¶ 7, 99-105; Radesky Decl. ¶¶ 66-67; Christakis Decl. ¶¶ 145, 261; Hilbert Decl. ¶¶ 64-65). As a result, the parental tools allow teens to benefit from the vast and varied array of content TikTok can recommend to them on a focused basis—which the State would deny them—but subject to limits on *over*consumption of such content. *See also* Malhotra Decl. ¶¶ 71-89 (discussing how TikTok's safety features demonstrate concern for minors consistent with ethical and responsible decision-making).

SB 976's challenged provisions are also overinclusive in that they restrict far more speech than is necessary to achieve the State's purported goal. SB 976 does not only prevent teens from viewing allegedly harmful content within personalized feeds, Opp. 14-18, 22-24, it *also* prevents them from viewing the enormous wealth of educational, political, and newsworthy material that TikTok identifies for them, as well as the online support communities that TikTok similarly can connect them with. *See, e.g.*, Petrocelli Decl., Ex. X, at 11 (concerns of Chamber of Progress, LGBT Tech, the Trevor Project, and Woodhull Freedom Foundation). SB 976 thus overinclusively denies teens access to the many beneficial aspects of personalized feeds. *See, e.g.*, Mattmann Decl. ¶¶ 86-100 (discussing personalized feeds' benefits for teens, including allowing teens to "discover interesting, educational, and helpful content" that a non-personalized feed would not expose them to, and enabling TikTok's key minor-safety features, which "rely on personalization"); Malhotra Decl. ¶¶ 57-70 (comparing value of personalized and non-personalized feeds); Galván Decl. ¶ 101 ("A key developmental need during adolescence is establishing connections and shared interests with peers, and learning new information and skills. Personalized feeds enable both of those processes."). A law that prohibits personalized delivery of beneficial content because of concerns about harmful content is the opposite of narrowly tailored—it is a bludgeon that treats all speech as equally dangerous simply because it is personalized.

For similar reasons, it is no answer to say that SB 976 "leaves open ample alternative channels for communication" merely because teens can still search for content on their own or engage in their own first-party speech. Opp. 46. SB 976 completely bars TikTok from providing, and teens from accessing, "an entire medium of public expression," *Menotti v. City of Seattle*, 409 F.3d 1113, 1138 (9th Cir. 2005), i.e., a compilation of speech curated to meet their interests and

expose them to informative and entertaining content they would not otherwise encounter. *See Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990) (an "alternative mode of communication may be constitutionally inadequate if the speaker's ability to communicate effectively is threatened" (quotation omitted)). A feed stripped of all personalization is not an "alternative channel" for the same expression; it is a fundamentally *different* "single speech product"—one that buries the content teens want to see amidst a mass of billions upon billions of videos in which they have no interest, while at the same time denying TikTok the ability to make expressive compilations of third-party content in the manner it desires.

Finally, the provisions are also underinclusive because they do nothing to prevent teens from accessing the same allegedly harmful personalized content on platforms that provide personalized feeds as a secondary offering or that publish only first-party speech. *See* Cal. Health & Safety Code § 27000.5(a),(b). The State offers no convincing rationale for that distinction. It again asserts that "the First Amendment itself draws a distinction" between first-party speech and compiling third-party speech, Opp. 46, which is wrong for the reasons explained above, *see supra* at 15. The State also tries to justify targeting only third-party speech compilations on the ground that a state "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). Yet the State does not even attempt to explain why other personalized speech compilations create less "pressing concerns" or otherwise could not be included within SB 976's ambit. The underinclusiveness thus does not reflect permissible legislative prioritization, but an impermissible distinction among speech compilations based on their personalized third-party content and the identity of the publishers that provide them. *See Brown*, 564 U.S. at 802.

## CONCLUSION

For the foregoing reasons, the motion for a preliminary injunction should be granted.

Dated: April 10, 2026

Respectfully submitted,

By: */s/ Daniel M. Petrocelli*
Daniel M. Petrocelli

DANIEL M. PETROCELLI (S.B. #97802)
dpetrocelli@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, Suite 800
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

JONATHAN D. HACKER (*pro hac vice*)
jhacker@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
Telephone: +1 202 383 5300
Facsimile: +1 202 383 5414

*Attorneys for Plaintiffs TikTok Inc. and TikTok USDS Joint Venture LLC*