United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| META PLATFORMS, INC., | Case No. 5:25-cv-09792-EJD |
| Plaintiff, | |
| | **ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION** |
| v. | |
| ROB BONTA, | Re: ECF No. 19 |
| Defendant. | |

| | |
|---|---|
| TIKTOK, INC., | Case No. 5:25-cv-09789-EJD |
| Plaintiff, | |
| | **ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION** |
| v. | |
| ROB BONTA, | Re: ECF No. 20 |
| Defendant. | |

| | |
|---|---|
| GOOGLE LLC et al., | Case No. 5:25-cv-09795-EJD |
| Plaintiff, | |
| | **ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION** |
| v. | |
| ROB BONTA, | Re: ECF No. 23 |
| Defendant. | |

Cyberspace and social media have undoubtedly become among the most prominent places for people to connect with each other, exchange views, learn, and much more. Platforms like Facebook allow users to engage in debates about an array of topics ranging from politics to

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

favored vacation destinations. Internet-based platforms have substituted for cable television in many instances, with audiences relying on streaming services to view shows of the moment. Big-budget films traditionally screened in movie theaters are now replaced by short-form video content on platforms like YouTube, Instagram, and TikTok. TikTok estimates that it had more than 170 million monthly users in the United States alone and has become one of the world's most widely used online media platforms. TikTok Mot. for Prelim. Inj. ("TikTok Mot.") 9, Case No. 25-cv-09789, ECF No. 20. YouTube hosts 20 billion videos on its platform, with users uploading hundreds of hours of new video every minute. YouTube Mot. for Prelim Inj. ("YouTube Mot.") 6, Case No. 25-cv-09795, ECF No. 23. And through its Facebook, Instagram, and Threads services, billions of people globally use Meta's services to share ideas and stay in touch with one another. Meta Mot. for Prelim. Inj. ("Meta Mot.") 11, Case No. 25-cv-09792, ECF No. 19.

Just as the internet and social media have become important fixtures in our world, these platforms have generated positive societal impacts. Beyond providing a way for people to connect and communicate, these platforms have democratized the type of information shared through content creation process, allowing people from all walks of life to share their talents with the world on the internet—skilled singers and songwriters who were otherwise undiscovered have risen to fame because a record label or producer viewed their content on YouTube.

As technology has continued to evolve, so too have these websites, services, and online applications. Instagram users who once saw only photos posted on the platform by the friends that they followed now see short videos in which a self-proclaimed influencer recommends a new mascara, supplement, or clothing-rental-service. And the previous limited manner of displaying content in chronological order has been replaced instead with feeds prioritizing content similar to that which the user has seen before. This increasingly prominent feature of social media platforms, as well as many other internet-based platforms, has appeared through the use of algorithmic delivery of content. And, although algorithms are not new, the incorporation of generative artificial intelligence and machine learning has altered the nature of these platforms' operations full scale, including wide-spread implementation of recommendation-based feeds.

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

2

United States District Court
Northern District of California

California's legislature found that this evolution has created "addictive features" of many social media platforms. S.B. 976, 2023–2024 Reg. Sess. (Cal. 2024). Unsurprisingly, minors are among the users on these platforms. Indeed, the California Legislature found that approximately 95 percent of 13- to 17-year-olds report that they use at least one social media platform and "more than one-third report using social media constantly." *Id.* A report issued by the United States Surgeon General identified urgent reasons for concern about social media usage by children and adolescents, including increased negative health outcomes, such as less healthy sleep patterns and negative mental health outcomes such as depression and self-harm behaviors. *Id.* In response to these findings and the platforms' changing features, California adopted Senate Bill 976, the "Protecting Our Kids from Social Media Addiction Act" ("SB 976" or the "Act").

Before the Court are Plaintiffs TikTok Inc. ("TikTok"), Meta Platforms, Inc. ("Meta"), and Google LLC and YouTube, LLC's (collectively, "YouTube") motions for a preliminary injunction. Plaintiffs seek to prohibit Defendant Rob Bonta ("Bonta") from enforcing §§ 27001(a), 27002(b)(2), and 27002(b)(4) (collectively, the "personalized feed provisions") of the Act against Plaintiffs, arguing these provisions unconstitutionally burden Plaintiffs' and their users' free speech rights under the First Amendment. Because Plaintiffs have not shown that the personalized feed provisions are likely to infringe upon their First Amendment rights, the Court **DENIES** Plaintiffs' preliminary injunction motions.

## I.    BACKGROUND

### A.    The Act

Plaintiffs challenge sections of the Act governing the provision of "addictive feeds," which Plaintiffs refer to as "personalized feeds." *See* YouTube Mot. 12; TikTok Mot. 7–8; Meta Mot. 8. The Act defines an "addictive feed" as "an internet website, online service, online application, or mobile application, or a portion thereof, in which multiple pieces of media generated or shared by users are, either concurrently or sequentially, recommended, selected, or prioritized for display to a user based, in whole or in part, on information provided by the user, or otherwise associated with the user or the user's device." § 27000.5(a). Excluded from this definition are feeds in which: (1)

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

"the information is not persistently associated with the user or user's device" and does not rely on the user's prior history on the platform; (2) the information is based on search terms that are unrelated to the user or the user's device; (3) the information consists of privacy or accessibility settings, technical information about the device, or device communications or signals concerning whether the user is a minor; (4) the user "expressly and unambiguously" requested the specific media, or the content creator's media, or the blocking, prioritization or deprioritization of the media; (6) the recommended, selected, or prioritized media is the next media in a preexisting sequence from the same content-creator and is not automatically played; or (7) where media is a direct, private communication between users.  § 27000.5(a)(1)–(7).

The Act prohibits the operator of an addictive internet-based service or application ("operator")[1] from providing minors with addictive feeds unless: (1) the operator does not have actual knowledge that the user is a minor, or (2) the operator "has obtained verifiable parental consent" to provide such a feed to a minor.  § 27001.  Operators must also provide parents the ability to limit the amount of time that their child can access an addictive feed, which must be set to one hour per day by default "unless modified by the verified parent," § 27002(b)(2), as well as a mechanism to set their child's "default feed" to "one in which pieces of media are not recommended, selected, or prioritized for display based on information provided by the user, or otherwise associated with the user or the user's device, other than the user's age or status as a minor." § 27002(b)(4).  By January 1, 2027, the operator must comply with regulations promulgated by the Attorney General to assess whether a user is a minor.  § 27001(a)(1)(B).

### B.    Procedural History

This is not the first time that the Act has been challenged before this Court.  In *NetChoice v. Bonta*, the Court considered challenges by NetChoice, an internet trade group with several

---

[1] An "addictive internet-based service or application" is defined as "an internet website, online service, online application, or mobile application, including, but not limited to, a 'social media platform' as defined in Section 22675 of the Business and Professions Code, that offers users or provides users with an addictive feed as a significant part of the service provided by that internet website, online service, online application, or mobile application."  § 27000.5(b)(1).

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
4

social media companies among its members.[2] *NetChoice v. Bonta*, 761 F. Supp. 3d 1202, 1210 (N.D. Cal. 2024), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025) [hereinafter "*NetChoice I*"].  NetChoice raised facial First Amendment and vagueness challenges to each of the Act's provisions, including the personalized feed provisions, as well as as-applied challenges on behalf of five of its members.  *Id.* at 1218.  There, as Plaintiffs do here, NetChoice argued that personalized feeds reflected the platforms' own speech such that restricting this speech violated the First Amendment.  *Id*.

Looking to *Moody*, the Court declined to enjoin the personalized feed provisions because NetChoice had not met its burden to demonstrate that "most or all personalized feeds covered by SB 976 are expressive and therefore implicate the First Amendment."  *Id.* (citing *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024)).[3]  In addition to clarifying a plaintiff's burden in bringing a facial First Amendment challenge, the Court cautioned that although *Moody*'s "sweeping language . . . could be interpreted as saying that all acts of compiling and organizing speech, with nothing more, are protected by the First Amendment, . . . *Moody* stands only for the proposition that restrictions on a private speaker's ability to compile and organize third-party speech implicate speech rights only if those restrictions impair the speaker's *own* expression."  *Id.* at 1219 (emphasis added).  The Court expressed doubt that regulating feeds which responded solely to user actions would "uniformly interfere with expression," especially because "[w]hen it comes to feeds that recommend posts based solely on prior user activity there is no apparent message being conveyed."  *Id.* at 1221.  The Court further explained that, if a user does interpret a personalized feed as communicating the platform's belief that the user is interested in the subject matter, that belief reflects the user's own interpretation rather than the platform's expression.  *Id.* at 1222.  And particularly notable here, the Court held that NetChoice lacked associational standing on behalf of its individual members to raise as-applied challenges to the personalized-

---

[2] YouTube and Meta are members of NetChoice; TikTok is not.
[3] The Court enjoined §§ 27002(a); 27002(b)(1) (both default provisions preventing child from accessing or receiving notifications between certain hours); and 27005 (compelled disclosure requirement).

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
5

United States District Court
Northern District of California

feed provisions. *Id.* at 1230–31.

NetChoice appealed. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1012 (9th Cir. 2025). As relevant here, the Ninth Circuit agreed that NetChoice did not have associational standing to pursue its as-applied challenge to the personalized feed provisions on behalf of its members. *Id.* at 1013. To conduct the requisite analysis, the Ninth Circuit explained that a court must assess the expressive nature of each member's personalized feed and where the feed falls on the spectrum from "express[ing] a platform's unique message to the world, [to] reflect[ing] users' revealed preferences to them." *Id.* at 1014. Given each member's unique platform and algorithm design, the Circuit agreed that this analysis required the individual members' participation. *Id.*

The Ninth Circuit then considered NetChoice's facial challenge to the personalized feed provisions. "Careful not to decide more than necessary," and recognizing that the Supreme Court did not decide the outer limits of which algorithm-based feeds are expressive for First Amendment purposes in *Moody*, the Ninth Circuit concluded that "NetChoice fail[ed] to show that any unconstitutional applications of the statute substantially outweigh[ed] its constitutional application." *Id.* at 1021 (internal quotation marks omitted) (citing *Project Veritas v. Schmidt*, 125 F.4th 929, 937 (9th Cir. 2025)).

Now two of NetChoice's members, YouTube and Meta, along with TikTok, have brought individual as-applied challenges with individualized facts about how their respective personalized feeds are compiled. Plaintiffs' motions for preliminary injunctions require this Court to consider the likelihood of their success on the merits of their First Amendment challenges. In so doing, the Court looks to *Moody* as guidance, however, as the Ninth Circuit emphasized, *Moody* did not decide the issue here—the outer limits of when an algorithm-based feed is expressive.

## II.    LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To secure a preliminary injunction, a plaintiff must establish that it (1) "is likely to succeed on the merits," (2) "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its]

favor," and (4) "that an injunction is in the public interest." *Id.* at 20.  The last two factors merge when the government is a party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    DISCUSSION

The Court begins its analysis with the likelihood of success on the merits, the "threshold inquiry." *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024, 1039 (9th Cir. 2024); *see also Developmental Servs. Network v. Douglas*, 666 F.3d 540, 544 (9th Cir. 2011).  A court "need not consider the other factors" if a movant fails to show a likelihood of success on the merits. *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).  Where the plaintiff alleges a First Amendment violation and injury, "the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011), *overruled on other grounds by Bd. of Trs. of Glazing Health & Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc)).

The Court will discuss in turn arguments regarding: (1) expressive messaging; (2) users' right to receive information; (3) the right to disseminate fully protected speech; and (4) YouTube's challenge to the default provisions as unconstitutionally vague.

### A.    Expressive Message

"The touchstone of First Amendment speech rights is [] the protection of *expression*." *NetChoice I*, 761 F. Supp. 3d at 1219 (emphasis in original).  Accordingly, Plaintiffs must establish that their activity is expressive in the first instance such that the First Amendment even applies. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  Where a compilation of third-party speech is at issue, it is protected only to the extent that the compilation is "inherently expressive" in its own right. *Moody*, 603 U.S. at 781 (Alito, J., concurring) (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 66 (2006)) [hereinafter *FAIR*].  Third-party compilations that organize speech in a "non-expressive way (e.g., chronologically) fall

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

'beyond the realm of expressi[on].'" *Id.* at 783 (Alito, J. concurring) (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995)); *see cf. Mapother v. Dep't of Just.*, 3 F.3d 1533, 1540 (D.C. Cir. 1993) (finding that a chronologically organized portion of a report reflected no point of view, thus deliberative process privilege did not attach).

The Court finds Plaintiffs have failed to show at this stage of litigation that their personalized feeds are "expressive." Rather, Plaintiffs rely on predictive algorithms that incorporate users' past watch history and other data and then suggest content that the algorithms anticipate will be engaging, or "interesting" to users. Plaintiffs' decision to rely on these algorithms' number-crunching capabilities is not an expressive judgment. Although Plaintiffs' algorithms differ slightly, each Plaintiff represents that their personalized feeds are the result of multi-step processes intended to convey their desired "expressive message." In other words, each Plaintiffs' intended message is some approximation of "we think you will find this content interesting." For example, TikTok's feeds convey its message that "this content is consistent with our values and we think you will find it informative and/or entertaining." TikTok Reply 6–7, ECF No. 68. YouTube's message is similarly that "the user will likely find the displayed content interesting and enriching." YouTube Mot. 14. Meta likewise intends to communicate a message to its users that, "their particular interests and preferences are reflected on Facebook, Instagram, and Threads services." Meta Mot. 13. But, as discussed above, Plaintiffs are not making any decisions about what content will be "interesting," because they are merely relying on predictive modelling to assess what users' characteristics and history on the platform suggest will keep these same users engaged. This decision is not an "expressive" message; it is merely a mirror that reflects back to users their own perceived interests. *See* Brief of Electronic Privacy Information Center and Law & Technology Scholars as Amici Curiae Supporting Defendant 3, ECF No. 54.[4] ("[The curatorial choices] are designed to evaluate *users*, not messages, and so are blind to the

---

[4] The Court cites to the *TikTok Inc. v. Bonta* docket (No. 5:25-cv-09789-EJD) for briefing and documents filed in all three of the above-captioned matters. To the extent a document was filed in only one of the actions, the Court will specify the relevant docket.

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
8

United States District Court
Northern District of California

meaning of the media selected and how that meaning impacts the message sent by the overall compilation.").  In effect, Plaintiffs are relying on an algorithmic function to make the determination of what is "interesting," divorced from any understanding of the underlying content. Plaintiffs themselves are not making any determination of what is "interesting" when they rely on this predictive modelling, nor do they otherwise seek to convey an expressive message through their personalized feeds.

Plaintiffs' arguments to the contrary regarding the level of human involvement and comparison to content moderation are unpersuasive.

### 1.    Human Involvement

First, perhaps intending to distance themselves from a finding that automated algorithms control decisions attenuated from human decision or control, Plaintiffs argue that personalized feeds are expressive because human employees make various expressive decisions while developing and monitoring Plaintiffs' recommender systems.  For example, humans decided to set maximization of user engagement as an objective for Plaintiffs' algorithms.  Such an argument may have intended to assuage Justice Barrett's concerns in her *Moody* concurring opinion that, where companies rely on algorithmic tools to implement their editorial judgment, technology may attenuate the connection between human judgment and technology-driven actions.  *Moody*, 603 U.S. at 746 (Barrett, J. concurring).  But the degree of human involvement at various points of the process does not transform a message that is not expressive at the outset into one that is—as the Court found above, Plaintiffs are not likely to succeed in showing their personalized feeds are "expressive" based on the current record.  And regardless, Plaintiffs have failed to show that human behavior such as setting a company's objective to maximize user engagement by algorithmic manipulation is on its own "expressive" message.  Otherwise stated, Plaintiffs decide to "'convey to users _____ because we think whatever fills in that blank is interesting, relevant or trustworthy' . . . but [Plaintiffs are] not filling in that blank.  And it's the filling in of the blank, what you're actually choosing to convey or not convey that is the exercise of editorial judgment." Transcript of Hr'g at 114:20–115:5, ECF No. 103.  The Court ultimately agrees with

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
9

United States District Court
Northern District of California

Bonta that these feeds "serve as 'passive receptacle[s]' of third-party speech or as 'dumb pipes' that merely emit what they are fed." *Moody*, 603 U.S. at 782 (Alito, J. concurring) (citing *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431, 458 (2014) (Scalia, J., dissenting)).

### 2.    Content Moderation

Next, Plaintiffs argue that the personalization feed provisions are akin to state laws restricting social media platforms' abilities to implement their content moderation policies. Notwithstanding that content moderation policies are explicitly exempt from the Act, the Court will examine this argument with two inquiries: (1) whether processes undertaken to moderate content can be disentangled from the personalization efforts in feed generation; and (2) if so, why the two processes, and resulting feeds, are different.

The Court begins with a short examination of Plaintiffs' individual feed generation processes (also referred to as their recommendation systems), which include both content moderation and personalization processes. Each Plaintiff suggests that these two processes are so intertwined that they cannot be disentangled. *See, e.g.*, Meta Reply 13 ("[T]here is no material distinction for First Amendment purposes between content-moderation algorithms and personalization algorithms."); TikTok Mot. 18–20; YouTube Mot. 10–11. The Court disagrees.

A review of each Plaintiff's recommender system demonstrates that the multi-step feed generation process can be separated into efforts to moderate content and ensure that Plaintiffs' community standards are followed on the one hand, and efforts to "personalize" the resulting feed, on the other. Feeds resulting from the former efforts are not subject to SB 976 and not at issue in this Action; feeds resulting from the latter efforts are. *See, e.g.*, Omnibus Opp'n 35, ECF No. 45 (SB 976 does not cover content moderation, nor do Plaintiffs allege that by engaging in the application of their content moderation guidelines, they face a genuine threat of imminent prosecution); *see also* Brief of Electronic Privacy Information Center and Law & Technology Scholars as Amici Curiae Supporting Defendant 3, ECF No. 54-1 ("Behavior profiling for feed generation is very different than the content moderation practices the *Moody* Court recognized may be expressive.").

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

Each system begins by identifying the universe of potential content to be considered for recommendation to users. Transcript of Hr'g at 13:10 ("There certainly is a step where there are content moderation standards that might dictate whether particular content can appear on YouTube's platform at all"); *see also* Zervas Decl. ISO YouTube's Mot. ("Zervas Decl.") 29, ECF No. 67-4 ("Content uploaded to a platform can be first checked against content moderation rules, which determine what content is allowed on the platform and could be recommended to users."). At this initial stage, Plaintiffs' content moderation systems operate to weed out content that Plaintiffs believe should not be on the platform at all, should be deprioritized, or should be accompanied by some kind of label. For example, during the first stage of its process, Meta relies on a rules-based approach to filter out "problematic items" including, among other items, "sexual/objectionable images." Mobasher Decl. ISO Meta's Reply ("Mobasher Decl.") ¶ 88, ECF No 90-1; *see also* Meta Mot. 13. Similarly, YouTube's recommender system will only recommend videos in later steps of its process that have not been removed for violation of YouTube's Community Guidelines. Goodrow Decl. ISO YouTube Mot. ("Goodrow Decl.") 10, ECF No. 23-1. And content that violates TikTok's Community Guidelines is excluded from the pool that would otherwise be eligible for recommendation in the "For You" feed, TikTok's primary personalized feed. Zhou Decl. ISO TikTok Mot. ("Zhou Decl.") 5, ECF No. 20-1.

After the identification of the content candidate pool, Plaintiffs each rely on engineer-created algorithms to sort and rank content in accordance with each Plaintiffs' "editorial judgments and goals." Transcript of Hr'g 23:6–7. YouTube's Vice President of Engineering explains that YouTube's recommender system's goal is to "predict which content will be relevant, enjoyable, and valuable to a particular user," and is "optimized for long-term user satisfaction." Goodrow Decl. 5–6. TikTok and Meta's recommendation systems work to achieve similar goals, relying on ranking processes. *See* Zhou Decl. 5 ("The [TikTok] recommendation system scores and ranks [videos eligible to be shown to a person] to determine which particular videos out of the candidate pool would be most interesting and informative to that person."); Mobasher Decl. ¶ 74 (explaining that "identifying the most relevant content items to show to a user . . . requires using a

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

multi-stage ranking and recommendation process").

Now, considering content-moderation efforts and personalization efforts side-by-side, the Court concludes that there are notable differences between them. It is well-established that content moderation can be expressive to the extent that it reflects decisions about what content to be included or excluded consistent with often written standards "detail[ing] the messages and videos that the platforms disfavor.: *Moody*, 603 U.S. 735. But as discussed above, *Moody* expressed skepticism about the expressive nature of personalized feeds, leaving open the question about whether there are material differences between feeds reflecting content-moderation decisions and those that are curated based on users' interests and associated characteristics. *Moody*, 603 U.S. at 736 n.5 ("We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards."); *id.* at 746 ("But what if a platform's algorithm just presents automatically to each user whatever the algorithm thinks the user will like—*e.g.*, content similar to posts with which the user previously engaged?") (Barrett, J., concurring)). On the record before it, the Court finds several ways in which the incorporation of users' data into a value function intended to reflect back to users their ascertained interests differs from content moderation. *See* Transcript of Hr'g 119:5–8. As discussed below, the implementation of Plaintiffs' content moderation decisions, unlike personalization, carries with it a moral valence. Content moderation implementation also serves as an initial gating mechanism, excluding content from the platform that might have otherwise been recommended.

Meta describes its recommender system prediction models, which are "similar to prediction models used in recommender systems across the industry," as including: p(like), p(comment), and p(video completion), among others, with the "p" reflecting the probability of the event in the parentheses occurring. Mobasher Decl. ¶ 79. So, p(comment) is a prediction model that relies on an individual users' previous interactions with the Plaintiff's platform as well as other demographical information to predict the likelihood that that user will "like" a piece of content. Such prediction models are used in combination and streamlined to create a single

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
12

ranking score. *Id.*; *see also* Zhou Decl. 6; Goodrow Decl. 10. It is this value function, or some variant of it, that Plaintiffs rely upon to "fill in the blank," as Bonta argues. By contrast, when Plaintiffs seek to implement their community standards, humans are not relying on users' data and interactions to reflect to the very same users the content that an algorithmic function predicts they may find "interesting." Rather, Plaintiffs' own policy positions filter and fill in the "blank" at the outset. "Humans are saying, for example, we don't want nudity on our platforms. . . . The blank is nudity." Transcript of Hr'g 119. Meta's Community Standards, TikTok's Community Guidelines, and YouTube's Community Guidelines (collectively, "Community Standards") were written by human beings and "set forth rules about what content would not be allowed . . . and reflected a 'wealth of user-agnostic judgments about what kinds of speech, including what viewpoints, are not worthy of promotion.'" Omnibus Opp'n 37–38 (citing *Moody*, 630 U.S. at 719–20, 736 n.5)). Plaintiffs' ability to implement their content moderation standards, "continu[ing] to remove posts containing disfavored ideas, such as racist ideology," is not contravened by their compliance with SB 976. *NetChoice I,* 761 F. Supp. 3d at 1221–22.[5]

Unlike the later personalization phases of the recommender system, the Community Standards serve as an initial gating mechanism for what may remain on the platform in many instances. *See, e.g.*, YouTube Mot. 16 (noting that the recommender system will not suggest videos that violate YouTube's Community Guidelines); Meta Mot. 12; TikTok Mot. 10. This feature of content moderation allows for an intuitive application of *Miami Herald v. Tornillo* and the cases that followed it. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241 (1974); *see also Moody,* 603 U.S. at 733–34 (noting that the settled principles set out in the seminal case, *Tornillo,* and those that followed "have much to say about the laws at issue here"). In *Tornillo*, the Miami Herald challenged a Florida "right of reply" statute that provided "that if a candidate for nomination or election is assailed regarding his personal character or official record by any

---

[5] The Court notes Plaintiffs' positions that their ability to present content that they deem "age appropriate" will be stymied by SB 976. *See e.g.*, Goodrow Decl. ¶ 29. Section 2700.5(3) appears to exempt from this section feeds in which the media generated is based on "device communications or signals concerning whether the user is a minor."

United States District Court
Northern District of California

newspaper, the candidate has the right to demand that the newspaper print, free of cost to the candidate, any reply the candidate may make to the newspaper's charges." *Tornillo*, 418 U.S. at 244. The Court found that the statute violated the First Amendment because it intruded on the newspaper editor's function. *Id.* at 258. By requiring the newspaper to publish a candidate's reply to any "assailment," the editors were compelled to "publish that which reason tells them should not be published." *Id.* at 256. The exercise of editorial control and judgment included the "choice of material to go into a newspaper, and the decisions made as to the limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair." *Id.* at 258. Further, the implications of upholding the right-of-reply statute were not lost on the Court: "under the operation of the Florida statute, political and electoral coverage would be blunted or reduced." *Id.* at 257.

The same "core teaching" was reflected in *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1 (1986), and in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995). *Moody*, 603 U.S. at 734. In *Pac. Gas & Elec. Co.*, the Supreme Court answered the question of "whether the California Public Utilities Commission may require a privately owned utility company to include in its billing envelopes speech of a third party with which the utility disagrees" in the negative. *Pac. Gas & Elec. Co.*, 475 U.S. at 5, 15. The Court found that "the Commission's access order . . . impermissibly requires appellant to associate with speech with which appellant may disagree." *Id.* at 15. Likewise, in *Hurley*, the question was about whether Massachusetts could require private citizens to *include* in a parade a group imparting a message that the organizers did not wish to convey. *Hurley*, 515 U.S. at 559. In reviewing the record, the Court pointed out the special expressive quality of parades, noting that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* at 569. Unlike "programming offered on various channels by a cable network, the parade does not consist of individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience . . . each is understood to contribute something to a common theme." *Id.* at 576. The Court held that as applied the challenged statute violated "the

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
14

fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message." *Id.* at 573. As the Court in *FAIR* summarized, "the compelled speech violation in each of [its] prior cases . . . resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *FAIR*, 547 U.S. at 63.

Laws regulating platforms' ability to implement their content moderation policies, which is to say, exclude, label, or demote content that the platforms disfavor, clearly raise many of the same concerns raised in *Tornillo*, *PG&E*, *Hurley*, and subsequent cases. *See e.g.*, *Moody*, 603 U.S. at 738–39 (finding that much like the Florida right-of-reply statute in *Tornillo*, Texas's law targeted expressive choices because it forced major platforms to present and promote content on their feeds to which they objected). But it is difficult for the Court to see how the same First Amendment concerns exist when the challenged statute restricts the use of "information provided by the user, or otherwise associated with the user or the user's device," for generating personalized feeds. SB 976 does not require Plaintiffs to share a specific message on users' personalized feeds, nor does it impair their ability to exclude content that Plaintiffs find objectionable. For example, Plaintiffs Community Standards reflect their expressive judgment that certain content, such as content that encourages self-harm is bad. But Plaintiffs recommender systems may nonetheless promote this same content through their algorithmic processes. *See* Omnibus Opp'n 23.

Plaintiffs argue that their intended message is comparable to that in *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011). There, data miners and an association of brand-name drug manufacturers challenged a Vermont law providing that, without a prescriber's consent, prescriber-identifying information could not be sold by pharmacies, disclosed by pharmacies for marketing purposes, or used for marketing by pharmaceutical manufacturers. *Id.* at 557. One of the law's challenged provisions effectively barred pharmaceutical manufacturers and marketers from using prescriber-identifying information for marketing. *Id.* at 559. In adopting the challenged law, the Vermont legislature did not dispute that detailers (pharmaceutical sales representatives who meet with doctors to promote specific prescription medicines) were engaged

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
15

in "marketing activities." *See* 2007 Vt. Laws No. 80, § 1(3).  The Court in *Sorrell* therefore only needed to look to established precedent holding that commercial speech is entitled to First Amendment protection before moving into its more substantive analysis regarding the law's content- and speaker-based restrictions.  *See Sorrell*, 564 U.S. at 564 (concluding without significant analysis that the statute "disfavors marketing, that is, speech with a particular content"); *see also Rubin v. Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (noting that the Court repudiated its previous position that commercial speech was not protected by the First Amendment in *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748 (1976)). The Court agrees with Plaintiffs that consideration of users' online behavior may be helpful to make an otherwise expressive message more compelling.  *See e.g.*, YouTube Mot. 19 (noting that in *Sorrell*, prescribing-identifying information permitted drug detailers to make their marketing messages more effective).  But as Bonta points out, the issue of "whether a speaker can use information about its audience to tailor its message" is not what the Court is faced with here, where the feed personalization efforts do not reflect any particular expressive message.  Omnibus Opp'n 47 (Plaintiffs' feed personalization efforts result in feeds that "can potentially encompass *anything*" and therefore do not have an expressive quality.).

A further examination of the characteristics that set content-moderation decisions apart from mere personalization underscores why the former are expressive and the latter is not. Content moderation decisions, implemented through Plaintiffs' Community Guidelines, carry with them a moral valence; the same is not true for personalization efforts based on users' data.  For example, Meta's Community Standards are "organized into twenty-three separate policies restricting specific categories of content," accompanied by a policy rationale, explaining the intent for the specific category and what it restricts.  *See* Kantor Decl. ¶ 9 n.8–27, No. 5:25-cv-09792-EJD, ECF No. 19-2.  YouTube's Community Guidelines reflect YouTube's judgment that content that promotes voter suppression, for example, creates a serious risk of egregious harm and is not allowed on the platform.  YouTube, Community Guidelines, https://perma.cc/LV7USCMD.  Thus, YouTube's decision to remove or prohibit such content reflects a moral judgment that this content

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

is bad.  The First Amendment clearly protects "moral judgments about art and literature." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011).  In adopting Community Guidelines, Plaintiffs have made value-laden judgments based on a "set of beliefs about which messages are appropriate and which are not." *Moody*, 603 U.S. at 738.  By implementing its Community Guidelines and excluding from any user's feed third-party content that Meta categorizes as "hate speech," Meta relies upon its editorial judgment to convey a message that it does not support hate speech on its platform, and implicitly that hate speech is "bad."  TikTok similarly proclaims that it is a "place for diverse communities to connect—not for spreading hate," and accordingly does not allow "hate speech" on its platform.  TikTok Community Guidelines, Hate Speech and Hateful Behavior, https://www.tiktok.com/safety/en/policies-and-engagement/safety-civility.  However, delivering a message to a particular user predicated on their demographic data and past watch history indicates that they are likely to find "blank" interesting is different.  This message is not accompanied by any editorial judgment, but is a creation of an algorithm.  By way of example, Plaintiffs do not decide to show a user a series of cat videos because their top-level decisionmakers think that cats are "good" animals or that something about the cats showcased makes the videos especially fun to watch.  In fact, Plaintiffs' inclusion of this message has nothing to do with whether its boardroom believes cats are good or bad, or holds a view on cats at all for that matter.  Rather, Plaintiff has decided, devoid of any expressive judgment, that regardless of the curated content itself, feeds should show content that "will be interesting" to users because they have previously watched and completed videos on a certain topic, typically watch videos of a certain length, or are in a certain location.   Indeed, if Plaintiffs made an editorial decision about whether to prioritize cat videos in users' feeds, the decision would doubtlessly affect some faction of users' long-term satisfaction with the platform, thereby undercutting Plaintiffs' objectives.

Because Plaintiffs have not shown that their personalized feeds convey an expressive message or reflect human editorial judgment, their First Amendment challenge fails.[6]

---

[6] YouTube challenges §§ 27002(b)(4) and § 27002(b)(2), which it calls the "default restrictions,"

United States District Court
Northern District of California

Accordingly, the Court **DENIES** Plaintiffs' motions on this basis.

### B.    Users' Right to Receive Information

In the alternative, Plaintiffs argue that the Act violates their users' rights under the First Amendment to receive information and ideas. *See* YouTube Mot. 19; TikTok Mot. 22. In support of this position, Plaintiffs rely on *Stanley v. Georgia*, where the Supreme Court assessed the constitutionality of a statute imposing criminal penalties on individuals for knowing possession of obscene matter. *Stanley v. Georgia*, 394 U.S. 557, 559 (1969). There, the Court underscored the well-established principle that the freedom of speech and press necessarily protects the right to receive information and ideas. *Id.* at 564. The Georgia statute contravened this principle by reaching into the privacy of an individual's home to control "what books he may read or what films he may watch." *Id.* at 565.

The Court also finds this position unpersuasive. There are clear differences between the speech at issue in *Stanley* and that asserted here. In *Stanley*, the speech at issue was obscenity, and so categorically unprotected by the First Amendment. *See Miller v. California*, 413 U.S. 15, 23 (1973). The Court did not engage in an analysis of the expressive nature of the speech. Here, by contrast, the crux of the issue is *whether* Plaintiffs are engaged in expressive activity by curating personalized feeds. Setting aside these differences, SB 976 does not require Plaintiffs to remove content from their platforms. In turn, minor users remain free to search for specific content, thereby receiving information and ideas. *See* Brief for the States of New York et al. as Amici

---

separately from § 27000.5. See YouTube Mot. 26–27. However, despite addressing the Sections separately, YouTube's argument necessarily relies on a finding that YouTube's personalized feeds reflect "expressive curation decisions." *Id.* at 27. Because the Court has found that personalized feeds do not reflect an expressive message insofar as they merely reflect to users their revealed preferences, YouTube's argument that the default restrictions impose "serious burdens" on the resulting "constitutionally protected speech" collapses on itself.

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

Curiae in support of Defendant 12, ECF No. 52-1 (noting that the Act permits platforms to recommend any media that is responsive to a user's affirmative conduct).

Plaintiffs suggest that because of the mountainous amount of content on their platforms, relying strictly on the search function may not yield the results that a user is hoping for, and the Act therefore *burdens* minors' right to access the speech. *See* YouTube Mot. 21; TikTok Mot. 22. Plaintiffs rely heavily on *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000), where Playboy challenged the Telecommunications Act of 1966's requirement that television operators take affirmative action to "fully scramble or otherwise fully block" channels that were primarily dedicated to sexually explicit programming. *Id.* But there was no dispute in *Playboy* that the programming itself was protected by the First Amendment, and "[t]o comply with § 505, the majority of cable operators adopted the 'time channeling' approach, so that, for two-thirds of the day, no viewers in their service areas could receive the programming in question." *Id.* at 803. Whereas here, users can still access content that might otherwise appear in their personalized feed by manual search.

For these reasons, the Court finds Plaintiffs' alternative argument similarly unavailing.

## C.    Right to Disseminate Fully Protected Speech

Meta also independently argues that the Act burdens its right to disseminate fully protected speech, a variant of Plaintiffs' argument that the Act unlawfully restricts users' access to information and ideas. *See* Meta Mot. 17–20. Meta principally relies on case law affirming its First Amendment right "to use its platform to promote views it finds congenial and to refrain from promoting views it finds distasteful" or, otherwise stated, to engage in content moderation. *Children's Health Def. v. Meta Platforms, Inc.*, 112 F.4th 742, 759 (9th Cir. 2024); *see also* Meta Mot. 17 (citing *Children's Health Def.*; *Moody*, 603 U.S. 707 (2024); *NetChoice v. Bonta*, 152 F.4th 1002, 1015 (9th Cir. 2025)). For the reasons discussed above, the Court finds that content-moderation decisions, which are "expressive choices," are distinct from the user data-driven personalization components of Meta's feeds that are the subject of the challenged provisions of the Act in this Action. *See infra* Section III.A.2. Because personalization efforts that rely strictly on

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

user preferences to convey content that the user is likely to find "interesting" do not convey an expressive message, the Court finds that Meta's argument here fails as the resulting compilation is not "fully protected speech."

In a footnote, Meta argues that the *Moody* Court expressly held that its reservations as to the expressive nature of a feed whose algorithms respond solely to users' activity were inapplicable to Facebook's feed because of the content moderation at play. *See* Meta Mot. 18 n.2. But "activities that are expressive in one context are not necessarily expressive in all others," and courts must distinguish between speech and non-speech elements. *See NetChoice I*, 761 F.Supp.3d at 1219, 1223. Meta's interpretation is an overextension of the Court's position in *Moody* which, as discussed above, was careful to consider only the issue before it: content moderation. *See Moody*, 603 U.S. 727 n.3 ("So our explanation of why Facebook and YouTube are engaged in expression when they make *content-moderation choices* in their main feeds should inform the courts' further consideration of that issue." (emphasis added)); *NetChoice I*, 761 F. Supp.3d at 1221. While the Court carefully carved out from its analysis feeds that were devoid of content moderation decisions (*i.e.*, those that respond solely to how users act online), the Court's decision should not be read for the proposition that any time a content moderation decision is part of a feed's overall mix, the entire feed is itself expressive.

Because Plaintiffs have not shown that their personalized feeds constitute fully protected speech, the Court likewise finds Meta's argument that the Act impermissibly burdens its First Amendment right to disseminate fully protected speech is not likely to succeed on the merits.

### D.    YouTube's Challenges to the Default Provisions

In addition to arguing that the default restrictions violate the First Amendment, YouTube also argues that these restrictions are void for vagueness because they do not provide fair notice of "conduct that is forbidden or required." YouTube Mot. 28 (citing *FCC v. Fox Television Stations*, 567 U.S. 239, 253 (2012)). Vagueness challenges based on a failure to provide a reasonable opportunity to know which conduct is forbidden by a statute are typically brought where criminal sanctions may be imposed, but the Supreme Court has also held that "[b]ecause First Amendment

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
20

freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Hum. Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1020 (9th Cir. 2010) (quoting *NAACP v. Button,* 371 U.S. 415, 433 (1963)). Because the Court finds that the challenged default provisions do not restrict YouTube's First Amendment rights based on the presented challenge, the Court examines the challenge "in light of the facts of the case at hand." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946 (9th Cir. 2013).

YouTube argues that the term "verified parent" is vague. YouTube Mot. 28. Section 27000.5 defines "Parent" as a "parent or guardian, including as defined in regulations promulgated pursuant to this chapter." "Verified" is not defined, which YouTube contends is fatal to the Act. YouTube Mot. 28.

"A statute is impermissibly vague if it 'fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement.'" *Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (citing *United States v. Mincoff*, 574 F.3d 1186, 1201 (9th Cir. 2009)). But "perfect clarity is not required even when a law regulates protected speech." *Hum. Life of Washington Inc.*, 624 F.3d at 1019. Courts look to the ordinary, contemporary, common meaning of a term undefined by statute as well as the word's surrounding context. *See Arce*, 793 F.3d at 1021 (first citing *United States v. Kilbride,* 584 F.3d 1240, 1257 (9th Cir. 2009), then citing *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).

The Court finds that, as used in the Act, "verified" is not impermissibly vague. In analyzing whether a phrase or word is susceptible to an ordinary meaning, courts often consider the dictionary definition of the word . *See e.g.*, *Matsumoto v. Labrador*, 122 F.4th 787, 807 n.15 (9th Cir. 2024) (considering the Oxford English Dictionary, Mirriam-Webster Dictionary, and Cambridge Dictionary's definitions of a term not defined in the statute). Where "parent" is a defined term within the Act, one can reasonably assume that "verified" modifies the word "parent." *See cf. Washington Educ. Ass'n v. Nat'l Right to Work Legal Def. Found., Inc.*, 187 F. App'x 681, 682 (9th Cir. 2006). Rather than consider the plain meaning of the word "verify," YouTube seems to skip a step and argue that "*verification* eludes a readily understood plain

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.

United States District Court
Northern District of California

meaning." YouTube Mot. 28 (emphasis added). However, "verify" is readily understood and has a plain meaning. Indeed, Black's Law Dictionary, the dictionary which YouTube consulted to define "verification," defines "verify" in two ways: "(1) to prove to be true; to confirm or establish the truth or truthfulness of; to authenticate; (2) to confirm or substantiate by oath or affidavit; to swear to the truth of." Verify, Black's Law Dictionary (12th ed. 2024). Despite YouTube's concern that the term "verified" may encompass an array of different procedures, as in *Matsumoto*, the Court finds that the ordinary meaning is sufficiently clear, and provides notice to operators of the subject services or applications that they must verify a person's status as a minor's "parent" before modifying the default settings. *See Matsumoto*, 122 F.4th at 805–06. For this reason, the Court also finds YouTube's vagueness argument unlikely to succeed.

## IV.    CONCLUSION

For the reasons above, the Court **DENIES** Plaintiffs' preliminary injunction motions. The Court notes that this is a *preliminary* injunction and further factual development could reveal that provisions not enjoined now are unconstitutional. For the time being, Bonta may enforce §§ 27001(a), 27002(b)(2), and 27002(b)(4).

**IT IS SO ORDERED.**

Dated: August 5, 2026

EDWARD J. DAVILA
United States District Judge

Case Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD
ORDER DENYING MOTS. FOR PRELIM. INJ.
22